IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
 _____
                               :
MAJOR TOURS, INC., et. al.,    :      HON. JEROME B. SIMANDLE
                               :
              Plaintiffs,      :      Civil No. 05-3091 (JBS/JS)
                               :
      v.                       :
                               :           OPINION
MICHAEL COLOREL, et. al.,      :
                               :
              Defendants.      :
 _____:
```

APPEARANCES:

Terry Davon Johnson, Esq.
BLANK ROME LLP
301 Carnegie Center
3rd Floor
Princeton, NJ 08540
     -and-
Thomas Kane, Esq.
44 Magnolia Court
Lawrenceville, NJ 08648
     -and-
Ezra D. Rosenberg, Esq.
William Gibson, Esq.
DECHERT LLP
Princeton Pike Corporate Center
997 Lenox Drive
Building 3, Suite 210
Lawrenceville, NJ 08648
     -and-
Yvette Claudia Sterling, Esq.
Barbara E. Ransom, Esq.
STERLING LAW FIRM, L.L.C.
400 High Street
Suite A
Burlington City, NJ 08016
     -and-
Michael Churchill, Esq.
Public Interest Law Center Of Philadelphia
1709 Benjamin Franklin Pkwy.
Second Floor
Philadelphia, PA 19103
     Counsel for Plaintiffs

Nonee Lee Wagner, Deputy Attorney General
Wayne J. Martorelli, Deputy Attorney General
Office of the NJ Attorney General
25 Market Street
PO Box 114
Trenton, NJ 08625
        -and-
Holly Rebecca Rogers, Esq.
DILWORTH PAXSON LLP
1500 Market Street
3500E
Philadelphia, PA 19102
        -and-
John J. Higson, Esq.
DILWORTH PAXSON, LLP
The Mellon Bank Center, 3200
1735 Market Street
Philadelphia, PA 19103
        Counsel for Defendants Michael Colorel, New Jersey
        Department of Transportation, Sharon Harrington, Diane
        Legriede, Vincent Shulze, New Jersey Motor Vehicle
        Commission, Kris Kolluri, and John F. Lettiere

William J. Pollinger, Esq.
WILLIAM J. POLLINGER, P.A.
Claridge Plaza
302 Union Street
Hackensack, NJ 07601
        Counsel for Defendants Jimmy's Lake Side Garage and James
        Restuccio


**SIMANDLE**, District Judge:

## Table of Contents


I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . 3
II.  BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . 4
III. DEFENDANTS' MOTION TO DISMISS . . . . . . . . . . . . . 12
     A.   Rooker-Feldman Doctrine . . . . . . . . . . . . . 12
     B.   Younger Abstention . . . . . . . . . . . . . . . . 17
          1.   Nature of the Interference . . . . . . . . . 19
          2.   Dismissal of Damages Claims . . . . . . . . 22
          4.   Prospective Injunction . . . . . . . . . . . 23
     C.   Sovereign Immunity . . . . . . . . . . . . . . . . 25
     D.   Sufficiency of Factual Allegations . . . . . . . . 29

2

        1.   New Jersey Civil Rights Act and Section 1983
           Claims with respect to Equal Protection . . . . 31
        2.   Procedural Due Process . . . . . . . . . . . 37
        3.   Substantive Due Process . . . . . . . . . . 38
        4.   Interstate Commerce and Right to Travel . . . . 41
        5.   Conversion . . . . . . . . . . . . . . . . 46
        6.   Federal and State Conspiracy Claims. . . . . . 46
   E.   Governmental Immunity . . . . . . . . . . . . . . 48
   F.   Statute of Limitations . . . . . . . . . . . . . 51
IV.  PLAINTIFFS' MOTION TO AMEND . . . . . . . . . . . . 54
   A.   Procedural Background . . . . . . . . . . . . . 54
   B.   Standard of Decision . . . . . . . . . . . . . . 57
   C.   New Allegations Regarding Supervisory Defendants .. 57
   D.   Additional Claims and Other New Allegations . . . . 59
   E.   Clarifying Amendments . . . . . . . . . . . . . 62
   F.   Summary . . . . . . . . . . . . . . . . . . . 64
V.   APPEAL OF MAGISTRATE JUDGE ORDER . . . . . . . . . . 64
   A.   Background of the E-mail Discovery Dispute . . . . . 65
   B.   Standard of Review . . . . . . . . . . . . . . . 69
   C.   Analysis . . . . . . . . . . . . . . . . . . . 70
        1.   De Novo Review . . . . . . . . . . . . . . . 70
        2.   Abuse of Discretion . . . . . . . . . . . . . 75
VI.  CONCLUSION . . . . . . . . . . . . . . . . . . . . 76

## I.  INTRODUCTION

This civil rights case involves allegations of racial discrimination in New Jersey's system of commercial bus safety inspections.  Plaintiffs bring this action against two groups of defendants, the state agencies and officials who operate the inspection system ("State Defendants") and a repair shop and its owner who Plaintiffs allege are involved in the discrimination ("Garage Defendants").  The matter is before the Court on the State Defendants' motion to dismiss under Rules 12(b)(1) and 12(b)(6), Fed. R. Civ. P. [Docket Item 260] and Plaintiffs' crossmotion to file a Fourth Amended Complaint under Rule 15,

Fed. R. Civ. P. [Docket Item 287].[1]  Both sets of Defendants oppose the motion to amend.  Plaintiffs also appeal a decision of Magistrate Judge Schneider regarding preservation of government emails and discovery of email backup tapes [Docket Item 284].

For the reasons explained below in today's Opinion, the Court will grant the State Defendants' motion to dismiss except as to certain claims against Defendants Shulze and Colorel.[2]  The Court will deny the motion to amend except insofar as it clarifies the current complaint with respect to the remaining claims because the additional claims and allegations are unduly delayed and prejudicial.  Magistrate Judge Schneider's discovery ruling will be affirmed.

## II.  BACKGROUND

New Jersey's Bus Safety Compliance Act ("BSCA") creates a

---

[1]  The labeling of the amended complaints became out of sync at some point.  While the parties label this proposed complaint the Third Amended Complaint, which is consistent with the docket entries, it would in fact be the Fourth Amended Complaint.  See Complaint [Docket Item 1]; First Amended Complaint [Docket Item 3]; Second Amended Complaint [Docket Item 46]; and Third Amended Complaint [Docket Item 128].  This opinion refers to the Third Amended Complaint as either "the current complaint" or simply "the Complaint."

[2]  Plaintiffs' various submissions to the Court are internally inconsistent with regard to the spelling of Mr. Colorel/Calorel's name (Colorel in the first complaint, Calorel in the current complaint) and Mr. Shulze/Schulze/Shultz's name (Shulze in the original caption, Schulze and Shultz both in ¶ 17 of the current complaint).  The Court will use the spellings in the caption until the parties provide the correct spelling.

system of inspections to promote vehicle safety.  N.J. Stat. Ann. § 48:4-2.1.  Federal law makes states eligible to receive federal grants if they adopt and enforce certain safety regulations.  49 C.F.R. §§ 350.107, 350.201(a).  Regulations promulgated pursuant to the BSCA expressly adopt and incorporate by reference certain federal rules pertaining to safety of vehicle equipment in order to receive grants under the federal program.  N.J. Admin Code § 16:53-1.1 (adopting 49 C.F.R. § 393).  The BSCA regulations, modeled on these federal rules, provide that authorized officers can direct any bus operated in New Jersey to immediately drive to a designated facility for inspection.  N.J. Admin Code § 16:53A-6.1.  Buses discovered to have a mechanical condition that would likely cause an accident or a breakdown, a so-called "out-of-service violation," may be required to unload passengers and be prevented from operating until the conditions have been repaired on-site or until towed and fixed at a repair facility. N.J. Stat. Ann. § 48:4-2.1(h).  Additionally, the bus company is subject to civil penalties for each violation.  N.J. Stat. Ann. § 48:4-2.1(f).

Plaintiffs are six African American owned and operated bus companies and their individual owners.[3]  They offer bus tours

---

[3]  The Plaintiffs are:  Charles Major and Major Tours, Inc., Victoria Daniels and M & M Tours, James Wright and JW Auto, Inc., Glen Ragin, Sr. doing business as Jamm Tours, Robert Allen, and Carl Revels doing business as CMT Express.  Where not otherwise indicated, these facts are recited as alleged in the Complaint.

5

between Pennsylvania and casinos that market to African Americans in Atlantic City, New Jersey.  Both the passengers and drivers of the buses are largely African American.  Beginning in 2000, according to Plaintiffs, they allegedly began to experience a pattern of racial discrimination in the bus inspection program that is ongoing.

Specifically, Plaintiffs allege that bus inspectors gather near casinos that have primarily African American clientele, targeting casino buses, instead of randomly selecting buses for inspection.  They claim that this initially discriminatory targeting leads to further increased scrutiny, because buses may be stopped based on data collected during prior inspections and kept in a database, leading to further stops and inspections.

Plaintiffs allege that when they are stopped, they are often subjected to the highest level of inspection, unlike white-owned bus operators with inferior safety and compliance records.  They allege that even the highest level of inspection should only take about an hour, but that inspections of Plaintiffs' buses typically take three to four hours.

Plaintiffs allege that the inspectors fabricate violations of the BSCA, finding out-of-service violations even on new or nearly-new buses.  When a violation is found or invented, Defendants discriminate against them by exercising their discretion to require towing to a repair shop instead of allowing

6

on-site repair.  The inspectors require the buses to be towed to
Jimmy's Lake Side Repair Shop, owned by Defendant James
Restuccio, who charges them above the prevailing market rates,
subjects them to verbal abuse, and "typically cannot perform the
allegedly necessary repairs," requiring Plaintiffs to tow the
buses elsewhere for repairs.  (Compl. ¶ 35.)  The inspectors
allow white-owned bus operators to select the repair centers when
those buses require repair.

Plaintiffs allege that when a bus does pass an inspection,
it is supposed to receive a sticker that would prevent the bus
from being inspected again during the quarter during which the
sticker was issued.  Their buses do not receive these stickers
when they pass inspection.

According to the Complaint, at least some of the allegedly
discriminatory incidents resulted in summonses being issued to
Plaintiffs, leading to municipal court adjudication of the out-
of-service violations.  What proportion of allegedly
discriminatory inspections turned up out-of-service violations,
and what proportion of those resulted in summonses is unclear.
The only allegations or evidence presented to the Court with
respect to these municipal court adjudications is the vague
mentions in the Complaint of fines assessed to Plaintiffs,
Defendant's exhibit purporting to be a "representative sample" of
municipal court adjudication docket transcripts, and Defendants'

representation in their brief that no municipal court
adjudication was ever appealed, and that all of them resulted
either in a finding of violation, or a plea agreement.  (Defs.'
Br. Supp. Motion to Dismiss, at 4-5, Ex-A "Representative Sample
of Adjudications.".)

The Defendants are the state agencies, the New Jersey
Department of Transportation (NJDOT) and New Jersey Department
Motor Vehicle Commission (NJMVC), and various state officials
involved in the bus inspections as well as Jimmy's Lakeside
Garage and its owner.  There are no allegations in the Complaint
regarding the conduct of any individual state officer.  Instead,
the Complaint contains only blanket accusations, such as that
"[d]efendants and their agents have taken all of these
discriminatory and harassing actions both directly and through
ratification of others' acts."  (Compl. ¶ 38.)  The complaint
also does not refer to any particular incidents of the alleged
pattern of conduct, nor does it provide any dates other than the
approximate starting date of the general pattern of conduct in
2000.

