```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW JERSEY


MAJOR TOURS, INC., et al.,     :   HON. JEROME B. SIMANDLE

              Plaintiffs,      :   Civil No. 05-3091 (JBS/JS)

     v.                        :
                                      OPINION
MICHAEL COLOREL, et al.,       :

              Defendants.      :
```

APPEARANCES:

Terry Davon Johnson, Esq.
BLANK ROME LLP
301 Carnegie Center
3rd Floor
Princeton, NJ 08540
    -and-
Ezra D. Rosenberg, Esq.
Evan Wainhouse Davis, Esq.
Irene Ayzenberg-Lyman, Esq.
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
    -and-
Yvette Claudia Sterling, Esq.
Barbara E. Ransom, Esq.
STERLING LAW FIRM, L.L.C.
400 High Street
Suite A
Burlington City, NJ 08016
    -and-
Michael Churchill, Esq.
Public Interest Law Center Of Philadelphia
1709 Benjamin Franklin Pkwy.
Second Floor
Philadelphia, PA 19103
    Counsel for Plaintiffs

Nonee Lee Wagner, Deputy Attorney General
Wayne J. Martorelli, Deputy Attorney General
Office of the NJ Attorney General
25 Market Street

```
PO Box 114
Trenton, NJ 08625
     -and-
Holly Rebecca Rogers, Esq.
DILWORTH PAXSON LLP
1500 Market Street
3500E
Philadelphia, PA 19102
     -and-
John J. Higson, Esq.
DILWORTH PAXSON, LLP
The Mellon Bank Center, 3200
1735 Market Street
Philadelphia, PA 19103
     Counsel for Defendants Michael Colorel, New Jersey
     Department of Transportation, Sharon Harrington, Diane
     Legriede, Vincent Shulze, New Jersey Motor Vehicle
     Commission, Kris Kolluri, and John F. Lettiere

William J. Pollinger, Esq.
WILLIAM J. POLLINGER, P.A.
Claridge Plaza
302 Union Street
Hackensack, NJ 07601
     Counsel for Defendants Jimmy's Lake Side Garage and James
     Restuccio
```

**SIMANDLE,** District Judge:

I.  **INTRODUCTION**

This matter is before the Court on the State Defendants' motion to exclude the testimony of Plaintiffs' racial profiling expert, Dr. John Lamberth.  [Docket Item 363.]  The principal issues are:  (1) whether Dr. Lamberth's method of analyzing inspection data in his initial expert report is reliable and helpful to a trier of fact; (2) whether Dr. Lamberth's analysis of evidence that Defendants used racist epithets is an expert opinion that is helpful to a trier of fact; and (3) to the extent Plaintiffs have sought to introduce the briefly-stated

conclusions offered in Dr. Lamberth's rebuttal report, whether Plaintiffs have shown them to be based on a reliable method.

**II.   BACKGROUND**

Plaintiffs are attempting to prove that two individual state officials — members of New Jersey's Commercial Bus Inspection Unit (CBIU) — discriminated against each of Plaintiffs' bus companies on the basis of the race of the owners of the bus companies over a period of several years.  Plaintiffs argue that they were disproportionately stopped for inspection, subject to greater scrutiny, and issued more citations than white-owned bus companies.  Plaintiffs hired Dr. Lamberth, a social psychologist who is an expert on racial profiling, to examine the data regarding the inspection of Plaintiffs' buses.

Dr. Lamberth prepared his opinion by examining the State's inspection records regarding Plaintiffs and one other company who leased buses from one of the Plaintiffs (Rahman Muhammad, doing business as Yours Charter Service).[1]  Lamberth compared that group's collective experience with that of all other bus companies traveling to Atlantic City.  [Docket Item 363-2 ("Lamberth Report") at 5-6.]  The CBIU performed 7,975 bus

---

[1] Dr. Lamberth's list does not perfectly correspond to the parties as named in the operative complaint, but the parties agree that all but Mr. Muhammad are Plaintiffs.  The divergence may be because Dr. Lamberth's list includes various trade names for bus companies.

inspections in Atlantic City between 2000 and 2007.  Plaintiffs and Rahman Muhammad were inspected 130 times.  [Id. at 5.]  Dr. Lamberth compared this fraction (130/7,975, or approximately 1.6%) to the fraction of bus trips to casinos that his test group constituted (calculated to be .34%), the latter percentage having been developed by straightforward but rough methods of extrapolation from limited data.  [Id. at 6-8.]  Dr. Lamberth observed that the likelihood of this distribution of inspections occurring by random chance is vanishingly small, and this remains true even if the calculation of the fraction of bus trips to casinos that his test group constituted is off by a reasonable degree.