The Complaint's federal claims include three counts.  Count
I is a 42 U.S.C. § 1983 claim based on several provisions of the
United States Constitution.  It claims Defendants' discriminatory
practices violate the Equal Protection Clause of the United
States Constitution, the Interstate Commerce Clause, and the

Privileges and Immunities clause of Article IV protecting the
right to travel freely between states.[4]  Plaintiffs also argue as
part of Count I that Defendants have violated Plaintiffs' rights
of procedural due process in some unspecified way, and attempted
to cover up the illegal acts set forth in the Complaint, which is
a violation of Plaintiffs' substantive due process rights.  Count
II is a 42 U.S.C. § 1981 claim, arguing that Defendants
interfered with Plaintiffs' contractual relationship with their
customers by preventing Plaintiffs from making and performing
contracts with their customers, and preventing Plaintiffs from
contracting with towing companies of Plaintiffs' choice, instead
forcing them to use Jimmy's Towing.  The current complaint is
unclear about which defendants the § 1981 claim is brought
against, but Plaintiffs' proposed Fourth Amended Complaint would
clarify that this claim is only against the Garage Defendants.
Count III is a 42 U.S.C. § 1985(3) claim that alleges a
conspiracy to carry out the pattern of conduct alleged in the
Complaint.

Plaintiffs' state law claims also include three counts.
Count IV is a New Jersey Civil Rights Act claim that mirrors the
§ 1983 claim.  See N.J. Stat. Ann. 10:6-2(c) & (e); Compl. ¶¶

---

[4]  Plaintiffs do not bring any claims under the Fourth
Amendment, nor make any challenge to the regulatory scheme
itself.  See generally Delaware v. Prouse, 440 U.S. 648 (1979)
(explaining the constitutional limits on safety checks performed
by officers in the field).

66–77.  Plaintiffs claim that Defendants' alleged conduct violates provisions of the New Jersey Constitution analogous to the provisions of the United States Constitution they claim were violated, and Plaintiffs also identify a number of provisions of Chapter 30 of the New Jersey Code of Criminal Justice that they claim Defendants violated.  Count V is a conversion claim against the Garage Defendants and two inspection officers, Shulze and Colorel, based on their refusal to return one or more buses to Plaintiffs.  The factual allegations supporting Count V refer to "Defendant Jimmy's," as well as "Defendants" generally.  But Plaintiffs clarify in their opposition to the motion to dismiss that they intended the claim to apply only to the Garage Defendants and the two state officials acting in their individual capacities, which is reflected in the proposed Fourth Amended Complaint.  Count VI is a state law civil conspiracy claim against all defendants based on the same conduct underlying the § 1985(3) conspiracy claim.

Plaintiffs seek compensatory and punitive damages, as well as the disgorgement of "any illegally-collected fees, charges, or other sums that Plaintiffs have paid as a proximate result of Defendants' discriminatory and illegal acts."  (Compl. ¶ 92(c).)  They clarify in their opposition to the motion to dismiss that their reference to disgorgement refers to only fees and charges paid to the Garage Defendants for towing and storage (Pls.' Br.

Opp. Motion to Dismiss, at 22), and they seek to amend the Complaint to clarify this point.  Plaintiffs also ask for equitable relief including a declaration that Defendants violated the laws upon which Plaintiffs rely, and an injunction against future such unlawful action.

The initial complaint was filed by the original Plaintiffs (Charles Major and Major Tours, Inc., as well as Victoria Daniels and M & M Tours) on June 15, 2005.  After the first complaint was filed, the parties conducted nearly four contentious years of discovery.  During this period, the initial Plaintiffs amended the Complaint several times adding additional Plaintiffs, among other changes.  Magistrate Judge Schneider ordered Defendants not to file dispositive motions with respect to the current complaint until this time.  [Docket Item 124.]

The State Defendants now move to dismiss the Complaint on a number of grounds.  These include the Rooker-Feldman doctrine and Younger abstention because of municipal court rulings on out-of-service violation penalties levied against Plaintiffs; sovereign immunity; failure to file within the statute of limitations; and various insufficiencies in the allegations as to particular claims.  Plaintiffs move to file a Fourth Amended Complaint in response to Defendants' motion to dismiss, seeking to add some allegations regarding the supervisory defendants' failure to train and investigate, to clarify parts of the Complaint, as

discussed above, and to add two new causes of action related to the same conduct: a claim under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, against the State Defendants and a claim under the New Jersey Law Against Discrimination (NJLAD), N.J. Stat. Ann. § 10:5-1, against all defendants.

## III.  DEFENDANTS' MOTION TO DISMISS

### A.  **Rooker**-**Feldman** Doctrine

According to the Rooker-Feldman doctrine, a federal district court cannot entertain what is functionally an appeal from a state court decision because Congress has only granted the power to hear such appeals to the United States Supreme Court.  See 28 U.S.C. § 1257 (2006) (allowing appeal from state court decisions to the United States Supreme Court); Rooker v. Fidelity Trust Co., 263 U.S. 413, 415-16 (1923); District of Columbia Court of Appeals v. Feldman, 460 U.S. 462, 483-84 (1983); Gary v. Braddock Cemetery, 517 F.3d 195 (3d Cir. 2008).  Defendants argue that this Court therefore lacks subject matter jurisdiction over Plaintiffs' Complaint, which they characterize as seeking relief from the municipal court adjudications of Plaintiffs' out-of-service violations.

The Supreme Court explained the scope of the doctrine in Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. 280 (2005).  In Exxon, the Supreme Court was concerned with what it

12

saw as the improper application of the <u>Rooker</u>-<u>Feldman</u> doctrine in the Third Circuit and elsewhere when ordinary principles of preclusion and abstention should govern the situation.  <u>Exxon</u>, 544 U.S. at 1521-22.  The Supreme Court emphasized that the only cases that constitute functional appeals are "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the federal district court proceedings commenced and inviting district court review and rejection of those judgments."  <u>Id.</u>  Thus, "If a federal plaintiff presents some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party, then there is jurisdiction and state law determines whether the defendant prevails under principles of preclusion."  <u>Exxon</u>, 544 U.S. at 293 (internal quotations and citations omitted); <u>see also</u> <u>Turner v. Crawford Square Apartments III, L.P.</u>, 449 F.3d 542, 547-48 (3d Cir. 2006); <u>Bolden v. City of Topeka</u>, 441 F.3d 1129, 1143 (10th Cir. 2006).

Although the Complaint argues that some of the out-of-service violations were improper, Plaintiffs seek redress not from the civil penalties themselves but the private costs and interference with their business caused by the inspections, towing, and repair.  Moreover, except for claims of outright fabrication of violations, Plaintiffs' claims do not even conflict with any state court decisions as that conflict is

13

understood for the purposes of Rooker-Feldman, because the claims
do not ask the Court to deny the legal conclusions actually
reached by any municipal court in this matter.

The Third Circuit Court of Appeals decision in Desi's Pizza,
Inc. v. City of Wilkes-Barre, 321 F.3d 411 (3d Cir. 2003),
controls this case with respect to the claims other than the
fabrication claims.  In that case, the district court had found
that the state court's determination that the plaintiff was a
nuisance had necessarily determined that the defendants' "conduct
was unrelated to retaliation or [to Desi's'] minority clientele."
Id. at 418.  But the Third Circuit Court of Appeals disagreed and
reversed, finding that "the state court's finding that Desi's was
a 'common nuisance' means only that Desi's operated in violation
of the Liquor Code or the Crimes Code."  Id. at 423.  As in
Desi's, in this case, the municipal court's adjudications related
to the out-of-service violations did not determine whether the
summonses for those violations were issued selectively, or
otherwise as a result of selective stops, selectively increased
scrutiny, or any other kind of discriminatory investigation or
enforcement.[5]  Therefore, because there is no conflict with the

_____

        [5]  Although there is no conflict with the state decision as
such conflict is understood for Rooker-Feldman purposes, the
collateral conflict that is present when a federal court finds
that the state court defendant would have had a meritorious
defense is considered in the next section as a factor in the
determination of whether this Court must abstain from hearing
these claims under Younger.  See Part III.B infra.

state court adjudications, this Court retains jurisdiction.  Cf. Marran v. Marran, 376 F.3d 143, 154 (3d Cir. 2004) (applying similar analysis); Parkview Associates Partnership v. City of Lebanon, 225 F.3d 321, 326 (3d Cir. 2000); Ernst v. Child and Youth Services of Chester County, 108 F.3d 486, 491-92 (3d Cir. 1997).

    To the extent Plaintiffs complain of fabricated violations that were ultimately the subject of municipal court proceedings, as distinct from fabrications that merely led to interference with Plaintiffs' business and towing, then these violations do meet the first prong of Rooker-Feldman doctrine, conflict with a state decision.  Unlike the claims of selective enforcement, the municipal courts necessarily decided that the violations were well founded and not fabricated in finding violations of the Compliance Act.  But while this conflict satisfies one necessary element for dismissal under Rooker-Feldman as set out by the Supreme Court in Exxon, it does not satisfy the other.

    Even where allegedly fabricated violations were ultimately adjudicated, the Court retains subject matter jurisdiction over "independent claim[s]" that deny "a legal conclusion that a state court has reached."  Exxon, 544 U.S. at 293.  This court has jurisdiction over the claims arising from the fabrication seeking relief from injuries other than the civil penalties, because Rooker-Feldman doctrine requires both conflict with the state

court decision and that the relief sought is "complaining of injuries caused by state-court judgments."  Id.  If inspection officers deliberately fabricated violations of the Compliance Act leading to towing and garage fees, then they injured Plaintiffs independently from any subsequent municipal court rulings because these injuries would have occurred regardless of whether the municipal courts ultimately adjudicating the matters believed the violations had been fabricated.  A cause of action for this kind of malicious conduct arises even before such a deliberately fabricated violation is the subject of a court action.  Cf. Wallace v. Kato, 549 U.S. 384, 388-91 (2007) (describing accrual of claims regarding wrongful arrest and prosecution).  This Court has jurisdiction over these claims to the extent Plaintiffs' injuries are independent from the fines, and Plaintiffs do not seek disgorgement of the fines paid to the state.

In summary, the Rooker-Feldman doctrine does not prevent this Court from having jurisdiction to hear Plaintiffs' claims involving unlawful exercise of discretion on the part of state officers because the exercise of this jurisdiction will not involve the possible denial of legal conclusions reached by any state court, much less ask for relief from state court judgments. And to the extent that Plaintiffs seek relief from fabricated violations of the Compliance Act that were the subject of municipal court proceedings, the Court has subject matter

16

jurisdiction over relief from injuries independent from the
municipal court judgments.[6]

### B. __Younger__ Abstention

Defendants argue that the relief Plaintiffs request would
interfere with pending state judicial proceedings, and this Court
should therefore abstain from hearing this case.  In Younger v.
Harris, 401 U.S. 37 (1971), the Supreme Court held that for
reasons of federal-state comity, a federal court should not
enjoin a pending state court criminal proceeding absent
extraordinary circumstances.  Id. at 41.  This principle has been
greatly expanded over time to cover a wide range of state
judicial proceedings and to prevent kinds of interference less
direct than an injunction to halt a state proceeding.  Middlesex
County Ethics Comm. v. Garden State Bar Assoc., 457 U.S. 423, 431
(1982).  With a few exceptions for the kind of extraordinary
circumstances contemplated by Younger, federal courts are now
expected to stay or dismiss any claim for relief whenever it
would interfere with a pending state judicial proceeding that

---

[6] The Court's frequent use of the construction "to the
extent" in this Opinion is indicative of the lack of clarity with
respect to Plaintiffs' claims even at this relatively late stage.
In the interests of advancing this case toward a resolution, the
Court has attempted to determine these issues as best it can, as
requested by the parties.  But Defendants may wish to move to
submit contention interrogatories to Plaintiffs, pursuant to Rule
33, Fed. R. Civ. P., to clarify the exact nature of each of the
Plaintiffs' claims with respect to each Defendant.

implicates important state interests and affords an adequate opportunity to raise constitutional challenges.  Zahl v. Harper, 282 F.3d 204, 209 (3d Cir. 2002).