   Dr. Lamberth also examined the duration of inspections, level of inspection, results of the inspection, and other inspection-related variables using the identical method (i.e., comparing the sum or mean of each group's results and showing that it would be very unlikely for an underlying normal distribution to yield both sets of results by random chance).  He showed that there were statistically significant differences in the results for each group for each category.  [Lamberth Report at 11-14.]  Finally, Dr. Lamberth's initial report also briefly comments on the import of evidence that the State Defendants made racist remarks in the workplace, opining that this is consistent with a finding of racial discrimination.  [Id. at 19-20.]

4

In response to criticism from Defendants' expert and in order to respond to Defendants' expert report, Dr. Lamberth prepared a rebuttal report. [Docket Item 363-3 ("Lamberth Rebuttal").] Among other things, in this rebuttal report Dr. Lamberth offers some new conclusions about what the inspection database reveals. [Id. at 15-17.] Dr. Lamberth opines that the condition of Plaintiffs' buses cannot explain the pattern he observed. He reaches this new conclusion based on an exhibit, which is not in the record, that purportedly suggests the buses were not in worse condition than other inspected buses, and based on a new statistical analysis comparing the outcomes of New Jersey State Police inspections to CBIU inspections. [Id.]

The question before the Court is whether Dr. Lamberth's initial report, and the conclusions in his rebuttal report, are admissible under the Federal Rules of Evidence.

**III.  DISCUSSION**

  **A.  Standard**

The admissibility of putative expert testimony is governed by Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) and Rule 702 of the Federal Rules of Evidence. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by

> knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

As the Supreme Court explained in Daubert, district court judges perform a "gatekeeping role," 509 U.S. at 596, by assessing whether expert testimony is both relevant and methodologically reliable in order to determine whether it is admissible under Rule 702. Id. at 590-91. The proponent of expert testimony must establish the admissibility of the expert's opinion by a preponderance of the evidence. In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 744 (3d Cir. 1994).

In this case, Defendants challenge both the reliability of Dr. Lamberth's method for reaching his conclusions, and challenge whether the conclusions, properly understood, "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. As to reliability, the Court is to scrutinize the expert's method only as necessary to ascertain whether the opinion is based on valid reasoning and sound methodology; the Court need not agree with the opinion, or believe that the method used to reach it was ideal. Oddi v. Ford Motor Co., 234 F.3d 136, 145-46 (3d Cir. 2000); In re Paoli, 35 F.3d at 742, 744 ("[T]hey do not have to demonstrate to the judge

by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable."). As to whether the opinion is useful to a lay jury, Rule 702 "demands that the expert testimony assist the trier of fact," and so the Court must also consider whether "the research is sufficiently connected to the facts and issues presented in a given case." Suter v. General Acc. Ins. Co. of America, 424 F. Supp. 2d 781, 787 (D.N.J. 2006) (citing Paoli, 35 F.3d at 743).

### B. Initial Report

#### 1. Reliability of conclusion based on inspection data

Reliability is about the relationship between the conclusions an expert reaches and the data and method used to reach those conclusions.  Assessing reliability therefore begins with an examination of the conclusions drawn by the expert. Reading Dr. Lamberth's report, it is easy to have a mistaken impression about his conclusions.  He is a racial profiling expert; his report uses the vocabulary of racial profiling; he references other racial profiling studies; and he refers to his self-selected group of companies as the "Minority-Owned Bus Companies," suggesting they represent a protected class and are being compared to an unprotected class.  But despite this formulation, Dr. Lamberth did not perform a standard racial

profiling analysis.  He actually makes no conclusions from the inspection data about the relevance of race to this case.  Indeed, although he produced a 33-page report, his conclusion is actually quite simple and limited:  when Plaintiffs are combined as a group with one additional non-Plaintiff bus company, that group was subject to more stops and greater scrutiny than their proportion of overall trips to Atlantic City would suggest. [Lamberth Report at 20.]

Defendants' criticisms largely address conclusions that one might expect Dr. Lamberth to reach given the nature of his rhetoric and expertise, but which he does not actually reach.  For example, the Court need not decide whether Dr. Lamberth's method could be used to reliably reach conclusions about particular plaintiffs or particular defendants, because Dr. Lamberth draws no such conclusions.  Similarly, the Court need not decide whether Dr. Lamberth's method could be used to reliably reach conclusions about the presence of racial profiling, because, again, he draws no such conclusions (though the Court will address the related question of whether Dr. Lamberth's study assists a trier of fact in reaching such conclusions).