Although the decisions of the municipal court have become final as a result of Plaintiffs failure to appeal, they are still considered pending.  See Huffman v. Pursue, Ltd., 420 U.S. 592, 610 (1975); O'Neill v. City of Philadelphia, 32 F.3d 785, 790-91 (3d Cir. 1994).  However, even though the municipal court proceedings are pending, in order for abstention to be appropriate here, this Court would have to hold that the doctrine applies to damages claims that could not have been raised in the state proceeding, but that require the adjudication of facts that could have been (but were not) adjudicated.  Additionally, because the final state court judgments can no longer be reopened just to raise old arguments, the Court would have to find that it has the power to enter a stay of a damages claim that is indistinguishable from a dismissal of that claim, even though the Court cannot dismiss a damages claim pursuant to abstention doctrine.  See Deakins v. Monaghan, 484 U.S. 193, 202 (1988).  And finally, the Court would have to hold that abstention is necessary for the damages claims even though the same facts will be adjudicated to assess the propriety of Plaintiffs request for a prospective injunction.  As explained below, because the Court is not convinced of any of these propositions, much less all of

18

them, the Court finds that abstention is inappropriate.

### 1.  Nature of the Interference

This case is different from the typical <u>Younger</u> case. Plaintiffs do not seek to vacate their municipal court convictions; to disgorge the fines paid in the municipal court proceedings; to enjoin the municipal court from adjudicating out-of-service violations; or otherwise ask for any relief involving the municipal court's past, current, or future conduct; and they do not challenge the validity of any state law or regulation, but only the racially discriminatory conduct of certain state officers.  Consequently, the state interests protected by <u>Younger</u> abstention, such as giving the state courts an opportunity to alter the construction of state law to make it constitutional, or permitting the state to set its own practices and procedures for adjudication, are largely absent in this case.  <u>Gwynedd Properties, Inc. v. Lower Gwynedd Tp.</u>, 970 F.2d 1195, 1202 (3d Cir. 1992) (finding a lack of important state interest because "[u]nlike the state proceedings in which the legality of land use ordinances are at issue, here [plaintiff] alleges that the defendants have applied these ordinances maliciously in order to deprive [plaintiff] of its federal constitutional and statutory rights"); accord Addiction Specialists, Inc. v. Township of Hampton, 411 F.3d 399, 409 (3d Cir. 2005).

However, there is still some degree of interference with state interests; the question is whether it is enough to justify abstention in this case.  Plaintiffs could have raised defenses in the municipal court proceedings (or upon appeal) involving the same operative facts as their constitutional claims in this case. If federal courts condone the decision not to raise the constitutional issues in state court, it might suggest a lack of faith in the state proceedings to competently adjudicate those issues.  In Huffman, the Supreme Court found that depriving states of the opportunity to adjudicate constitutional issues did implicate comity principles.  See Huffman, 420 U.S. at 608-09. But, among other differences from this case, the Huffman court emphasized that this consideration was especially important when "the constitutional issue involves a statute which is capable of judicial narrowing."  Id.  Claims of racial discrimination or fabrication of violations are not remedied by judicial narrowing of any statute or regulation.  Huffman did not involve a damages claim, much less one brought based on unconstitutional conduct that is independent from the validity of any statute, undermining its application to this case.

The Third Circuit Court of Appeals has used similar reasoning as Huffman in an action for damages in Williams v. Hepting, 844 F.2d 138, 144 (3d Cir. 1988).  In that case, the Court of Appeals found that where a § 1983 damages claim attacks

20

a state criminal conviction, the proper course is to stay the damages claim until state proceedings have ended.  But <u>Williams</u> does not seem to have been applying abstention principles, but rather applying principles unique to the criminal context, prefiguring <u>Heck v. Humphrey</u>, 512 U.S. 477, 486-87 (1994).  <u>See</u> <u>Williams</u>, 844 F.2d at 144 (noting previous holdings that § 1983 claims in this scenario "would interfere with congressional policy requiring initial resort to state tribunals in habeas corpus petitions.").[7]

Neither the Third Circuit Court of Appeals nor the Supreme Court have decided whether <u>Younger</u> abstention applies to claims for damages that interfere with state proceedings in the way described above.  <u>See</u> <u>Quackenbush v. Allstate Ins. Co.</u>, 517 U.S. 706, 728 (1996).  And at least some controlling authority suggests <u>Younger</u> abstention is not appropriate.  <u>See</u> <u>Gwynedd Properties, Inc.</u>, 970 F.2d at 1202.  Because the state interests <u>Younger</u> is intended to protect are largely inapplicable here, the

---

[7]  Because Congress has made habeas corpus the exclusive remedy for wrongful criminal conviction, <u>Heck</u> construed the scope of § 1983 to exclude claims that would imply the invalidity of an underlying criminal conviction or sentence until such a conviction or sentence has been appropriately "reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." <u>Id.</u>  <u>Heck</u> does not apply in cases where there is no habeas remedy.  <u>See</u> <u>Spencer v. Kemna</u>, 523 U.S. 1, 21 (1998) (Ginsburg, J., concurring); <u>Leather v. Eyck</u>, 180 F.3d 420, 424 (2d Cir. 1999).

Court is not convinced that abstention is called for based on the state's general interest in adjudicating whether individual officers acted in an unconstitutional manner when enforcing an unchallenged state statute.

       2.   Dismissal of Damages Claims

Even if this Court found that the federal-state friction present when a district is asked to adjudicate facts that could have been adjudicated in a state court action was important enough to justify Younger abstention, the Third Circuit Court of Appeals held in Williams that because a damages claim seeks relief that is unavailable in ongoing coercive proceedings, the only appropriate action is to stay the damages claims until the conclusion of the state proceedings; the claim cannot be dismissed.  Id. at 144-45.

This rule is the necessary consequence of the scope of this Court's power to decline jurisdiction.  <u>Deakins v. Monaghan</u>, 484 U.S. 193, 202 (1988) ("[T]he District Court has no discretion to dismiss rather than to stay claims for monetary relief that cannot be redressed in the state proceeding.").  District courts have the power to dismiss injunctive relief only because courts control the discretionary relief they grant as courts sitting in equity.  <u>See</u> <u>Quackenbush</u>, 517 U.S. at 719-20, 728.  If <u>Younger</u> abstention applies to actions for damages at all, it requires a

temporary stay; it is impermissible to dismiss actions for damages that were not cognizable in ongoing state proceedings. Id.

The question is therefore whether the Court could enter such a stay in a case where the state judgement has become final and cannot be reopened.  It could be that even though the Court lacks the power to dismiss the damages claims, by some trick of formalism, it retains the power to enter an infinite stay.  But this position is untenable.  An infinite stay is dismissal in all but name, and matters of jurisdiction and vindication of constitutional rights must not be made to turn on nomenclature alone.  In the precedent explaining why dismissal of a damages claim outright is impermissible, and permitting a stay, the courts have distinguished the concepts precisely based on premise that the federal proceedings can be resumed at some point.  See, e.g, Hepting, 844 F.2d at 144.  In creating the rule of infinitely pending proceedings, neither Huffman nor O'Neill involved actions for damages that were independent from the state proceedings, and therefore neither court contemplated nor condoned the possibility that an action for damages may be functionally dismissed if a plaintiff fails to exhaust his appeals of a civil penalty.

3.  Prospective Injunction

23

Finally, even if abstention applies to these kinds of
damages claims based on the unconstitutional conduct of
individual officers, and even if the Court had the power to enter
an infinite stay of such claims, abstention is this case would
still be inappropriate because it serves no functional purpose as
the Court must make these factual findings regarding the bus
inspections anyway, since Plaintiffs seek a prospective
injunction.  See Wooley v. Maynard, 430 U.S. 705 (1977)
(permitting plaintiff to seek prospective injunction even though
the constitutional judgment would impugn previous convictions).
Plaintiffs ask this Court for prospective injunctive relief,
presumably to include revision of the inspection database and
changing the procedures employed by the bus inspectors, perhaps
including additional training.  To assess whether such an
injunction is warranted, the Court must determine the imminence
of harm or the continuing harm based on past unconstitutional
conduct.  See City of Los Angeles v. Lyons, 461 U.S. 95, 101-02
(1983); O'Shea v. Littleton, 414 U.S. 488, 502 (1974).  The
Supreme Court held in Wooley v. Maynard that, unlike in Huffman,
where "the relief sought is wholly prospective," Younger
abstention does not bar federal exercise of jurisdiction, even
though it might mean making factual and legal findings that the
equivalent of the findings contemplated in Huffman.  Thus, even
if the Court permanently stayed the damages claims, it would

24

still adjudicate the facts that would be the subject of the damages claims, making any abstention an odd formality.

## C.  Sovereign Immunity

Defendants argue that many of Plaintiffs' claims are barred by sovereign immunity as embodied by the Eleventh Amendment.[8] State immunity from suit in federal courts is known as Eleventh Amendment immunity, a subset of a state's sovereign immunity. Fed. Mar. Comm'n v. S.C. State Ports Auth., 535 U.S. 743, 753 (2002).  The parties largely agree about the general scope of Eleventh Amendment immunity, despite Plaintiffs having pleaded several claims that are barred.  Plaintiffs may bring suits for prospective injunctive relief pursuant to federal law against state officers in their official capacities, but not the state itself or state agencies.  Ex Parte Young, 209 U.S. 123 (1908); Cory v. White, 457 U.S. 85, 91 (1982); C.H. ex rel. Z.H. v. Oliva, 226 F.3d 198, 201 (3d Cir. 2000).  Both NJDOT and the NJMVC are state entities.  See Red Star Rowing & Transp. Co. v. Dep't. of Transp. of New Jersey, 423 F.2d 104, 105-06 (3d Cir. 1970); Bowers v. Nat'l Collegiate Athletic Ass'n, 475 F.3d 524,

_____

[8]  Defendants raise this immunity argument in support of their motion to dismiss for lack of subject matter jurisdiction. It is not clear that sovereign immunity is an issue of this Court's subject matter jurisdiction.  See, e.g., Lombardo v. Pennsylvania Dep't of Public Welfare, 540 F.3d 190, 197 n.6 (3d Cir. 2008).  But because the result in this case does not depend on whether it is analyzed as a matter of subject matter jurisdiction or not, the Court will consider it as presented.

545 (3d Cir. 2007).

Defendants correctly note that, under some circumstances, state officials acting in their official capacities are not "persons" subject to suit under § 1983. Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1989). However, the Supreme Court in Will explicitly stated, "Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" Id. at 71 n.10 (quoting Kentucky v. Graham, 473 U.S. 159, 167 (1985)).

State officials are immune from suits in federal court based on violations of state law, including suits for prospective injunctive relief under state law, unless the state waives sovereign immunity. Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 106 (1984). Plaintiffs do not argue that the state has consented to suit in federal court under the New Jersey Civil Rights Act, and the Act itself only provides for actions initiated in New Jersey state court. Therefore, all state law claims will be dismissed as against the state agencies and individuals in their official capacities.