For the very limited conclusion Dr. Lamberth does actually reach, his method is reliable.  Because Dr. Lamberth's approach involves straightforward math, the only conceivably problematic

8

aspect of his analysis would be the raw numbers being input into the equations.  To the extent there is even a genuine dispute about the underlying numbers, it is ultimately a dispute about issues on which reasonable people can disagree; in other words, it may undermine the correctness of Dr. Lamberth's conclusions, but not the reliability of his method.

Dr. Lamberth's method for reaching his limited conclusion is sufficiently reliable to make his conclusion admissible, so long as it also meets the other requirements of Rule 702, Fed. R. Evid.

### 2.  Usefulness of conclusion based on inspection data

Because Dr. Lamberth does not opine that black-owned buses as a whole were treated differently by the CBIU (or by the individual defendants), nor does he opine as to whether racial discrimination was the cause of the disproportionate treatment of his non-random sample, the primary obstacle to the admissibility of the statistical aspect of his initial report is whether it is helpful to the trier of fact in determining whether the State Defendants discriminated against Plaintiffs on the basis of the race of the bus companies' owners.

The most obvious way Dr. Lamberth's opinion might be helpful is if a trier of fact could reasonably infer from Dr. Lamberth's conclusion that his test group was discriminated against on the

basis of race.  This conclusion would be helpful even if it did not specifically implicate the conduct of the individual defendants, since a conclusion need not be dispositive of a matter to be helpful in its resolution.  But an inference of racial discrimination based solely on Dr. Lamberth's method would not be reasonable in this case for two fundamental reasons.

First, the studied sample is small, self-selected, and related by characteristics other than race.  In the typical racial profiling cases, the subjects of the discrimination are so numerous and engaged in such a common activity that it is reasonable to assume that they have little in common other than their race that might explain their disparate treatment.  See, e.g., State v. Soto, 734 A.2d 350 (N.J. Super. Ct. L. Div. 1996).  But in this case, Dr. Lamberth was not analyzing stops of all drivers on a certain roadway, or pat-downs of everyone living in a certain neighborhood.  Nor was he analyzing a random or representative sample.  Instead, he was analyzing eight bus companies that make trips to Atlantic City casinos, who are the companies who brought this action plus one company recommended by them for inclusion in the study, and about whom we know that at least two of the companies shared the same vehicles.  Because of the nature of the group studied in this case, it is unreasonable to conclude from this data alone that race explains the observed disparity.

The second fundamental problem is that the study did not compare a protected class to a similarly-situated unprotected class.  Comparing a self-selected group of companies to a comparison group that includes bus companies owned by African-Americans does not tell us anything meaningful about the presence of racial discrimination, without more information.  Troublingly, Dr. Lamberth does not appreciate why this presents an obstacle to drawing inferences about racial profiling from his data.  Dr. Lamberth wrote in his report, and testified at the hearing on this motion, that the inclusion of black-owned companies in the comparator group just understates any racially disproportionate results.  [Lamberth Report at 12.]  Dr. Lamberth's argument is circular — it is only the case that including black-owned companies in the comparator group would understate the degree of disparate treatment if one assumes to be true what the argument seeks to prove, that there was racial profiling.  If instead there was just something about the handful of companies studied by Dr. Lamberth (or just enough of them to skew the data, given the small sample) that made them more likely to be inspected and to have worse inspection outcomes — such as the condition of their buses, or the location of their routes — then the inclusion of self-selected complainants and the exclusion of other black-owned companies would present a very misleading picture about the presence of racially disparate treatment of bus companies.

While a finding of causation cannot be reasonably inferred from Dr. Lamberth's statistical analysis contained in the initial report, that is not the only possible way that Lamberth's expert opinion might prove helpful.  The bare existence of differential treatment of Plaintiffs does not itself satisfy either prong of the equal protection claim they seek to prove (since it does not even show that they were treated differently from a similarly-situated unprotected class), but it is a necessary predicate to those elements.  Plaintiffs adduce other evidence to support the premise that racial bias was the cause of the disparate treatment of Plaintiffs, including statements made by Defendants regarding their views of black-owned bus companies.  To the extent that Dr. Lamberth's opinion forms part of a larger web of circumstantial evidence, it can be helpful even if it alone is not dispositive of any disputed element.[2]

In summary, Dr. Lamberth's limited conclusion that Plaintiffs plus one other company were collectively subject to more stops and greater scrutiny than their proportion of overall trips to Atlantic City would suggest is a conclusion that is

---

[2] Additionally, at the Daubert hearing, Defendants appeared to maintain that there is no room for discretion in the CBIU inspections, and that there is not even evidence that Plaintiffs were more frequently inspected and found to be in violation of the regulations.  Defendants' expert, Dr. McCombs, also opined that Plaintiffs were not inspected more often than other bus companies.  These too are disputes of fact on which Dr. Lamberth's opinion may be useful.