Similarly, although the Eleventh Amendment can be abrogated by Congress pursuant to Congress's power under the Fourteenth Amendment, Seminole Tribe v. Florida, 517 U.S. 44, 59 (1996),

26

Congress did not abrogate sovereign immunity with the passage of the Civil Rights Act of 1871, 42 U.S.C. §§ 1981-1988, or its subsequent amendments.  Quern v. Jordan, 440 U.S. 332, 341-45 (1979).  The Eleventh Amendment therefore bars suits under the federal Civil Rights Act for damages to be paid from the state treasury.  As noted above, although the Complaint appears to ask for disgorgement of fines paid to the state, Plaintiffs clarify in their opposition to the motion to dismiss that they seek only disgorgement of money paid to the Garage Defendants.  (Pls.' Br. Opp. Summ. J., at 21-22).  Efforts to disgorge fines paid into the state treasury would be barred because the Third Circuit Court of Appeals has held that Eleventh Amendment immunity "prevents a federal court from requiring state officers to disgorge from the state treasury even unlawfully converted property."  Bennett v. White, 865 F.2d 1395, 1408 (3d Cir.), cert. denied, 492 U.S. 920 (1989).  See also Hess v. Port Authority Trans-Hudson Corp., 513 U.S. 30, 48-49 (1994) (noting importance of whether the action directly impacts the state treasury).  Under the BSCA, penalties are paid into the state treasury, N.J. Stat. Ann. § 48:4-2.1(n), and therefore disgorgement of the fines is not relief that can be granted in federal court under the Eleventh Amendment jurisprudence.

The one point of significant disagreement between the parties regarding the scope of Eleventh Amendment immunity

concerns relief sought from state officials in their individual
capacities.  Defendants incorrectly maintain that Plaintiffs must
allege that the individual state officials acted in a manner
outside of their duties as employees in order to lose the
protection of Eleventh Amendment immunity.  The Eleventh
Amendment does not bar individual liability for violations of
federal law by individuals performing their state duties under
color of state law.  Hafer v. Melo, 502 U.S. 21, 28 (1991) ("The
requirement of action under color of state law means that Hafer
may be liable for discharging respondents precisely because of
her authority as auditor general.  We cannot accept the novel
proposition that this same official authority insulates Hafer
from suit.").  The first case cited by Defendants in support of
their position is on point, but the holding is erroneous under
Hafer.  Watts v. Internal Revenue Serv., 925 F. Supp. 271, 275
(D.N.J. 1996) (Orlofsky, J.) ("The individual defendants . . .
share the immunity of the United States insofar as their actions
that gave rise to this complaint were taken within the scope of
their employment.")  The second case they cite was reversed on
these grounds.  Slinger v. New Jersey, 2010 WL 601353, at *3 (3d
Cir. Feb 22, 2010) (reversing on the grounds that state officers
are not "immune from personal liability under § 1983 solely by
virtue of the 'official' nature of their acts.")  And the third
case is simply inapposite, as it does not involve any officials

28

sued in their personal capacities.  Plaintiffs' federal law damages claims against state defendants in their individual capacities are not barred by Eleventh Amendment immunity, but these individuals may be protected by governmental immunity, as discussed below.

In summary, the state entities named as defendants in the Complaint must be dismissed.  In their official capacities, the state officials may not be sued for damages in federal court and are only subject to prospective injunction under federal law. Any claims for injunctive relief against state officials arising under state law, however, must be dismissed.  In their personal capacities, the state officials may be sued for damages under federal law subject to federal and state governmental immunity.

### D.  Sufficiency of Factual Allegations

The sufficiency of pleadings in federal court is governed by Rule 8, Fed. R. Civ. P., among others, a rule that is designed to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007).  The rule provides that "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  This is not a high bar. As the Third Circuit Court of Appeals has affirmed, "the Federal Rules do not require a claimant to set out in detail the facts

upon which he bases his claim.  Rather, the complaint must only give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  Thomas v. Independence Tp., 463 F.3d 285, 295 (3d Cir. 2006) (internal quotations and citations omitted).

Some facts, however, are necessary.  In order to give Defendant fair notice, and to permit early dismissal if the complained-of conduct is not unlawful, a complaint must allege, in more than legal boilerplate, those facts about the conduct of each defendant giving rise to liability.  Twombly, 550 U.S. at 555; Fed. R. Civ. P. 11(b)(3).  These factual allegations must present a plausible basis for relief (i.e. something more than the mere possibility of legal misconduct).  See Ashcroft v. Iqbal, 129 S.Ct. 1937, 1951 (2009).[9]

In its review of Defendants' motion to dismiss pursuant to Rule 12(b)(6), Fed. R. Civ. P., the Court must "accept all factual allegations as true and construe the complaint in the light most favorable to the plaintiff."  Phillips v. County of Allegheny, 515 F.3d 224, 231 (3d Cir. 2008) (quoting Pinker v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)).  And

---

[9]  Just as a claim for damages against an individual requires a showing of that individual's liability, in order to enjoin state officials to behave in a certain way, Plaintiffs must show that an injunction is necessary to redress the injuries those officials are inflicting or imminently will inflict upon the Plaintiffs.  Rizzo v. Goode, 423 U.S. 362, 377 (1976).

on this procedural posture, "courts generally consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." Lum v. Bank of America, 361 F.3d 217, 222 n.3 (3d Cir. 2004) (citation omitted).  Because the Complaint involves multiple claims and multiple defendants, the Court must carefully determine whether the Complaint provides each defendant with the requisite notice required by Rule 8 for each claim, and whether the claim itself presents a plausible basis for relief.[10]

### 1.  New Jersey Civil Rights Act and Section 1983 Claims with respect to Equal Protection

To state a claim under the Equal Protection Clause, Plaintiffs must allege that the State Defendants' actions "(1) had a discriminatory effect and (2) were motivated by a discriminatory purpose." Bradley v. United States, 299 F.3d 197, 205 (3d Cir. 2002).  The discussion that follows focuses on the sufficiency of the § 1983 claim under the United States

---

[10]  Courts are justifiably reluctant to dismiss complaints for factual insufficiency without leave to amend because the modern federal rules seek to avoid technical dismissals based on a failure to properly plead a claim, and efforts are made to distinguish technical dismissals from dismissals resulting from genuine absence of sufficient factual allegations; the purpose of modern pleadings is simply to provide notice of the action and avoid the problems created under the old code pleading standard. See generally Charles Alan Wright, et al., 5 Fed. Prac. & Proc. Civ. § 1216 (3d ed.).  This general reluctance is diminished with respect to a complaint that has been amended multiple times in response to years of discovery.

Constitution.  Although analysis of a New Jersey Civil Rights Act
claim under the New Jersey Constitution can, in some
circumstances, yield different conclusions, the Court has not
been given any reason to believe the analysis would be different
on these facts.  See State v. Segars, 799 A.2d 541, 547 (N.J.
2002) (explaining similarity of the two constitutions'
prohibition on racial discrimination); Chapman v. New Jersey,
Civil No. 08-4130 (AET), 2009 WL 2634888 (N.J. Aug. 25, 2009)
(explaining that the NJCRA mirrors § 1983).  Additionally,
Plaintiffs support their NJCRA claim by citing New Jersey
criminal laws.  Because Defendants do not ask the Court to
address this particular issue in their motion, the Court does not
resolve in this Opinion whether such a claim is cognizable.

As to the supervisory defendants, the Complaint is
inadequate because it fails to allege how these defendants were
involved in the conduct.  Despite having been drafted after years
of pre-trial discovery had been completed, the current complaint
only refers to Defendants collectively, alleging that "defendants
and their agents" engaged in the pattern described in the
complaint.  The Complaint therefore must be dismissed as against
those officials because vicarious liability is inapplicable to §
1983 suits; "a plaintiff must plead that each Government-official
defendant, through the official's own individual actions, has
violated the Constitution."  See Iqbal, 129 S.Ct. at 1948.

Without some sense of how the supervisory defendants participated through their individual actions, the Complaint must be dismissed as against these defendants.  Id.

As to the individual investigators, the Court is presented with a closer call.  The collective pleading problem is mitigated with respect to these two defendants, because the nature of their involvement is somewhat clearer from the context, but even here the collective pleading presents a problem as to what parts of the pattern of discrimination each officer is alleged to have engaged in.  See Magluta v. Samples, 256 F.3d 1282, 1284 (11th Cir. 2001) (explaining sufficiency in the context of a similar collective pleading problem); Charles Alan Wright, et al., 5 Fed. Prac. & Proc. Civ. § 1248 (3d ed.) ("Frequently, a complaint alleging several claims for relief against one or more defendants will fail to inform the defendants sufficiently to enable them to prepare an adequate response.").  And compounding this collective pleading problem, the Complaint alleges a general pattern of conduct without reference to any particular incidents, or even the frequency of such incidents.  Though pleading of specific times and places is not required under Rule 8, it is difficult to provide the kind of notice Rule 8 does require in a case involving multiple defendants and a long course of conduct without some discussion of particular incidents and how each defendant was involved in them.  See United States v. Bonanno

33

<u>Organized Crime Family</u>, 683 F. Supp. 1411, 1429 (E.D.N.Y 1988).

Despite these problems, if the Complaint is "construed so as to do justice," Fed. R. Civ. P. 8(e), then it adequately provides notice of their alleged conduct to the investigator defendants, Vincent Shulze and Michael Colorel. Even though these officers are not put on notice of the precise conduct in which they are alleged to have individually engaged, such as by laying out the time and place of each incident, the Complaint is sufficient to make them aware of the allegation that they exercised their discretion as bus inspectors in deciding who to stop and how to treat them in racially discriminatory ways during the period of their employment since 2000. This is sufficient, at least in terms of specificity of participation in the alleged conduct, to state a claim.

Beyond the problems with the specificity of the facts regarding the personal involvement of each official, Defendants also argue that the Complaint contains insufficient allegations of discriminatory purpose. Here, however, the Complaint is easily sufficient.

The Complaint contains abundant allegations of racially-motivated discrimination, which are summarized at the beginning at the first paragraph: "Because of Plaintiffs' race, Defendants and their associates have targeted their buses for improper, illegal, and unreasonably burdensome stops, inspections, and

34

seizures." (Compl. ¶ 1)  Plaintiffs allege, among other things, that Defendants and their agents gathered near certain casinos known to have primarily African American clienteles in order to stop buses in a racially discriminatory manner (Id. ¶ 26); that Defendants exercised their discretion with racially discriminatory intentions, targeting Plaintiffs' buses for towing because of Plaintiffs' race (Id. ¶ 30); and that Defendants often require Plaintiffs — on account of their race — to have their buses towed away (Id. ¶ 34).  Each of these is a specific allegation of a discriminatory act taken for racially discriminatory reasons, and supported by further allegations of white owned buses being subjected to differential treatment.

Defendants maintain that these statements are too conclusory, but they are not.  The question of how specific a complaint's allegations must be when pleading a claim of discrimination was the issue addressed in the Supreme Court's recent decision in Iqbal.  129 S.Ct. at 1951.  That decision explained that Rule 8, Fed. R. Civ. P., requires a discrimination complaint to plead factual allegations that, if true, would tend to show that a discriminatory purpose and not some benign purpose was behind the conduct alleged to have discriminatory effects. Id.  Iqbal involved immigration-related detentions of Arab Muslims after the attacks of September 11, 2001.  In Iqbal, the defendants offered a nondiscriminatory purpose, a focus on

35

individuals with suspected links to the Arab Muslim attackers,
that explained the discriminatory effect of the detention of
Muslims and Arabs.  Iqbal, 129 S.Ct. at 1951.  Relying on
"judicial experience and common sense," the Supreme Court found
the defendant's explanation to be the "more likely" explanation,
that nothing in the Complaint other than bare allegations of
discriminatory purpose was inconsistent with the
nondiscriminatory explanation, and therefore that the allegations
of discriminatory behavior were not sufficient to plausibly
establish a discriminatory purpose.  Id. at 1950-51 ("It should
come as no surprise that a legitimate policy directing law
enforcement to arrest and detain individuals because of their
suspected link to the attacks would produce a disparate,
incidental impact on Arab Muslims, even though the purpose of the
policy was to target neither Arabs nor Muslims. . . . As between
that 'obvious alternative explanation' for the arrests and the
purposeful, invidious discrimination respondent asks us to infer,
discrimination is not a plausible conclusion.").