12

reached using a reliable method.  And though it is of somewhat limited help to resolving the key issues of fact in this case, the Court cannot find that it is of no use at all.  The Court will preclude any testimony, however, suggesting that Dr. Lamberth's conclusions regarding the self-selected group of Plaintiffs is representative of the treatment given to minority owned bus companies as a whole, because the data compiled by Dr. Lamberth do not permit such an inference.  Such a limitation of testimony is necessary to assure that there is no confusion to the jury concerning the purposes for which this opinion testimony may be considered.

### 3. Conclusion Regarding Racial Epithets

At a deposition in this case, a former CBIU inspector named Wilfred Grotz testified that Defendant Calorel used racial slurs in reference to African-Americans, and that Calorel said "niggers run junk."  (Grotz Dep. 18:17-19:3.)  Grotz also testified that Defendant Schulze liked to go to Atlantic City because he thought it was easy to ticket and impound black-owned buses there, because "blacks had junk buses."  (Grotz Dep. 48:21-49:17.)  The evidence also includes the existence of an Equal Employment Office investigation based on allegations that Schulze called his secretary, who was both African-American and blind in one eye, a

"worthless one-eyed nigger."[3]

Dr. Lamberth concludes from this evidence that "While I cannot say that these inspectors allowed their feeling[s] to influence their work and who they inspected and how harsh they were, the data are consistent with targeting of [black-owned bus companies]." [Lamberth Report 21.] This conclusion is self-evident and therefore not helpful to a trier of fact. A lay juror does not need an expert to tell him or her that openly racist statements "are consistent with" racist conduct.

At the hearing, Dr. Lamberth and Plaintiffs' counsel elaborated upon this conclusion in an attempt to show how Dr. Lamberth was using specialized or scientific knowledge in a way that might be helpful to a lay juror. Plaintiffs' counsel proffered various hypothetical positions Defendants might take for which it would be useful to have Dr. Lamberth's testimony. If Defendants argued that they were merely joking, for example, Dr. Lamberth could be called to testify that it is unlikely that people would use racial slurs in this way in jest. Even assuming such a hypothetically necessary opinion, which is not offered in the report, could satisfy Plaintiffs' burden on this motion to exclude, the Court has not been presented with sufficient

---

[3] Dr. Lamberth also refers in his report to an admission made by Calorel in a deposition that he used some kind of racial slur, but no party has attached the relevant deposition to this motion, or to the summary judgment record.

14

evidence or argument to persuade it that Dr. Lamberth's status as a social psychologist gives him any specialized or scientific insight into whether Defendants could have been joking when they allegedly made these statements.

Because Dr. Lamberth's opinion as to the import of this evidence does not constitute the kind of scientific, technical, or other specialized knowledge that will assist the trier of fact to understand the evidence, it is not admissible as an expert opinion.  Defendants' motion to exclude this aspect of Dr. Lamberth's proposed opinion will be granted.

### C.  Rebuttal Report

In his rebuttal report, Dr. Lamberth belatedly addresses the crucial issue that the fact-finder in this case must resolve: whether race was the cause of the increased scrutiny experienced by Plaintiffs.  In that report, Dr. Lamberth makes two new observations about the data in order to rule out the possibility that the relative age of Plaintiffs' buses explains their experience of increased scrutiny.  At the Daubert hearing, Plaintiffs took the position that they need not defend the admissibility of these rebuttal opinions yet, if ever, because they had not yet sought to introduce them into evidence.[4]

---

[4] Unfortunately, Plaintiffs mistakenly believe that they are entitled to a presumption of discriminatory intent, because no neutral reason for the disparate treatment of Plaintiffs has