     Unlike the defendants in Iqbal, Defendants in this case have
offered no nondiscriminatory reason for any of the racially
discriminatory behavior specifically alleged in the Complaint,
nor is there any obvious nondiscriminatory explanation for the
disparate treatment alleged by Plaintiffs.  There is no obvious
and lawful purpose that explains, for example, why inspectors

would target casinos frequented by African Americans for bus
safety inspections, or why they would permit white operated buses
to repair violations on-site while requiring Plaintiffs to be
towed.

Rule 8 does not require plaintiffs who are pleading a
pattern of racially discriminatory conduct to include all of the
evidence that suggests that the conduct was a result of racially
discriminatory intentions rather than the byproduct of some
legitimate purpose.  Braden v. Wal-Mart Stores, Inc., 588 F.3d
585 (8th Cir. 2009) (holding that plaintiffs need not plead facts
that rule out every possible lawful explanation for alleged
conduct, but must simply plead facts inconsistent with obvious,
more likely, lawful explanations for the alleged conduct); Nemet
Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 261
(4th Cir. 2009) (same).  Instead, they must simply allege enough
facts to nudge the claim into the realm of the plausible.

Therefore, the factual allegations in the current complaint
regarding racially discriminatory purpose are sufficiently
concrete with respect to the investigator defendants.


2.  Procedural Due Process

As to the procedural due process aspect of Count I, the
Complaint does not specify the conduct underlying this claim.  It
is impossible for the Court (and Defendants) to assess whether

37

the municipal court hearings were a sufficient post-deprivation remedy without knowing the deprivation upon which Plaintiffs rest their claim.  The Court cannot determine whether Plaintiffs are complaining of the fines they paid to the state, the towing fees they paid to private companies, neither, or both.  Plaintiffs' opposition to Defendants' motion to dismiss does not mention the procedural due process claim.  Lack of opposition is not a sufficient reason to grant the motion to dismiss, Stackhouse v. Mazurkiewicz, 951 F.2d 29, 30 (3d Cir. 1991), but since Plaintiffs do not point to any aspects of the Complaint to clarify the nature of the deprivation, the Complaint must be dismissed as insufficient.  Therefore, this claim will be dismissed as against all state defendants for failure to state a claim.

### 3.  Substantive Due Process

Plaintiffs' substantive due process claim based on an alleged coverup is unaffected by the presence of a post-deprivation remedy, and the Complaint identifies the specific conduct underlying the claim.  See Estate of Smith v. Marasco, 318 F.3d 497, 511 (3d Cir. 2003) (explaining that official cover-ups may violate an individual's substantive due process rights); Crawford v. Parron, 709 F. Supp. 234, 237 (D.D.C. 1986) (explaining that violations of substantive due process are not

38

cured by a post-deprivation remedy).

However, there is no allegation in the Complaint regarding how any of the individual defendants were involved in the coverup.  The Complaint states that Defendants collectively spoliated evidence, lied about investigatory efforts, and submitted false or misleading evidence in judicial proceedings, without identifying any individual's participation, or explaining what incident or incidents and proceedings are being referred to.

Plaintiffs submit several documents in their opposition to the motion to dismiss which they claim support the allegations of coverup, and add some allegations regarding specific defendants in their opposition to the motion to dismiss.  The substance of the allegations in the motion brief are that Defendant Shulze wrote a letter, which Defendant Legriede submitted as her own, to the attorney originally retained by Plaintiffs.  The letter stated that the department was taking the allegations of racial profiling seriously and would investigate, when in fact the department did not perform an investigation.  Defendant Harrington also allegedly claimed such a non-existent investigation was ongoing.  Further, according to Plaintiffs, neither Harrington nor Legriede ever volunteered that another investigation had revealed racist behavior on the part of Shulze, who was disciplined for it.

Even if the Court were to consider these allegations made in

opposition to the motion to dismiss even though the Complaint does not allege them with respect to any particular defendant, the facts alleged in the motion papers do not rise to the level of stating a claim for violation of Plaintiffs' substantive due process rights.  The Third Circuit Court of Appeals has held that "only prefiling conduct that either prevents a plaintiff from filing suit or renders the plaintiff's access to the court ineffective or meaningless constitutes a constitutional violation."  Marasco, 318 F.3d at 511-12.  Stated another way, "If state officials wrongfully and intentionally conceal information crucial to a person's ability to obtain redress through the courts, and do so for the purpose of frustrating that right, and that concealment and the delay engendered by it substantially reduce the likelihood of one's obtaining the relief to which one is otherwise entitled, they may have committed a constitutional violation."  Id. (citing Swekel v. City of River Rouge, 119 F.3d 1259, 1262-63 (6th Cir. 1997).

Since the complained-of conduct obviously did not prevent Plaintiffs from filing suit, the alleged conduct would need to have "render[ed] the plaintiff's access to the court ineffective or meaningless."  Id.  Plaintiffs' allegations that Defendants misled Plaintiffs about the existence of an internal investigation, and failed to volunteer the existence and results of another investigation, do not rise to the level of

interference required to state a claim.  While knowledge that no investigation was happening might have hastened Plaintiffs' filing of this action, and while knowledge of the other racial bias investigation may have bolstered Plaintiffs' case, neither constitutes "information crucial to a person's ability to obtain redress through the courts."  Id.  Compare Ryland v. Shapiro, 708 F.2d 967 (5th Cir. 1983) (finding substantive due process violation where prosecutors concealed from the parents of a murder victim the fact that a murder had occurred at all, delaying them from bringing a wrongful death action against the murderer) with Joyce v. Mavromatis, 783 F.2d 56 (6th Cir. 1986) (finding no violation where plaintiff had all of the requisite facts to file suit).

The Court will therefore dismiss this claim as against all State Defendants for failure to state a claim upon which relief can be granted.


### 4.  Interstate Commerce and Right to Travel

The affirmative grant to Congress of authority to regulate interstate commerce encompasses an "implied [or 'dormant'] limitation on the power of the States to interfere with or impose burdens on interstate commerce."  Healy v. Beer Inst., 491 U.S. 324, 326 n. 1 (1989).  When enforcing the Dormant Commerce Clause, "it is the responsibility of the judiciary to determine

whether action taken by state or local authorities unduly threatens the values the Commerce Clause was intended to serve." Norfolk Southern Corp. v. Oberly, 822 F.2d 388, 399 (3d Cir. 1987) (quoting Wardair Canada, Inc. v. Florida Dep't of Revenue, 477 U.S. 1, 106 (1986)).  The Constitution also secures the individual right to travel freely between the states.  See United States v. Shenandoah, 595 F.3d 151, 161 (3d Cir. 2010). Plaintiffs claim that the racial discrimination they experienced violates the Commerce Clause and their right to travel because the bus companies operated between Pennsylvania and New Jersey.

Plaintiffs do not address the motion to dismiss with respect to these claims in their opposition.  As noted above, lack of opposition by Plaintiffs is not a sufficient reason to grant the motion to dismiss.  Stackhouse, 951 F.2d at 30.  Some examination of the merits is necessary.

Here, if the state officers exercised racially discriminatory discretion, the scope of the actual injury done to Plaintiffs does not change by also pointing out that these acts of racial discrimination incidentally violate other provisions of the Constitution as well.  Conversely, if the Compliance Act is not being applied in a racially discriminatory manner, then, under the circumstances of this case, there is no violence to the Commerce Clause or Plaintiffs' right to travel done by the inspection program.  However, the Court assumes for the sake of

42

argument that these kind of incidental constitutional violations are nevertheless cognizable because there may be some value in the official recognition, by way of declaratory relief, of how this racial discrimination infringes on others of their fundamental rights, in addition to the right to be free from such discrimination.

Defendants' sole argument is that only statutes and regulations can violate the Commerce Clause and the right to travel.  The fact that most Dormant Commerce Clause cases involve facial language or incidental effects of statutes or regulations instead of discriminatory enforcement does not mean that no act of official discretion can violate the Dormant Commerce Clause. Several cases have found that the discretionary actions of state officials can violate the dormant Commerce Clause.  See, e.g., Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders of Atlantic County, 112 F.3d 652, 668 (3d Cir. 1997) (upholding injunction under dormant Commerce Clause preventing state agency from implementing policy that interfered with interstate commerce such that the agency "can no longer implement its self-sufficiency policy - either formally or informally - by rejecting or hindering contracts between waste management districts and out-of-state facilities or operators.") (emphasis added); Florida Transp. Service, Inc. v. Miami-Dade County, 543 F. Supp. 2d 1315, 1328 (S.D. Fla. 2008) ("The port director . . .

used the ordinance to protect a group of entrenched stevedores and bar the entry of new competitors to the stevedore market."). Generally what a state cannot constitutionally accomplish by regulation, it may not accomplish by granting power to state officials who will exercise it in such a way to have the same effect as the unconstitutional regulation.

Similarly, the fact that the discrimination is occurring as an act of official discretion and not legislative mandate does not itself preclude a right to travel claim. Cf. United States v. Guest, 383 U.S. 745, 759-60 (1966).

The correct inference to be drawn from the fact that most of the precedent on these claims involves discriminatory statutes or regulations is that discretionary acts will rarely so burden interstate commerce or intentionally prevent freedom of travel as to give rise to a claim. This is the real insufficiency of Plaintiffs' claim.

While acts of official discretion can be found to violate the dormant Commerce Clause, courts finding such discriminatory exercise of discretion sufficient have only found it when it is systematically exercised against out-of-state businesses as out-of-state businesses. See, e.g., Florida Transp. Service, Inc., 543 F. Supp. 2d at 1328. No court has found it to apply when the subject of improper state action happens to incidentally be engaged in interstate commerce. Similarly, the fact that the

subjects of racial discrimination are engaged in interstate travel is not itself sufficient to give rise to a violation of the right to travel; that claim requires an intent on the part of the officials to frustrate the right to travel.  Cf. United States v. Guest, 383 U.S. 745, 759-60 (1966) (explaining that for the purpose of 18 U.S.C. § 241 which protects the constitutional right to travel freely between the states, a specific intent to interfere with the federal right to travel must be proved). <u>See also</u> <u>Bray v. Alexandria Women's Health Clinic</u>, 506 U.S. 263, 275 (1993) (applying same requirement of intent to a Civil Rights Act claim for violation of interstate travel rights).

The Complaint does not allege that Plaintiffs were discriminated against because they came from out-of-state, or that Defendants' intent was to interfere with their right to travel.  Without more, Plaintiffs do not state a claim under these provisions.  The Court therefore finds that the Complaint fails to state any independent claim under the Commerce Clause or with respect to the right to travel.[11]

_____

[11] Additionally, as to the supervisory defendants, the travel-related claims suffer from the same defects as the Equal Protection claim; there is no allegation regarding the supervisory defendants' participation in the unconstitutional conduct.  And even if Plaintiffs stated a claim for constitutional violation, the individual inspectors would be entitled to qualified immunity from damages given the lack of controlling precedent on the question of how these constitutional provisions apply to the exercise of official discretion that incidentally burdens interstate commerce and interferes with the right to travel.

### 5. Conversion

The conversion claim makes no reference to the conduct of any state officials, except for noting that some official ordered Defendant Jimmy's to release a vehicle owned by Plaintiff Major which was not released.  Without any further allegation regarding the involvement of any State Defendant, this claim must be dismissed as against them.

### 6. Federal and State Conspiracy Claims

In order for Plaintiffs to state a claim under § 1985(3), they must allege "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States."  Farber v. City of Paterson, 440 F.3d 131, 134 (3d Cir. 2006) (internal quotations and citations omitted).  State law civil conspiracy has similar requirements.  LoBiondo v. Schwartz, 970 A.2d 1007, 1029-30 (N.J. 2009) (noting that the elements include an agreement between the parties to inflict a wrong against or an injury upon another, and an overt act that results in damage).