15

In fact, Plaintiffs have sought to introduce one of the two rebuttal opinions into evidence. Plaintiffs cite and rely on the rebuttal report's discussion of safety scores in their opposition to summary judgment. (Pl.'s Statement of Material Facts ¶ 31.) Dr. Lamberth observed that an exhibit used in Defendants' expert report (Exhibit 105) shows that in some unspecified period Plaintiffs' buses were not flagged as having more safety issues than other buses which had been stopped for inspection. Unfortunately, the exhibit in question is not in the record, and even though the Court alerted Plaintiffs to the importance of

---

been put forward by Defendants. This model of evidentiary burdens in which evidence of disparate treatment creates a presumption of discriminatory intent, called McDonnell Douglas burden-shifting, is applicable in employment discrimination actions, but not in this non-employment action. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800 (1973) ("The critical issue before us concerns the order and allocation of proof in a private, non-class action challenging employment discrimination."). Plaintiffs cited Stewart v. Rutgers, 120 F.3d 426 (3d Cir. 1997), at the Daubert hearing for the proposition that McDonnell Douglas burden-shifting applies to this non-employment case. But Stewart is an employment discrimination case. It has nothing to say about the applicability of McDonnell Douglas to non-employment selective enforcement or racial profiling cases. The Court is not aware of any reported case applying McDonnell Douglas burden-shifting to a non-employment § 1983 claim. On the contrary, every reported racial profiling case the Court is aware of is inconsistent with the application of McDonnell Douglas burden-shifting. See, e.g., Bradley v. United States, 299 F.3d 197, 205 (3d Cir. 2002) (noting that it was the plaintiff's burden to prove discriminatory intent at the summary judgment stage); Chavez v. Illinois State Police, 251 F.3d 612, 645 (7th Cir. 2001) (affirming grant of summary judgment to defendant when plaintiff failed to adduce evidence of discriminatory intent, and not applying burden-shifting analysis).

this document in assessing the admissibility of Dr. Lamberth's testimony, Plaintiffs opted not to introduce the exhibit into the record in the belief that they did not need to do so.  Without this crucial evidence, Plaintiffs fail to meet their burden of showing that this rebuttal opinion is admissible.  Dr. Lamberth's opinion about Exhibit 105 will therefore be excluded.

The second point made by Dr. Lamberth in the rebuttal is an argument that the relative safety of Plaintiffs' buses cannot explain the differential treatment because the State Police did not stop and cite Plaintiffs' buses with as much greater frequency as the CBIU did.  Plaintiffs correctly noted at the Daubert hearing that have not yet sought to introduce this opinion into the evidentiary record, and no mention is made of it in the summary judgment record.  It is therefore unnecessary to resolve its potential admissibility at this stage.  If Plaintiffs' case proceeds past summary judgment and at a later time Plaintiffs seek to introduce Dr. Lamberth's opinion regarding what the State Police data shows, Defendants will be permitted to renew their motion.  See Titan Stone, Tile & Masonry, Inc. v. Hunt Const. Group, Inc., Civ. No. 05-3362 (GEB), 2007 WL 1659056, at *4 (D.N.J. June 5, 2007) (declining to determine whether to exclude expert before it had become clear whether or how the expert's opinion would be used); AUSA Life Ins. Co. v. Dwyer, 899 F. Supp. 1200, 1203 (S.D.N.Y. 1995)

(deeming premature a motion in limine to preclude expert report, and choosing to wait until trial to rule on admissibility of the report).

## IV. CONCLUSION

In summary, Dr. Lamberth's opinion contained in his initial report regarding the disparate treatment of the group he studied (Plaintiffs plus one related bus company) is reliable and helpful to a trier of fact insofar as he analyzes the data that tend to show that the selected group's buses were inspected by the CBIU at a rate significantly greater than expected from their proportionate share of bus trips and with similarly higher rates of violations, provided that Dr. Lamberth does not suggest that his data and conclusions regarding this self-selected group is representative of all minority owned bus companies.  However, his opinion as to the meaning of Defendants' alleged use of racial slurs and racist statements is not the kind of scientific, technical, or other specialized knowledge that will assist the trier of fact to understand the evidence.  Finally, Plaintiffs have not shown that the one opinion from the rebuttal report that Plaintiffs do seek to introduce, regarding what is shown by an exhibit that is neither extensively described nor admitted into the record, is reliable.  Such a showing would require Plaintiffs to introduce the relevant exhibit, or at a minimum describe it in

more detail.  The accompanying Order will be entered.


| **June 6, 2011** | **s/ Jerome B. Simandle** |
|---|---|
| Date | JEROME B. SIMANDLE |
| | United States District Judge |