Plaintiffs' allegations regarding the conspiracy claims say

46

nothing more than that defendants conspired to perform all of the alleged conduct.  Even after discovery, the allegations regarding when, how, or which defendants conspired, and what they conspired to do are vague.  Certainly as to the supervisory defendants these claims must be dismissed.  There is simply no allegation of agreement or allegations of facts constituting circumstantial evidence of agreement between the supervisory defendants and the other defendants.

It is a closer call with respect to Shulze, Colorel, and the Garage Defendants, but the Complaint is sufficient to state a conspiracy claim against them.  The allegation that Plaintiffs' buses have been towed predominantly to one garage suggests some element of coordination among the inspectors and the garage.  Defendants correctly note that to successfully allege the agreement aspect of conspiracy, Plaintiffs must allege sufficient factual matter to suggest an actual agreement was made; mere conclusory allegation of collaboration based on parallel conduct is insufficient.  Twombly, 550 U.S. at 556-57.  But the allegation regarding coordination with the garage goes beyond an allegation of parallel conduct that could be explained by lawful decisions.  One particular factual allegation clearly tips the claim beyond mere possibility and into the realm of plausibility: Plaintiffs allege that white-owned buses are permitted to select the repair site to which they are towed, while Plaintiffs' buses

are not.  Thus, the pattern of conduct is not just that certain buses are disproportionately sent to one garage, a phenomenon plausibly explained by circumstances of where the buses are inspected.  The pattern also includes an allegation that only these buses are forced to go to any particular location at all.  The discriminatory decision to force a location at all upon only these buses, combined with the allegations that they were disproportionately forced to go to a particular garage by the inspectors, is enough circumstantial evidence to suggest a conspiracy for the purposes of sufficiency of the pleadings.

Therefore, the conspiracy counts will be dismissed with respect to the supervisory defendants, but maintained with respect to Shulze and Colorel.

### E.  Governmental Immunity

Qualified immunity protects some government officials from some federal claims, and state common law and statutes protect some officials from some state claims.  Having determined that Plaintiffs state a claim against Shulze and Colorel under § 1983, § 1985(3), the NJCRA, and common law civil conspiracy for violation of their rights under the United States Constitution and New Jersey's Constitution, the Court must determine whether these defendants are protected by governmental immunity from either the federal claims or the state claims.

48

Regarding the federal claims under § 1983 and § 1985(3), if the allegations are proved true, then Shulze and Colorel will have no plausible argument that they "made a reasonable mistake about the legal constraints" on their actions.  Curley v. Klem, 499 F.3d 199, 206-07 (3d Cir. 2007) (internal quotations and citations omitted).  A mistake is not reasonable when it amounts to the violation of a "clearly established" right, such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  Curley, 499 F.3d at 207 (internal quotations and citations omitted).  The right to be free from racially discriminatory exercise of official discretion, or of a conspiracy to carry out such racial discrimination, is as firmly and clearly established as any in the entire body of our law, a point Defendants concede.  (Defs.' Reply Br., 4.)  If the allegations in the Complaint are proved true, then these officers individually violated and conspired to violate the equal protection rights of Plaintiffs and no reasonable officer could have believed his conduct was not unlawful.

Defendants do not assert any state common law immunities, relying instead on the Tort Claims Act.  See N.J. Stat. Ann. § 59:1-2.  The Act does not grant public employees immunity from suits under rights of action provided by the New Jersey Constitution, nor from suits under the NJCRA.  Owens v. Feigin,

49

947 A.2d 653 (N.J. 2008) (holding that the NJTCA does not apply to the NJCRA); Garlanger v. Verbeke, 223 F. Supp. 2d 596, 604 (D.N.J. 2002).  Thus, as a matter of immunity law, Plaintiffs' NJCRA claim may therefore proceed against the state officials in their personal capacities.

As to the civil conspiracy claim, such claims are subject to the requirements of the Tort Claims Act.  County Concrete Corp. v. Town of Roxbury, 442 F.3d 159, 174 (3d Cir. 2006).  However, the act does not immunize an official "if it is established that his conduct was outside the scope of his employment or constituted a crime, actual fraud, actual malice or willful misconduct."  R.K. v. Y.A.L.E. Schools, Inc., 621 F. Supp. 2d 188, 199-200 (D.N.J. 2008) (quoting N.J. Stat. Ann. § 59:3-14).  The conspiracy alleged here would constitute willful misconduct.

The NJTCA also requires that the claimant file a notice of claim with the entity being sued within ninety days of the accrual of the claim.  N.J. Stat. Ann. § 59:8-3 and -8.  In Velez v. Jersey City, 850 A.2d 1238 (2004), the New Jersey Supreme Court held that the Tort Claims Act's notice-of-claim requirements were applicable to claims for intentional torts, which includes civil conspiracy.  However, the Court applied this requirement prospectively to causes of action accruing after the date of the opinion, which was June 29, 2004.  850 A.2d at 1246.  The conspiracy claim raised here accrued before that date, as

Plaintiffs' various submissions reveal that as early as 2003 African American owned buses were being diverted to the Garage Defendants.  [Docket Item 4.]  Therefore, Plaintiffs were not required to comply with the NJTCA's notice-of-claim provision.

Because the allegations underlying the federal claims involve violations of clearly established rights, and the state claims involve allegations of wilful misconduct not subject to the NJTCA's notice-of-claim provisions, Shulze and Colorel are not protected by governmental immunity from these claims.


### F.   Statute of Limitations

The parties agree that New Jersey's two-year statute of limitations on personal injury actions, N.J. Stat. Ann. § 2A:14-2, applies to the federal and state civil rights acts claims for damages against State Defendants in their personal capacities. The first complaint in this action was filed on June 15, 2005, which is therefore the earliest possible date to which the contents of the current complaint could relate back.  See Fed. R. Civ. P. 15(c)(1).  The only reference to dates or times of any kind in the current complaint is an approximation regarding the year in which the systemic discrimination is alleged to have begun, around 2000.

Defendants argue that each incident of the pattern described in the complaint is a separate wrong, and only those injuries

51

occurring within the two-year period prior to the filing of the complaint are actionable.[12]  A claim based on racial profiling or selective enforcement accrues at the time of the discriminatory enforcement action.  See Hilton v. Whitman, No. 04-cv-6420 (SDW), 2008 WL 5272190 (D.N.J. 2008) (collecting cases and concluding that "[m]ost Courts in this District agree that a selective enforcement claim based on racial profiling accrues upon the stop, search and seizure made pursuant to the selective enforcement of the law"); Dique v. Mulvey, 2008 WL 1882856 (D.N.J. 2008).  Even when the injury-causing action itself may be either lawful or unlawful from the victim's perspective at the time, the claim still accrues.  See Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1386 (3d Cir. 1994) ("A claim accrues in a federal cause of action as soon as a potential claimant either is aware, or should be aware, of the existence of and source of an injury ... not upon awareness that this injury constitutes a legal wrong.").  Without knowing whether any such incidents occurred within the two years preceding the filing of the Complaint, Defendants argue the Complaint should be dismissed.

---

[12]  If the Court were to have to decide the filing date for the purposes of the statute of limitations question, it would be faced with the question of whether the later-added Plaintiffs claims are considered filed with the filing of the initial complaint under Rule 15(c).  But since the Court does not yet reach this question, it need not decide whether these claims would relate back.

Plaintiffs maintain that the conduct complained of is a continuing practice.  Under some circumstances, "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time barred."  Cowell v. Palmer Twp., 263 F.3d 286, 292 (3d Cir. 2001) (quoting Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am., 927 F.2d 1283, 1295 (3d Cir. 1991).

It is not apparent from the face of the Complaint which actions occurred within the statutory period, and which predate it.  This fact alone makes dismissal at this stage inappropriate, because even if the continuing violation doctrine is inapplicable, the Complaint may still state claims for conduct occurring within the statutory period.  See Brody v. Hankin, 145 Fed. App'x 768, 771-72 (3d Cir. 2005) ("If a statute of limitations 'bar is not apparent on the face of the complaint, then it may not afford the basis for a dismissal of a complaint under Rule 12(b)(6)." (internal quotations and citations omitted).  Further, the Court also cannot determine from the face of the Complaint whether the continuing violation doctrine should apply.  Among other reasons, the Complaint does not address the frequency of the occurrences and does not adequately

explain the nature of the database of out-of-service violations
that Plaintiffs allege leads to ongoing effects on the past
unlawful conduct.  See Cowell, 263 F.3d 286, 292 (3d Cir. 2001)
(explaining necessary factors for determining applicability of
the doctrine).

Defendants are free to move for a more definite statement
under Rule 12(e), or seek summary judgment based on additional
evidence they presumably developed in discovery since they should
have known it was their burden to prove this affirmative defense,
but dismissal at this stage is inappropriate because the face of
the Complaint does not warrant it.

## IV.  MOTION TO AMEND

### A.  Procedural Background

The first Complaint in this case was filed on June 15, 2005.
It appeared to seek a preliminary injunction, but failed to
attach such a motion or to comply with the rules of procedure for
such an action.  To remedy these problems, the First Amended
Complaint was filed on July 26, 2005, this time accompanied by
the proper motion (though the motion was not properly served
initially, causing more delay).  The subject of the injunction
was the return of a bus held by the Garage Defendants for
collateral, and has been resolved except insofar as it serves as
the basis of Plaintiffs' conversion claim.

Plaintiffs sought to file a Second Amended Complaint on

April 17, 2006, to add more plaintiffs, among other substantive changes.  After several failed attempts to submit a motion that complied with the rules and a proposed complaint that adequately explained the changes to be made, the motion was eventually granted on August 7, 2006.  This version contained a jurisdiction and venue allegation under Title VI, but no count or prayer for relief pursuant to that statute.  It also had a count under the NJLAD.

The scheduling deadline for amendment of the pleadings expired on November 27, 2006.  [Docket Item 50.]  Nearly two years later, Plaintiffs sought to file a Third Amended Complaint on May 15, 2008.  This motion, like many of the others, was procedurally deficient and had to be re-submitted.  On July 29, 2008, Plaintiffs' request to add class action allegations was denied, but Plaintiffs were permitted to otherwise amend the complaint despite the delay.  This version dropped the references to Title VI and the NJLAD claim.  The Magistrate Judge's order permitting the amendment also stayed all responses to the Third Amended Complaint pending further order of the Court.  [Docket Item 124].

Since that time, the parties have engaged in countless discovery disputes.  On August 24, 2009 Judge Schneider lifted the stay on filing dispositive motions.  Discovery closed on December 22, 2009.

The proposed Fourth Amended Complaint, filed after the close of discovery and in response to Defendants' motion to dismiss, would make a number of changes.  First, it adds six paragraphs (¶¶ 39-44) of allegations regarding the supervisory defendants' (Lettiere, Legreide, and Harrington) failure to investigate evidence of racial discrimination within the bus inspection unit, and their failure to train inspectors regarding racial sensitivity.  Second, it adds two new claims and the facts Plaintiffs believe are necessary to support them:  a Title VI claim based on the federal funding of bus inspection program, and a claim under the NJLAD based on the conduct of the Garage Defendants.  Third, it adds a new allegation regarding reporting of violations in a federal database to support the New Jersey Civil Rights Act claim.  And fourth, it clarifies some of the ambiguities and mistakes present in the current complaint, by stating that Count I (§ 1983) applies only to State Defendants; Count II (§ 1981) does not apply to any State Defendants; Count III (§ 1985) applies to all defendants; Count V, which would become Count VII (conversion) as against the State Defendants is based on their "collaboration" with the Garage Defendants in refusing to release a bus; and the prayer for relief with respect to the disgorgement of fees applies only to the Garage Defendants.

## B.   Standard of Decision

Rule 15(a)(2) provides that leave to amend should be freely given when justice so requires.  Fed. R. Civ. P.  The decision to permit amendment is discretionary.  Toll Bros., Inc. v. Township of Readington, 555 F.3d 131, 144 n. 10 (3d Cir. 2009).  Among the legitimate reasons to deny a motion are unjustified prejudice to the non-moving party or futility.  Lorenz v. CSX Corp., 1 F.3d 1406, 1414 (3d Cir. 1993) (citation omitted).  Prejudice may involve requiring the opponent to expend significant additional resources to conduct discovery and prepare for trial or significantly delaying the resolution of the dispute.  Long v. Wilson, 393 F.3d 390, 400 (3d Cir. 2004).  Futility is determined by the standard of legal sufficiency set forth in Rule 12(b)(6), Fed. R. Civ. P.  In re Burlington Coat Factory Litigation, 114 F.3d 1410, 1434 (3d Cir. 1997). Accordingly, an amendment is futile where the complaint, as amended, would fail to state a claim upon which relief could be granted.  Id.

## C.   New Allegations Regarding Supervisory Defendants

The new allegations contained in paragraphs 39-44 would both prejudice the supervisory defendants and are futile.  The State Defendants argue that these amendments would require new discovery, substantially delaying resolution of this action and increasing the costs to both sides.  Plaintiffs' response is that

no additional discovery would be necessary since these
allegations merely restate facts discovered in depositions.  But
the Court finds that these new allegations will require discovery
to be reopened.  The training of the bus inspectors was not
previously at issue.  And if the supervisors' knowledge of the
discriminatory incidents was at issue, it was not mentioned in
the Complaint, meaning Defendants may have rightly assumed the
claims against the supervisors would be dismissed.  Indeed, the
discovery is apparently so incomplete on this topic that
Plaintiffs cannot even now allege actual knowledge on the part of
the supervisors, and rely on the ambiguous allegation that
Defendants knew "or should have known."  The Court is persuaded
that adding these allegations would require reopening of
discovery extending this already marathon case.  Because
Plaintiffs offer no compelling reason for the extraordinary
delay, the amendment will be denied.

    Additionally, the proposed amendment is futile.  Even before
the Supreme Court's decision in Ashcroft v. Iqbal, 129 S.Ct.
1937, 1951 (2009), which may have made supervisory liability even
more narrow, a plaintiff had to not only identify a specific
supervisory practice that the defendant failed to employ, but
also allege "both (1) contemporaneous knowledge of the offending
incident or knowledge of a prior pattern of similar incidents,
and (2) circumstances under which the supervisor's inaction could

be found to have communicated a message of approval."
Bonenberger v. Plymouth Township, 132 F.3d 20, 25 (3d Cir. 1997)
(quoting Colburn v. Upper Darby Township, 838 F.2d 663, 673 (3d
Cir. 1988)).

The Fourth Amended Complaint would add the alternative
statement that these supervisors either knew or "should have
known" about allegations occurring in a separate investigation
that Shulze was performing his job in a racially discriminatory
manner, and that they failed to train the investigators in racial
sensitivity to prevent such discrimination.  This is the
equivalent of alleging that these defendants were or were not
liable.  These allegations are not sufficient to sustain a claim
for supervisory liability.  Even assuming mere knowledge of
discrimination were sufficient after Iqbal, actual knowledge of
actual incidents is very different from constructive knowledge
about allegations made regarding possible incidents.
Additionally, the Fourth Amended Complaint contains no
allegations suggesting that the supervisors' inaction
communicated a message of approval, Bonenberger, 132 F.3d at 25,
or indifference.

**D.  Additional Claims and Other New Allegations**

The amendments reinserting the Title VI claim and the NJLAD
claim, and the amendment adding the new information about

reporting to the federal database, will all prejudice Defendants without adequate justification.

The only one of these changes Plaintiffs attempt to justify is the belated resurrection of the Title VI claim.  As to that claim, Plaintiffs argue that its reinsertion into the Complaint is a result of recent discovery revealing federal funding of the bus inspection program.  But it is hard to believe that Plaintiffs needed five years of discovery to learn that the bus inspection program received federal funding, especially where they were already aware of the federal grant program and its relationship to the bus inspections (Compl. ¶ 28).  Indeed, collection of evidence to confirm the existence of federal funding was not necessary to add an allegation under the Act, since they had reasonable belief that the program was being operated according to federal regulations in order to gain grant funding.  Plaintiffs also do not reply to the arguments raised by Defendants with respect to the futility of the Title VI claim. Their non-opposition underscores the fact that Plaintiffs' have not diligently pursued this claim.

Because Plaintiffs attempt to justify only the addition of the Title VI claim, and that justification is hollow, the questions before the Court with respect to these amendments are whether there has been unwarranted delay in seeking the amendments, whether repeated amendments have failed to cure these

pleading deficiencies, and whether there is any prejudice to Defendants.

Plaintiffs maintain that no further fact discovery will be necessary because of these changes.  The Court disagrees. Plaintiffs seem to believe that so long as they are based on the same set of operative facts, new legal theories cannot necessitate new discovery.  This is true, but misleading, because the set of operative facts changes when new theories are introduced if they contain unique elements and defenses.  Proving and defending an NJLAD claim, for example, requires discovery of material facts not perfectly aligned with those facts put at issue by an Equal Protection claim. Such discovery, which appears to the Court to be inevitable required if these claims are added, delays the resolution of this matter and increases the costs without any justification for the delay having been offered by Plaintiffs.

The Title VI claim was never properly pled, and indeed is not properly pled even now as the complaint cites the wrong section of Title VI, § 2000d-1, under which there is no private right of action.  Alexander v. Sandoval, 532 U.S. 275 (2001). There was no reason for the State Defendants to have spent time and money engaging in discovery on the issue, especially since Plaintiffs' apparent abandonment of the claim suggested it would be a non-issue.  The same goes for the NJLAD claim.

61

Finally, there is no indication that discovery has already been conducted on how reporting to the federal database works, what each Defendant knew about how that reporting works, and the precise way in which the database is used for future stops. Except as next discussed, Plaintiffs' motion to file a Fourth Amended Complaint will be denied.

### E.  Clarifying Amendments

The amendments to Counts I and II and the prayer for relief are solely to clarify the Complaint.  These amendments will therefore be permitted.[13]

This leaves only Count V (conversion), which would become Count VII.  Plaintiffs seek to add a sentence alleging that Defendants Colorel and Shulze "collaborated" with the Garage Defendants in unlawfully refusing to release a bus from the repair shop.  Under New Jersey law, conversion is the "wrongful exercise of dominion and control over the property of another in a manner inconsistent with the other person's rights in that

---

[13]   The State Defendants do not oppose the amendments.  The Garage Defendants do oppose them, alleging in their opposition papers that one of the attorneys for Plaintiffs had represented that the action against them would be more circumscribed than suggested by the ad damnum clauses and prayer for relief in current and proposed complaints.  These defendants are free to move to strike portions of the Complaint based on these arguments under the appropriate rules, but the Court will not deny the clarifying amendments on the basis of assertions, unsupported by any sworn declarations or hearing transcripts, regarding certain promises made by Plaintiffs as to the scope of the Complaint.

property." McAdam v. Dean Witter Reynolds, Inc., 896 F.2d 750,
771 (3d Cir. 1990) (citing Mueller v. Tech. Devices Corp., 84
A.2d 620, 623 (N.J. 1951)).  Like many parts of the motion to
dismiss, Plaintiffs did not address Defendants' arguments
regarding the sufficiency of the conversion claim, raising
questions about the futility of this amendment.  While the
amendment would cure the problem identified by the Court above in
Part III.D.5, it does not overcome Defendants' other objections.

Defendants are mistaken that a notice of claim was required
by the Tort Claims Act for this claim.  As explained above with
respect to the civil conspiracy claim, the Tort Claims Act's
notice-of-claim requirements apply to intentional torts accruing
after June 29, 2004.  Velez, 850 A.2d at 1246.  The proposed
complaint states that the bus was held from "December 2003
through xx [sic.] 2005," but the preliminary injunction filed in
2005 makes clear that the State Defendants' conduct leading to
accrual of the conversion claim occurred prior to June 29, 2004
[Docket Item 5].  Therefore, no notice of claim is necessary.[14]

But Defendants are correct that no state defendant is
alleged to have had "dominion and control" of the bus for the
purpose of conversion.  McAdam, 896 F.2d at 771.  All Plaintiffs

---

[14]  Of course, due to the two-year statute of limitations,
any claim for conversion accruing prior to June 15, 2003 is time-
barred.  Similarly, any claim for conversion accruing after June
29, 2004, is barred unless Plaintiffs filed an appropriate notice
of claim under the Tort Claims Act.

are able to allege is that the two State Defendants "conspired" with the Garage Defendants at some unspecified time in some unspecified way to further the conversion.

This new aspect of the conspiracy allegation is futile. Unlike the conspiracy with respect to selection of the garages, the allegation of collaboration with the garage to refuse to release the bus is just a bare allegation unsupported by any other circumstantial evidence to suggest agreement between Shulze and Colorel and the Garage Defendants with respect to the release of the bus.

### F.  Summary

The Court will deny the motion to amend the complaint with respect to the additional counts and new allegations as each is either unduly prejudicial, futile, or both.  This includes the new allegation of conspiracy contained in the revised conversion count.  The Court will permit the amendments clarifying the complaint including: the changes to Counts I and II; the proposed changes to the New Jersey Civil Rights Act count (currently Count IV) except for proposed ¶ 80; the proposed changes to subsection (b) of the prayer for relief; and the deletion of all claims and defendants which have been dismissed herein.

## V.  APPEAL OF MAGISTRATE JUDGE ORDER

## A.  Background of the E-mail Discovery Dispute

On March 9, 2009 the State Defendants moved for a Protective Order to avoid production of emails that had been deleted from the active server and now were available only on backup tapes. [Docket Item 178.]  Defendants maintain that restoring emails from Defendant's system of backup tapes is complicated and expensive because the backup tapes are designed to reproduce the entire network environment in the event of a crash, and not for retrieval of particular documents.  Rule 26(b)(2)(B) provides that a party need not produce electronically stored information from sources that are not reasonably accessible because of the undue cost of retrieval. Fed. R. Civ. P. 26(b)(2)(B).[15]  The rule

---

[15]  Rule 26 provides in relevant part:
(B) Specific Limitations on Electronically Stored Information.  A party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost. . . . If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). . . .
(C) When Required. On motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that: (i) the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive; (ii) the party seeking discovery has had ample opportunity to obtain the information by discovery in the action; or (iii) the burden or expense of the proposed

allows for discovery of difficult-to-access data when the requesting party shows good cause.  Id.  Defendants argued that the high cost of the retrieval from the backup tapes meets this "undue burden" exception, and that Plaintiffs cannot demonstrate good cause.

Plaintiffs argued, among other things, that Defendants' failure to maintain the emails in an accessible format should not provide a basis upon which to avoid having to produce them, because Defendants had an obligation to preserve them for litigation.  This appeal involves Judge Schneider's treatment of this argument.

On August 4, 2009, Judge Schneider ordered the production of Defendants' litigation hold letters, finding that Plaintiffs had made a preliminary showing of spoliation of evidence.  Judge Schneider also found that September 11, 2003 was the date Defendants' duty to preserve relevant evidence was triggered by a letter threatening litigation regarding racial profiling in bus inspections.  Judge Schneider found that an informal and probably inadequate hold letter was not issued until November 5, 2005, and that the first formal hold letter was not sent until March 22,

---

discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.
Fed. R. Civ. P. 26(b)(2)(B)-(C).

2007.

Judge Schneider's opinion of October 20, 2009 begins by determining whether the emails on the backup tapes are reasonably accessible under Rule 26(b)(2)(B).  Relying in large part on Zubulake v. USB Warburg LLC, 217 F.R.D. 309, 319-20 (S.D.N.Y. 2003), Judge Schneider determined that they were not reasonably accessible.  Plaintiffs offered no evidence rebutting Defendants' affidavit estimating the cost of recovery at $1.5 million.

Judge Schneider then turned to the question of whether Plaintiffs have nevertheless demonstrated good cause for the production of the emails, examining the seven factors stated in the Advisory Committee Notes to Fed. R. Civ. P. 26(b)(2)(B).  These include:

> (1) the specificity of the discovery request;
> (2) the quantity of information available from other and more easily accessed sources; (3) the failure to produce relevant information that seems likely to have existed but is no longer available on more easily accessed sources; (4) the likelihood of finding relevant, responsive information that cannot be obtained from other, more easily accessed sources; (5) predictions as to the importance and usefulness of further information; (6) the importance of the issues at stake in the litigation; and (7) the parties' resources.

Id.  Judge Schneider found that most of these factors tilted in Defendants' favor.  Although Judge Schneider found the request to be reasonably specific and the issues at stake very important, he also found that substantial information was available from other

67

discovery sources, that the likelihood of finding critical information was largely speculative, that the emails are likely to be cumulative of evidence already produced, and that the resources of the State of New Jersey, while vast, are not unlimited.

Judge Schneider examined Defendants' culpability for the present inaccessibility of previously accessible emails under the third factor.  Judge Schneider found that because most of the emails of the key individuals had been produced, there was a relatively small likelihood that the failure to preserve the emails had resulted in relevant emails becoming archived.  To the extent that any relevant emails were improperly deleted and archived, he found that there was no evidence that Defendants intentionally did so.

Finding that, overall, the factors favored Defendants and that Plaintiffs had not demonstrated good cause, Judge Schneider ordered that the State Defendants were not required to fully review their backup tapes for responsive documents.  Judge Schneider provided that if Plaintiffs requested that the State Defendants search their December 2007 backup tapes, then Plaintiffs and the State Defendants had to equally share the retrieval costs, but that if Plaintiffs wanted to search the March 2006 tapes, they had to pay all costs.  The remainder of the tapes did not have to be produced at all.  Plaintiffs moved

for reconsideration of Judge Schneider's Opinion and Order on November 4, 2009, which Judge Schneider denied on December 21, 2009. [Docket Item 275].

Plaintiffs moved for reconsideration arguing, among other things, that Judge Schneider did not give the failure to put in place a litigation hold any weight in his discussion of the Zubulake or good cause factors.  This motion was denied, noting that the August 4 Opinion specifically noted that there was some possibility that relevant evidence is contained in Defendants' backup tapes as a result of the failure to preserve the evidence on the live server, but that the other considerations were paramount.

 The question upon this appeal is whether Judge Schneider gave appropriate weight to Defendants' culpability for the emails being inaccessible, given that the reason for the increased costs of recovery was Defendants' failure to institute a timely and effective litigation hold.[16]

### B.  Standard of Review

To the extent that Plaintiffs frame their appeal as an argument that no matter the other circumstances, as a matter of law, a defendant cannot be granted a protective order under

---

[16]  Plaintiffs do not challenge Judge Schneider's finding that there was no evidence of intentional spoliation.

69

26(b)(2)(B) if the failure to institute a proper litigation hold
was the cause of the inaccessibility, then the Court reviews this
question of law de novo.  Doe v. Hartford Life and Acc. Ins. Co.,
237 F.R.D. 545, 548 (D.N.J. 2006) (holding that review of factual
findings is for clear error, and review of legal conclusions is
de novo under L. Civ. R. 72.1(c)(1)(A)).  To the extent that
Plaintiffs are not arguing for such a bright line rule, and
instead are arguing that, in this particular case, Judge
Schneider gave insufficient weight to Defendants' culpability as
one of several factors, then this argument would be a challenge
to the exercise of discretion.  Magistrate judges are given great
deference in such decisions, and they will be reversed only for
an abuse of discretion.  Id.


### C.  Analysis

#### 1.  De Novo Review

The first question is whether, as a matter of law, a
protective order under Rule 26(b)(2)(B) can ever be granted to a
party when the evidence is inaccessible because of that party's
failure to institute a litigation hold.   The Court examines this
question de novo, and concludes that no such bright line rule
exists.

Nothing in the plain language of Rule 26(b)(2)(B) requires
such a threshold determination of who is at fault for the data

having become inaccessible.  The Rule states, "A party need not provide discovery of electronically stored information from sources that the party identifies as not reasonably accessible because of undue burden or cost."  One could argue that "undue" should be interpreted to mean "not a result of the party's own negligence," but the more natural reading of "undue" is simply that the burden or cost outweighs the potential benefit. Moreover, the Rule permits an order of production if the party shows good cause, which is where one would expect the analysis of the party's culpability in the inaccessibility to lie.  The Advisory Committee notes point to a multi-factored balancing test for assessing good cause.

Both of the parties and Judge Schneider rely heavily on a line of cases from the Southern District of New York known as the Zubulake cases.  See Zubulake v. UBS Warburg LLC ("Zubulake IV"), 220 F.R.D. 212 (S.D.N.Y. 2003) (Scheindlin, J.).[17]  These cases address the questions of when a duty to preserve evidence begins, what must be preserved in the context of electronic data, what is meant by inaccessible data, and what the proper remedies are for spoliation of this evidence.  A case recently decided by the same Judge and self-titled as "Zubulake Revisited: Six Years

_____

[17]  Rule 26 was amended in 2006 to address the issues raised by the increasingly frequent storage of information on electronic formats.  The Advisory Committee's analysis of the rule mirrors many of the points made in Zubulake, making the cases a point of focus for courts seeking to understand the revised rule.

71

Later," adds to this line of cases.  Pension Committee of University of Montreal Pension Plan v. Banc of America, No. 05 Civ. 9016 (SAS), 2010 WL 184312 (S.D.N.Y. Jan. 15, 2010) (Scheindlin, J.).

While the Zubulake cases thoughtfully consider discovery in the context of electronic data, none of the Zubulake cases, including Pension Committee, address the question of whether a party can be granted a protective order under Rule 26(b)(2)(B) when the inaccessibility of evidence is that party's fault. Instead, these cases speak to the question of when spoliation sanctions are warranted.  Although these are conceptually related inquiries, they are distinct.

The imposition of spoliation sanctions is a discretionary act.  In order to get from the Zubulake cases' discussion of spoliation to the bright line test Plaintiff seeks to defend, this Court would have to find that not only are spoliation sanctions required for negligent failure to retain emails on electronic servers as a matter of law, but also that the specific sanction of having to retrieve all of the relevant emails from backup tapes, no matter the cost, is also required as a matter of law.  No part of the reasoning or holdings in the Zubulake cases supports the rule that negligent spoliation requires discovery of backup tapes regardless of the other circumstances of the case. Indeed, those cases affirm the longstanding rule that "the

determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge and is assessed on a case-by-case basis." Fujitsu Ltd. v. Federal Exp. Corp., 247 F.3d 423, 436 (2d Cir. 2001).

This need for case-by-case discretionary balancing of factors also applies to the analysis under Rule 26(b)(2)(B). See Disability Rights Council of Greater Washington v. Washington Metropolitan Transit, 242 F.R.D. 139 (D.D.C. 2007). In Disability Rights Council, Magistrate Judge Facciola considered the argument raised by Plaintiffs here, but concluded that the proper approach was to balance Defendants' culpability as one factor in the seven-factor analysis. Only after considering the seven factors suggested by the Advisory Committee did Judge Facciola find that discovery of the backup tapes was warranted. The Rules compel exactly this discretionary balancing of costs and benefits of discovery, not a bright line requirement of production, no matter how burdensome, how likely to succeed, or how necessary to the litigation, if a party fails to adequately preserve every byte of previously accessible data.

Plaintiffs object that unless there is a prophylactic bright line rule, future parties will have a road map to avoiding discovery obligations. This Court disagrees for three reasons. First, this opinion takes no position on the question of whether a bright line rule exists with respect to a party intentionally

permitting relevant evidence to become inaccessible, rather than negligently failing to preserve it.  If there is evidence that a party has intentionally deleted emails or deliberately failed to inform key parties about the need to preserve emails, then the outcome may be different.  The case for intentional spoliation based on failures to preserve electronic evidence becomes easier and easier as federal rules for preservation of electronic evidence become more widespread and specific.[18]  Second, there are penalties available for spoliation wholly apart from whether the Court will order production of backup tapes.  These penalties can be as severe as necessary to deter the strategy Plaintiffs suggest future parties may adopt.   And third, the lack of a bright line rule should not be equated with the existence of the opposite rule; it does not mean that any given defendant will avoid the obligation of expensive retrieval of backup information.  Instead, a party's failure to preserve evidence will be weighed among all the other relevant factors, one of which is how much information was able to be accessed.  If a party permits all the relevant emails to be put on inaccessible media, as Plaintiffs fear, then the good cause balancing will tilt more strongly in favor of ordering discovery as the

---

[18]  For example, in the future, should the State of New Jersey fail to preserve emails under their obligation as explained by Judge Schneider, there will be a strong inference that such failure rises above mere inadvertence.

inaccessible media will be the only source of relevant emails.


2.   <u>Abuse of Discretion</u>

Having found that there is no bright line rule preventing a party from invoking Rule 26(b)(2)(B) when that party's negligence is responsible for the inaccessibility of the data, the Court next examines whether Judge Schneider abused his discretion in his application of the good cause factors to the facts of this case.  He did not, and so the Court will affirm his decision.

Judge Schneider found that the amount of evidence produced by Defendants (including depositions of the key individuals and tens of thousands of emails) meant that the backup tapes were likely to produce evidence of only marginal, cumulative benefit, and at great expense.  He found that this outweighed the slim likelihood of the discovery of non-cumulative evidence even if there was some unknown degree of negligent spoliation.

While the undersigned might have weighed the evidence of negligent spoliation more heavily in deciding whether to order discovery of the pre-2007 backup tapes, it is not clear that this re-weighing would result in a different outcome, much less that Judge Schneider's weighing was so far afield as to constitute an abuse of discretion, which generally requires a showing that the ruling below "rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to

fact."  See Interfaith Community Organization v. Honeywell
Intern., Inc., 399 F.3d 248, 253 (3d Cir. 2005).  This Court will
not order the state to perform over a million dollars worth of
discovery on the off chance that it might add to the five year's
worth of discovery already obtained, just because there is some
risk that relevant emails were not preserved.  Judge Schneider
considered the appropriate factors, weighed them in a reasonable
and comprehensive manner, and did not abuse his discretion in
doing so.  His Orders of November 4, 2009 and December 21, 2009
will be affirmed.


**VI.  CONCLUSION**

     While the Court may appropriately exercise jurisdiction over
this case despite the subject matter's relationship to some
municipal court judgments, much of the case will be dismissed as
a matter of sovereign immunity and sufficiency of the Complaint.
What survives of the Third Amended Complaint are Plaintiffs'
claims against the Garage Defendants, who have not moved to
dismiss any claims, and the § 1983, § 1985(3), NJCRA, and civil
conspiracy claims against the individual state inspectors alleged
to have engaged in racially discriminatory enforcement of the
Compliance Act.  If the allegations with respect to these two
State Defendants can be proved, they may be liable for damages in
their individual capacities; and Plaintiffs may be entitled to

some declaratory and injunctive relief.  The proposed amendments to the Complaint are nearly all unduly prejudicial, futile, or both.  Amendments at this late stage will only be permitted with respect to clarifications to Count I and II.  Finally, Judge Schneider applied the correct legal standard and did not abuse his discretion in determining the issue of discovery of the backup emails.  His orders will be affirmed.  The accompanying Order is entered.


**June 22, 2010**                              **s/ Jerome B. Simandle**
Date                                 JEROME B. SIMANDLE
                                     United States District Judge