IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| MAJOR TOURS, INC., et al., | HON. JEROME B. SIMANDLE |
| Plaintiffs, | Civil No. 05-3091 (JBS/JS) |
| v. | |
| MICHAEL COLOREL, et al., | **OPINION** |
| Defendants. | |

APPEARANCES:

Terry Davon Johnson, Esq.
BLANK ROME LLP
301 Carnegie Center
3rd Floor
Princeton, NJ 08540
    -and-
Ezra D. Rosenberg, Esq.
Evan Wainhouse Davis, Esq.
Irene Ayzenberg-Lyman, Esq.
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
    -and-
Yvette Claudia Sterling, Esq.
Barbara E. Ransom, Esq.
STERLING LAW FIRM, L.L.C.
400 High Street
Suite A
Burlington City, NJ 08016
    -and-
Michael Churchill, Esq.
Public Interest Law Center Of Philadelphia
1709 Benjamin Franklin Pkwy.
Second Floor
Philadelphia, PA 19103
    Counsel for Plaintiffs

Nonee Lee Wagner, Deputy Attorney General
Wayne J. Martorelli, Deputy Attorney General
Office of the NJ Attorney General
25 Market Street
PO Box 114
Trenton, NJ 08625
    -and-
Holly Rebecca Rogers, Esq.
DILWORTH PAXSON LLP
1500 Market Street
3500E
Philadelphia, PA 19102
    -and-
John J. Higson, Esq.
DILWORTH PAXSON, LLP
The Mellon Bank Center, 3200
1735 Market Street
Philadelphia, PA 19103
    Counsel for Defendants Michael Colorel, New Jersey
    Department of Transportation, Sharon Harrington, Diane
    Legriede, Vincent Shulze, New Jersey Motor Vehicle
    Commission, Kris Kolluri, and John F. Lettiere

William J. Pollinger, Esq.
WILLIAM J. POLLINGER, P.A.
Claridge Plaza
302 Union Street
Hackensack, NJ 07601
    Counsel for Defendants Jimmy's Lakeside Garage and James
    Restuccio

**SIMANDLE,** District Judge:

## Table of Contents

I.   Introduction..............................................3
II.  Background................................................5
III. Standard of Review.......................................9
IV.  Statute of Limitations..................................10
    A.  Relation back.......................................11
    B.  Continuing violation doctrine......................12
    C.  Discovery rule.....................................18
    D.  Consequences of these findings.....................20
V.   Equal Protection Claims Against State Defendants........22
    A.   Evidence of knowledge of owners' race...........25
    B.   Evidence of differential treatment based on race..27
    C.   False violations and forced impound.............34
    D.   Scope of potential liability....................38

VI.   Detention of Bus 203....................................41
      A.   Conversion.......................................44
      B.   § 1981...........................................48
      C.   Conspiracy.......................................51
VII.  NJCRA Claims...........................................55
      A.   Due process......................................55
      B.   Criminal prohibitions............................57
      C.   Equal Protection.................................58
VIII. Cross-claims of Garage Defendants.....................59
      A.   Cross-claim I....................................59
      B.   Cross-claim II...................................62
IX.   Experts................................................64
      A.   McCombs..........................................64
      B.   Levinson.........................................68
      C.   Tinari...........................................70
X.    Motion to Seal.........................................74
XI.   Conclusion.............................................75

## I.   INTRODUCTION

This case involves allegations of racial discrimination in New Jersey's system of commercial bus safety inspections of tour buses in Atlantic City, New Jersey, as well as allegations regarding the improper impounding of a particular bus. Plaintiffs are six African American owned bus companies and their owners who have operated such tour buses during the years 2000 through 2007.  They claim there is racial disparity in the selection of buses for inspection, decisions to issue citations for bus safety violations, and decisions to impound buses ordered to be taken out of service when they fail inspection at the Atlantic City site.  This Court previously dismissed some of Plaintiffs' claims, and consequently the action is now proceeding against two state officials involved in the inspection system, Vincent Schulze and Michael Calorel ("State Defendants"), and a

repair shop and its owner who Plaintiffs allege are involved in the discrimination, Jimmy's Lakeside Garage and James Restuccio ("Garage Defendants") and who Plaintiffs allege impounded one of Plaintiffs' buses for two years.  A more complete description of this lengthy and contentious litigation appears in <u>Major Tours, Inc. v. Colorel</u>, 720 F. Supp. 2d 587 (D.N.J. 2010).[1]

The matter is before the Court on several motions.  The State Defendants move for summary judgment as to Plaintiffs' claims against them [Docket Item 365], and move for summary judgment as to the Garage Defendants' cross-claims.  [Docket Item 357.]  The Garage Defendants move for summary judgment as to Plaintiffs' claims against them, [Docket Item 358], and cross-move for summary judgment as to their cross-claims against the State Defendants.  [Docket Item 386.]  Additionally, there are also three motions to strike expert reports:  Plaintiffs' motion to preclude the testimony of the State Defendants' racial profiling expert, [Docket Item 354], and the Garage Defendants' and State Defendants' motions to strike the testimony of Plaintiffs' damages experts.  [Docket Item 355 & 356.]  Finally, Plaintiffs move to seal certain evidence attached to their

---

[1]     As the Court noted in that Opinion, Michael Calorel's last name was mispelled "Colorel" in the caption of the initial complaint in this case.  Thus, the caption of this case bears the name "Colorel," even though it is now clear that the proper spelling is "Calorel."

4

opposition to the State Defendants' motion for summary judgment [Docket Item 394].

## II.  BACKGROUND

As set forth in this Court's Opinion of June 22, 2010, this case principally involves the enforcement of New Jersey's Bus Safety Compliance Act, N.J. Stat. Ann. § 48:4-2.1, legislation that created a system of inspections to promote vehicle safety. Major Tours, Inc. v. Colorel, 720 F. Supp. 2d 587, 593 (D.N.J. 2010).  Under the Act, officers of New Jersey's Commercial Bus Inspection Unit (CBIU) can direct any bus operated in New Jersey to immediately drive to a designated facility for inspection. N.J. Admin Code § 16:53A-6.1.  Buses discovered to have a mechanical condition that would likely cause an accident or a breakdown, a so-called "out-of-service violation," may be required to unload passengers, to be taken out of service, and not permitted to operate in New Jersey until the conditions have been repaired.  The statute specifically describes the nature and permissible duration of the impound:

> The vehicle may be held or impounded until appropriate repairs are made on-site or until towed by the owner or operator to an appropriate repair facility, maintenance garage or otherwise, so that repairs of all bus safety out-of-service violations can be made.  The vehicle shall not be operated in this State until the defects are remediated and such remedial action is either certified or approved by the department.

N.J. Stat. Ann. § 48:4-2.1(h).  Additionally, the bus company is subject to civil penalties for each violation.  N.J. Stat. Ann. § 48:4-2.1(f).

The Bus Safety Compliance Act does not provide for how buses are to be selected for inspection.  According to the State, its policy is that the buses are to be chosen for inspection based on sequential selection (e.g., every third bus), visible or otherwise obvious defects (e.g., bald tires), or past inspection data contained in a database of bus safety information.  (See, e.g., State Defs.' Docket Item 369 Ex. 11 ("RSIVL dated 8/20/04").)[2]

Plaintiffs are six African American owned and operated bus companies and their individual owners:  Charles Major and Major Tours, Inc., Victoria Daniels and M & M Tours, James Wright and JW Auto, Inc., Glen Ragin, Sr. doing business as Jamm Tours, Robert Allen, and Carl Revels doing business as CMT Express. They offer bus tours between Pennsylvania and Atlantic City, New Jersey.  Plaintiffs allege that the State Defendants ignored the race-neutral inspection processes and improperly targeted their buses, and that Defendants selectively enforced the safety laws against them out of racial animus toward the owners of the bus

---

[2]   The parties have submitted separate collections of exhibits in support of their various motions.  For ease of identification, the Court includes the docket item in which the exhibit is contained.

companies.  The discriminatory conduct allegedly includes more frequent inspections, heightened scrutiny, and unwarranted violations and impound orders, as alleged in the Fourth Amended Complaint.

Plaintiffs also allege that the State Defendants discriminated against them by requiring towing to a repair shop instead of allowing on-site repair.  The inspectors allegedly required the buses to be towed to Jimmy's Lakeside Garage, which allegedly charged them above the prevailing market rates and subjected them to verbal abuse.  Charles Major and Major Tours, Inc. also complain of a particular incident in which a bus owned by Major Tours and operated by M & M Tours, Bus 203, was improperly detained at Jimmy's for two years.

The initial complaint was filed by Charles Major and Major Tours, Inc., as well as Victoria Daniels and M & M Tours on June 15, 2005.  After the first complaint was filed, the parties conducted nearly four contentious years of discovery.  During this period, the initial Plaintiffs amended the complaint several times adding additional Plaintiffs, among other changes.

In its June 22, 2010 Opinion, this Court dismissed on sovereign immunity grounds Plaintiffs' claims against state entities, claims for damages against Schulze and Calorel in their official capacities, and state law claims for injunctive relief. Major Tours, 720 F. Supp. 2d at 603.  The Court found the factual

7

allegations contained in the Third Amended Complaint to be
insufficient to state several of the claims, including claims as
to the supervisory officials previously named, claims based on
federal procedural and substantive due process deprivations,
claims under the dormant commerce clause and for violation of the
right to interstate travel, and the conversion claim as against
the State Defendants.  Id. at 605-610.

The Fourth Amended Complaint, filed to align the pleadings
with the June 2010 Opinion, includes six counts.  [Docket Item
330.]  Count I is a claim pursuant to 42 U.S.C. § 1983 arguing
that the State Defendants' racially discriminatory conduct
violated Plaintiffs' equal protection rights.  Count II is a
claim pursuant to 42 U.S.C. § 1981 arguing that the Garage
Defendants interfered with Major Tours and M & M Tours's rights
to freedom of contract by illegally impounding Bus 203 for almost
two years for racially discriminatory reasons.  Count III is a
conspiracy claim against the State and Garage Defendants pursuant
to 42 U.S.C. § 1985(3) based on the § 1983 claim.  Count IV is a
claim pursuant to the New Jersey Civil Rights Act (NJCRA), N.J.
Stat. Ann. § 10:6-2(c),(e) arguing that all of the Defendants
deprived Plaintiffs of their due process rights and equal
protection rights under the N.J. Constitution, and violated
certain criminal prohibitions against police racial profiling
(N.J. Stat. Ann. § 2C:30-5(d)) and official misconduct (N.J.

Stat. Ann. § 2C:30-6(a), 7(a)).  Claim V is a claim for
conversion under the common law of New Jersey against the Garage
Defendants based on the alleged unlawful seizure of Bus 203.
Finally, Count VI is a claim of civil conspiracy against all
Defendants declaring that "Defendants agreed among themselves and
with others to commit all the foregoing acts."

### III.  STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that
there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R. Civ.
P. 56(a).  A fact is "material" only if it might affect the
outcome of the suit under the applicable rule of law.  <u>Anderson
v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986).  Summary
judgment will not be denied based on mere allegations or denials
in the pleadings; instead, some evidence must be produced to
support a material fact.  Fed. R. Civ. P. 56(c)(1)(A); <u>United
States v. Premises Known as 717 S. Woodward Street, Allentown,
Pa.</u>, 2 F.3d 529, 533 (3d Cir. 1993).  However, the court will
view any evidence in favor of the nonmoving party and extend any
reasonable favorable inferences to be drawn from that evidence to
that party.  <u>Hunt v. Cromartie</u>, 526 U.S. 541, 552 (1999).
Where the nonmoving party bears the burden of persuasion at
trial, the moving party may be entitled to summary judgment

merely by showing that there is an absence of evidence to support an essential element of the nonmoving party's case.  Fed. R. Civ. P. 56(c)(1)(B); Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

## IV.  STATUTE OF LIMITATIONS

Plaintiffs Charles Major and Victoria Daniels (and their respective companies) filed the original Complaint on June 15, 2005.  The remaining Plaintiffs — James Wright, Glen Ragin, Sr., Robert Allen, and Carl Revels (and their respective companies) — were added by amendment, with the motion to amend having been filed on April 17, 2006.  With the exception of Ms. Daniels, whose company (M & M Tours) did not exist before 2003, Plaintiffs complain of discriminatory incidents ranging from 2000 through 2007.

The parties agree that New Jersey's two-year statute of limitations on personal injury actions, N.J. Stat. Ann. § 2A:14-2, applies to all of Plaintiffs' damages claims based on racial profiling.  Generally speaking, a plaintiff must file a claim within the prescribed limitations period for each injury-causing act from which they seek redress.  Wells v. Rockefeller, 728 F.2d 209, 217 (3d Cir. 1984).  Plaintiffs maintain that the April 17, 2006 addition of several Plaintiffs relates back to the June 15, 2005 Complaint, and that the incidents from January 1, 2000

through June 15, 2003 are actionable under the continuing violation doctrine and the discovery rule.

### A.  Relation back

Rule 15(c) of the Federal Rules of Civil Procedure does not directly contemplate the addition of plaintiffs to an existing action, but courts have applied the basic principles of that rule to the addition of plaintiffs.  <u>Nelson v. County of Allegheny</u>, 60 F.3d 1010, 1014 n.7 (3d Cir. 1995) (noting that the Committee Note to the 1966 Amendment states that the attitude taken in revised Rule 15(c) toward change of defendants extends by analogy to amendments changing plaintiffs).  The Rule provides that an amendment to add defendants can relate back to the date of the original complaint if any new claims or defenses "arose out of the conduct, transaction, or occurrence set out — or attempted to be set out — in the original pleading," and if within the service period the defendant(s) "(i) received such notice of the action that it will not be prejudiced in defending on the merits; and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity."  Rule 15(c)(1)(C), Fed. R. Civ. P.

Here, even if Defendants received enough notice to avoid prejudice by Plaintiffs alleging a widespread practice, Plaintiffs' argument fails because they have not demonstrated "a

mistake concerning the identity of the proper party."  <u>Id.</u> at
1014 (quoting Rule 15(c), Fed. R. Civ. P.).  Although the caption
of the initial complaint filed in this case included the phrase
"and all others similarly situated," this case was not otherwise
pleaded or prosecuted as a class action, and nothing in the
complaint suggested the identities of these later-added
Plaintiffs or gave notice that they would be bringing these
claims.  When new plaintiffs were unaware of their rights, then
they can assert equitable tolling, as Plaintiffs do in this case
as discussed below.  But otherwise, unless a plaintiff can meet
the conditions of Rule 15(c), defendants are entitled to their
reliance on the fact that old claims are eventually laid to rest
when plaintiffs sit on their rights.  <u>Id.</u>  Accordingly, the
claims of the plaintiffs who were first added in 2006 do not
relate back to the original filing of the complaint in 2005.


**B.  Continuing violation doctrine**

Both the federal courts and New Jersey courts recognize an
equitable exception to the statute of limitations called the
continuing violation doctrine.  Plaintiff invokes this doctrine
to argue that even if the claims accrued before 2003, they are
timely.[3]  There are some unsettled issues of law which the

_____

[3]     The continuing violation doctrine must be distinguished from
        both the continuing tort doctrine and the ongoing conspiracy

parties do not address regarding whether federal or state law
governs the continuing violation doctrine as applied to the
federal claims.  See <u>Speth v. Goode</u>, Civil Action No. 95-0264,
2011 WL 221664, at *7 n.7 (D.N.J. Jan. 20, 2011) (describing
unsettled issues).  But since the Court does not discern any
distinctions between the state law and federal law versions of

---

doctrine.  The continuing tort doctrine holds that a tort
claim related to conduct more than six years old will not be
time-barred if "each injury allegedly constitutes a new
tort, because each injury contains all the elements of a
tort, without any need to refer to prior actions to
establish liability." <u>Russo Farms, Inc. v. Vineland Bd. of
Educ.</u>, 675 A.2d 1077, 1086-87 (N.J. 1996); <u>see Kolczycki v.
City of East Orange</u>, 722 A.2d 603, 610 (N.J. Super. Ct. App.
Div. 1999).  The continuing violation doctrine is a doctrine
based on the accrual of claims which are an aggregate of
wrongs, no single one of which would give rise to a discrete
claim.  By contrast, the continuing tort doctrine is a
doctrine permitting action on a new tort when the victim of
the tort has previously been the victim of similar or
identical discrete wrongs but took no action.  One doctrine
addresses the problem of actionable injuries that are a
collective result of many non-actionable sleights, and the
other doctrine addresses on-going injuries which the victim
could previously have prevented but which are ongoing.  Like
the continuing tort doctrine, the ongoing conspiracy
doctrine does not allow recovery for claims that are
otherwise barred; instead, it allows recovery for new acts
despite the plaintiff having learned of the conspiracy and
its effects outside the statutory period.  <u>See West Penn
Allegheny Health System, Inc. v. UPMC</u>, 627 F.3d 85, 2010 WL
4840093, at *14 (3d Cir. 2010) ("[I]t therefore appears that
West Penn may, consistent with the statute of limitations,
recover damages for the acts that occurred within the
limitations period.").  This latter doctrine does make
Plaintiffs' conspiracy claims timely to the extent they are
based on inspections within the statutory period, even if
the agreement underlying the conspiracy was formed outside
the statute of limitations.  <u>Id.</u>

13

the doctrine that are relevant here, the Court need not decide which body of law applies.

Virtually all of the precedent discussing the continuing violation doctrine involves workplace discrimination suits.  New Jersey courts describe the doctrine as "an equitable exception to the statute of limitations" that applies to "causes of action arising under anti-discrimination laws" because "[a]n actionable claim under [New Jersey's Law Against Discrimination] based upon a hostile work environment frequently arises out of repeated incidents that take place over time and by their cumulative effect make it unreasonable and unhealthy for the plaintiff to remain in that work environment."  Alliance For Disabled In Action, Inc. v. Renaissance Enterprises, Inc., 853 A.2d 334 (N.J. Super. Ct. App. Div. 2004).

In 2002, the Supreme Court decided National R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002), which provides a clear explanation of the doctrine in the workplace harassment context. New Jersey courts have followed Morgan in deciding the scope of the doctrine.  See Shepherd v. Hunterdon Developmental Center, 803 A.2d 611, 623 (N.J. 2002); see also Green v. Jersey City Bd. of Educ., 828 A.2d 883, 891 (2003) (applying Morgan to a Conscientious Employee Protection Act claim).  In the context of Title VII claims, the Supreme Court in Morgan established that the doctrine applies only to a certain class of claims, holding

14

that "[h]ostile environment claims are different in kind from discrete acts.  Their very nature involves repeated conduct.  The 'unlawful employment practice' therefore cannot be said to occur on any particular day.  It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own."  In other words, Morgan "distinguished between 'discrete' discriminatory acts, such as wrongful terminations, and acts concerning unlawful employment practices, which 'cannot be said to occur on any particular day,'" and applied the continuing violation doctrine to the latter set of claims.  See Mancini v. Township of Teaneck, 846 A.2d 596, 599-600 (N.J. 2004) (quoting Morgan).

The Third Circuit Court of Appeals has entertained application of the continuing violation doctrine to non-employment civil rights actions in a handful of cases, but has held that it applies outside the employment context in only two cases:  Centifanti v. Nix, 865 F.2d 1422, 1433 (3d Cir. 1989) and Keystone Ins. Co. v. Houghton, 863 F.2d 1125 (3d Cir. 1988).  The former case applies the doctrine as one of several holdings without explanation or discussion, and the latter was overturned by the Supreme Court.  See Klehr v. A.O. Smith Corp., 521 U.S. 179 (1997).  To the extent that the doctrine applies beyond the employment context, it is clearly confined to the delayed accrual of a claim based on aggregate wrongs.

15

As recently summarized by the New Jersey Supreme Court:

> [T]he continuing violation theory cannot be applied to sweep in an otherwise time-barred discrete act. . . . As we have said, the continuing violation theory was developed to allow for the aggregation of acts, each of which, in itself, might not have alerted the employee of the existence of a claim, but which together show a pattern of discrimination.  In those circumstances, the last act is said to sweep in otherwise untimely prior non-discrete acts. . . . What the doctrine does not permit is the aggregation of discrete discriminatory acts for the purpose of reviving an untimely act of discrimination that the victim knew or should have known was actionable.

Roa v. LAFE, 985 A.2d 1225, 1233 (N.J. 2010).  In Wilson v. Wal-Mart Stores, 158 N.J. 263, 273 (1999), the New Jersey Supreme Court found that in order to constitute a continuing violation, the acts "must be continuous on an almost daily basis."  See Giovanetti v. ICI Americas, Inc., 2006 WL 1520756 (N.J. Super. Ct. App. Div. 2006) (citing Wilson).

Even if the doctrine applies to § 1983 actions, it does not apply to a racial profiling claim involving many discrete acts of racial profiling and selective enforcement.  Unlike a hostile work environment in which not every inappropriate comment or glance is actionable in itself, racial profiling involves a series of discrete actionable incidents.  A claim based on racial profiling or selective enforcement accrues at the time of the discriminatory enforcement action.  See Hilton v. Whitman, No.

16

04-cv-6420 (SDW), 2008 WL 5272190 (D.N.J. 2008) (collecting cases
and concluding that "[m]ost Courts in this District agree that a
selective enforcement claim based on racial profiling accrues
upon the stop, search and seizure made pursuant to the selective
enforcement of the law"); Dique v. Mulvey, 2008 WL 1882856
(D.N.J. 2008).  Every time a bus is improperly stopped or
discriminated against on the basis of race, a cause of action
arises.

It would undermine the grave import of such racial
discrimination to hold that, as required for the continuing
violation doctrine to apply, no single stop was actionable.
Racially selective enforcement is analogous to an employee being
repeatedly turned down for promotion on the basis of race.  The
employee may not discover the discriminatory reason for the
failure to promote until the pattern emerges, in which case the
employee's recourse is to equitable tolling based on the
discovery rule, but that does not aggregate the discrete acts
into a continuing violation.  See Morgan, 536 U.S. at 114
(describing how failure to promote claims, unlike hostile work
environment claims, cannot take advantage of the continuing
violation doctrine).

**C.  Discovery rule**

Generally, even when the injury-causing action itself may be either lawful or unlawful from the victim's perspective at the time, the claim still accrues.  See Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1386 (3d Cir. 1994) ("A claim accrues in a federal cause of action as soon as a potential claimant either is aware, or should be aware, of the existence of and source of an injury . . . not upon awareness that this injury constitutes a legal wrong.").  However, the Third Circuit Court of Appeals has held that in the context of selective enforcement, New Jersey's discovery rule tolls the statute of limitations until the victim discovered, or by exercise of reasonable diligence should have discovered, that the police action was improper.  Dique v. New Jersey State Police, 603 F.3d 181, 188 (3d Cir. 2010) ("It was not until July 2001, when his attorney became aware of the extensive documents describing the State's pervasive selective-enforcement practices, that Dique discovered, or by exercise of reasonable diligence should have discovered, that he might have a basis for an actionable claim.").

To take advantage of this rule of equitable tolling to make incidents outside the two-year statutory range actionable, Major and Daniels must adduce evidence that they did not know about the racial profiling in the CBIU system until June 15, 2003, and the other Plaintiffs must show that they did not learn about it until

at least April 17, 2004.  See Lopez v. Swyer, 300 A.2d 563, 568
(N.J. 1973) ("The burden of proof will rest upon the party
claiming the indulgence of the rule."); see also Lapka v. Porter
Hayden Co., 745 A.2d 525, 565 (N.J. 2000).

Plaintiffs offer no evidence that supports the proposition
that any of the Plaintiffs first learned about the discriminatory
nature of the system after the relevant cutoff dates.  And what
evidence there is diametrically opposes that conclusion.  The
owners of CMT Express complained to Senator Arlen Spector about
the discrimination in 2002.  (State Defs.' Docket Item 369 Ex. 27
at 9.)  On September 11, 2003, attorney Robert Sugarman, hired by
Major and several other unidentified African American owned and
operated companies, sent a letter to the Commissioner of the
Department of Transportation and the Attorney General of New
Jersey.  (Pls.' Docket Item 390 Ex. U ("Sugarman Letter").)  The
letter makes clear that the knowledge of the practices of the
CBIU were widespread, and known to Sugarman's clients prior to
June 15, 2003.  The letter states that beginning around 2000, the
CBIU initiated a "systematic program of harassment, deterrence,
and discrimination, based on racial profiling."  (Id.)  It
relates that, in addition to being selected for inspection, buses
without problems are written tickets, and forced to go thirty
miles away for "repair."  (Id.)  It states, "As a result of this
program, by the fall of 2002, African American bus operators had

19

found it impossible to operate in Atlantic City, and had
terminated at least Friday night charter service, and in most
cases, had terminated all service to Atlantic City." (Id.)

No reasonable jury could infer from the evidence that is in
the record that these companies were unaware of the putative
racial profiling until just a few months before the Sugarman
letter, or in the case of four of Plaintiffs, nearly a year after
it.  Therefore, Plaintiffs have not adduced evidence from which a
jury might find that their claims accruing prior to two years
before their respective filing dates are timely.

**D.  Consequences of these findings**

Plaintiffs will only be able to recover for injuries that
occurred in the two years prior to the effective date of their
complaints, which for Daniels and Major is June 15, 2003, and for
the remaining Plaintiffs is April 17, 2004.  Evidence of
selective enforcement outside these time frames is still relevant
evidence under Rule 404(b) of the Federal Rules of Evidence,[4] but

---

[4]     The Rule provides that evidence of other wrongs is
admissible to prove "motive, opportunity, intent,
preparation, plan, knowledge, identity, or absence of
mistake or accident."  Fed. R. Evid. 404(b).  Such evidence
may be admissible subject to the constraints of Fed. R.
Evid. 403 provided that the probative nature of such
evidence is not substantially outweighed by undue prejudice,
consumption of time or confusion of the issues.

Plaintiffs cannot recover for losses resulting from the stops occurring before the applicable period.[5]

Major Tours experienced three inspections after June 15, 2003, and none after September 10, 2004.  (State Defs.' Docket Item 369 Ex. 14 ("Lamberth Report") at 94.)  M & M Tours had all thirteen of its stops after June 15, 2003, two of which occurred before September 10, 2004.  (<u>Id.</u> at 99.)  CMT experienced three inspections after April 17, 2004, all of which occurred after September 10, 2004.  (<u>Id.</u> at 95.)  JAMM Tours experienced seven inspections after April 17, 2004, all of which occurred after September 10, 2004.  (<u>Id.</u> at 96.)  RAC Tours experienced fourteen inspections after April 17, 2004, all but two of which occurred after September 10, 2004.  (<u>Id.</u> at 97.)  JW Auto experienced

---

[5]   Any NJCRA claims may be limited to stops occurring on and after September 10, 2004, since that is the date the Act was passed.  However, it is not clear whether the Act is retroactive.  <u>See</u> <u>Schiavo v. John F. Kennedy Hosp.</u>, 609 A.2d 781, 783 (N.J. Super. Ct. App. Div. 1992) (explaining that curative statutes are generally retroactive); New Jersey Senate Committee Statement, A.B. 2073, 5/6/2004 ("[T]he bill is intended to address potential gaps which may exist under remedies currently provided by New Jersey's 'Law Against Discrimination.'").  Since the only discussion of the statute's retroactivity by either party is citation to a single case that expressly made no holding on the issue, the Court will decline to perform what would functionally be a <u>sua</u> <u>sponte</u> review of the matter. If any Plaintiff seeks to recover upon an NJCRA claim for a stop occurring before September 10, 2004, the party must demonstrate that the NJRCA applies retroactively.

sixteen inspections after April 17, 2004, all but two of which occurred after September 10, 2004.  (Id. at 98.)[6]

## V.   EQUAL PROTECTION CLAIMS AGAINST STATE DEFENDANTS

To prevail on their § 1983 and NJCRA equal protection claims, Plaintiffs must each prove that actions of each Defendant (1) had a discriminatory effect on them and (2) were motivated by a discriminatory purpose.  See Bradley v. United States, 299 F.3d 197, 205 (3d Cir. 2002).  The parties agree that the claim pursuant to the New Jersey Civil Rights Act under the New Jersey Constitution is governed by the same standards.  See State v. Segars, 799 A.2d 541, 547 (N.J. 2002) (explaining similarity of the two constitutions' prohibition on racial discrimination).

Unlike employment discrimination, a plaintiff alleging discrimination unrelated to employment does not receive a presumption of racial discrimination based on a showing that the plaintiff belongs to a racial minority and was treated differently from a similarly-situated white person.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800 (1973) (creating certain presumptions for employment discrimination

---

[6]    Consistent with the foregoing, the parties shall prepare, in their Joint Final Pretrial Order, a complete listing of each party's incidents for which it seeks recovery and will present evidence at trial, and a separate list of each proposed incident of other instances of racial profiling by Defendants which it intends to introduce into evidence under Rule 404(b).

cases); <u>Bradley v. United States</u>, 299 F.3d 197, 205 (3d Cir. 2002) (noting that it was the plaintiff's burden to prove discriminatory intent at the summary judgment stage); <u>Chavez v. Illinois State Police</u>, 251 F.3d 612, 645 (7th Cir. 2001) (affirming grant of summary judgment to defendant when plaintiff failed to adduce evidence of discriminatory intent, and not applying burden-shifting analysis).[7]

To prove discriminatory effect, Plaintiffs must show that they are members of a protected class, that they are otherwise similarly situated to members of the unprotected class, and that plaintiffs were treated differently from members of the unprotected class. <u>Bradley</u>, 299 F.3d at 206 (citing <u>Chavez v. Illinois State Police</u>, 251 F.3d 612, 636 (7th Cir. 2001)).[8]

---

[7] Although the Supreme Court has assumed without deciding that this burden-shifting may apply outside Title VII actions to § 1983 employment actions, there has been no suggestion that the scheme designed for the employment situation is more broadly applicable. <u>See</u> <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 506 n.1 (1993). Even if <u>McDonnell Douglas</u> were to be extended to the present type of action, it would not change the result in this case because the presumption to which <u>McDonnell Douglas</u> entitles a plaintiff is a presumption of discriminatory intent, but Plaintiffs in this case have ample evidence to show discriminatory intent — what is potentially lacking for each claim and the main subject of dispute is whether they adduce proof that they were differently treated from similarly-situated white-owned buses. <u>McDonnell Douglas</u> places the burden of production on the plaintiff with respect to that element.

[8] Plaintiffs and the State Defendants have each cited <u>Bradley</u> as the controlling decision. This Court agrees.

In this case, Plaintiffs contend that CBIU inspectors discriminated against them on the basis of their race by treating their buses differently from other similar white owned buses in the inspection process.[9]  It is undisputed that Plaintiffs, as African Americans, are members of a protected class.  The State Defendants dispute the other elements, making two arguments: first, that Plaintiffs have not adduced evidence that the inspectors knew the race of the bus company owners such that they could discriminate against them; and second, that Plaintiffs have failed to adduce evidence that the State Defendants were not simply following established race-neutral procedure in stopping these buses.  See Fed. R. Civ. P. 56(c)(1)(B) ("[T]he moving party may be entitled to summary judgment merely by showing that there is an absence of evidence to support an essential element of the nonmoving party's case.").[10]  Since, as explained below,

---

[9]    Defendants have not challenged the standing of the Plaintiff companies to bring this action, as distinct from the owners themselves.  See Thinkink Information Resources, Inc. v. Sun Microsystems, Inc., 368 F.3d 1053, 1058-59 (9th Cir. 2004) (discussing the state of the law with respect to corporations as the subjects of racial discrimination).  In the absence of a such a challenge, the Court is satisfied that, to the extent any of the companies constitutes a separate legal entity from its owner, they have standing to bring a racial discrimination claim based on the race of their owners.  See, e.g., City of Richmond v. J.A. Croson Co., 488 U.S. 469, 717 (1989) (permitting white-owned firms to bring suit under the Equal Protection Clause).

[10]   The Court separately addresses the NJCRA claims brought against the Garage Defendants.  See infra Part VII.C

Plaintiffs present sufficient evidence on both issues to raise a factual dispute, summary judgment will be denied.

### A.  Evidence of knowledge of owners' race

Plaintiffs present direct evidence that CBIU inspectors met two of Plaintiffs — Charles Major and Victoria Daniels. Defendant Schulze admits that he knew the race of the owner of Major Tours and M & M Tours because of his interactions with them.  (Pls.' Docket Item 389 Ex. A ("Schulze Dep. of Jan. 22, 2008") at 171:1-22.)  Plaintiffs also present evidence that Calorel and Schulze discussed and made disparaging remarks about black-owned bus companies.  (Pls.' Docket Item 389 Ex. OO ("Grotz Dep. of Sept. 17, 2009") at 18:7-21:4.)  Therefore, a jury could reasonably infer that Calorel was also privy to this information.

A reasonable factfinder could determine that the same evidence of discussions about bus companies and who runs them shows that Defendants knew the race of many of the bus company owners.  So the only question is whether a reasonable factfinder could infer that the State Defendants knew, or operated on their beliefs about, the race of the remaining four bus company owners. See, e.g., Diaz-Bernal v. Myers, 758 F. Supp. 2d 106, 134-35 (D. Conn. 2010) (holding that Equal Protection claim can be based on perceived ethnicity).

25

There are a number of ways that Schulze or Calorel could
have learned or guessed the race of each of Plaintiffs.  They, or
colleagues who shared the information with them, could have met
the owners at any of the municipal court hearings on summonses
issued by the CBIU (at which an inspector is usually present to
testify about the violation).  They also might have inferred the
race of the bus company owners from the clientele or destination
of the buses.  Dr. Lamberth testified that based on his
observation of the inspectors and the knowledge they gain or can
infer from the names of the companies, their clientele, drivers,
etc., they are "going to know to a great extent who it is who
owns those bus companies." (Pls.' Docket Item 389 Ex. D
(Lamberth July 19, 2010 Dep.) at 110:13-22.)  While these
mechanisms by which Schulze and Calorel learned or guessed the
race of the owners are partly speculative, what is shown if one
credits reasonable inferences from Plaintiffs' evidence (as
required in this summary judgment motion) is that Schulze and
Calorel did in fact learn the race of many bus companies through
these or other mechanisms, and that these particular companies
experienced disproportionate scrutiny from the CBIU for some
reason.  Collectively, this evidence is enough for a reasonable
jury to infer that Schulze and Calorel guessed or knew the race
of all six company owners.

26

**B.   Evidence of differential treatment based on race**

Given the totality of circumstantial evidence presented in this case, and acknowledging the closeness of this question, the Court finds that Plaintiffs have adduced sufficient evidence from which a reasonable jury could find that they were treated differently from white-owned buses, and that this differential treatment was motivated by a discriminatory purpose.  This analysis requires a more extensive review of the circumstantial evidence and admissible expert opinion presented in this case.

Plaintiffs adduce evidence that they were stopped for inspection far more often than sequential selection can explain. Their racial profiling expert, Dr. Lamberth, examined the State's inspection records regarding Plaintiffs and one other black-owned bus company who leased buses from one of the Plaintiffs. Lamberth found that Plaintiffs and the one non-Plaintiff company collectively were 4.75 times more likely to be inspected than random chance would predict.  (Pls.' Docket Item 389 Ex. S ("Lamberth Report") at 11-14.)  Statistically, this rate of inspection, occurring almost five times more than the average expected by random chance, could not have occurred without targeted selection of these buses, for one reason or another.

Plaintiffs also introduce evidence from which a jury could reasonably conclude that the State Defendants' purportedly mandatory and race-neutral system of inspections was actually

27

highly discretionary.  The nature of the bus safety violations is such that there is some degree of discretion in determining the existence of a visible safety violation to justify a non-random stop even when they are being scrupulously adhered to.  See, e.g., N.J. Admin. Code § 16:53A-3.5 (describing a violation for a part not attached "in a workmanlike manner").  There is also evidence that these guidelines were not scrupulously adhered to. A CBIU inspector named Gerhard Kaniper explained that inspectors would sometimes do nothing more than identify fluids dripping from the bus, or a tire that looks "questionable," to justify pulling a bus out for inspection, without further identifying any particular regulation.  (Pls.' Docket Item 389 Ex. F (Kaniper January 31, 2008 Dep.) at 55:8-56:4.)  Most damningly, Kaniper testified that even if a bus was not a sequentially-selected bus, and even if it had no visible defects, inspectors still sometimes sent such buses to the inspection site for more thorough inspection.  (Kaniper Dep. 55:8-56:4.)

Additionally, Plaintiffs adduce evidence that Schulze and Calorel held racist attitudes.  A CBIU inspector named Wilfred Grotz testified at his deposition that Schulze thought his secretary was a "lazy nigger," and instructed Grotz to watch her closely for any mistakes that could be used against her.  (Grotz Sept. 17, 2009 Dep. 16:13-17:3.)  He testified that Calorel would say "niggers run junk," referring specifically to black-owned

28

buses in Atlantic City.  (Grotz Dep.  18:17-19:3.)  He also claims Calorel said he moved his home because an African American family moved in next to him.  (Grotz Dep. 19:15-20:12.)

It is true, as Defendants contend, that Plaintiffs have not undertaken to prove differential treatment by careful study of the racial distribution of stoppable offenses.  In <u>State v. Soto</u>, 734 A.2d 350, 360-61 (N.J. Super. Ct. L. Div 1996), a case Plaintiffs cite as analogous to their own, the Court was able to find differential treatment because it was presented with evidence about the rates at which different racial groups committed driving violations; this provided a basis for a determination whether the pattern of motor vehicle stops was a reflection of differential treatment, or just fair enforcement with differential results.  <u>Id.</u> at 352-353; <u>see also</u> <u>State v. Kennedy</u>, 588 A.2d 834, 841 (N.J. Super. Ct. App. Div. 1991) (finding differential treatment based on a scientific study that disclosed the racial composition of those exceeding the speed limit).  Although Plaintiffs employed the same expert employed in <u>Soto</u>, Dr. John Lamberth, he departed from the method he had employed in <u>Soto</u>.  In this case, he did not study the racial distribution of legitimate bases for non-random inspection: visible defects and safety scores.[11]

---

[11]   Dr. Lamberth belatedly attempted to briefly analyze the relative safety scores and condition of Plaintiffs' buses in a rebuttal report.  <u>Major Tours, Inc. v. Colorel</u>, Civil No.

Nevertheless, Plaintiffs still adduce enough evidence to create a genuine dispute of material fact as to whether they were racially profiled.  In addition to the evidence described above suggesting that Schulze and Calorel had the motive and opportunity to racially discriminate against Plaintiffs, and the evidence that Plaintiffs were indeed subject to significantly more frequent inspections than the average tour bus company, there is also evidence that Plaintiffs' buses were stopped for reasons other than their visible defects and safety scores.  The

_____

05-3091 (JBS/JS), 2011 WL 2221176 (D.N.J. June 7, 2011). But one of these conclusions was inadmissible because Plaintiffs declined to introduce the document from which it could be determined that the conclusion was based on a reliable method, and Plaintiffs did not seek to introduce the other opinion into the summary judgment record (and so the Court did not consider whether it was based on a reliable method).  Dr. Lamberth's opinions are admissible, however, to the extent he has computed the incidence of Plaintiffs' inspections by the CBIU compared with that of the average bus traveling to Atlantic City.  This amounts to evidence of disparity between the frequency of inspections of plaintiffs' buses compared with the average tour bus of any racial ownership; it is not itself proof that black-owned buses were treated differently than white-owned bus companies because Dr. Lamberth did not analyze the data according to race of the comparison bus companies. Similarly, Dr. Lamberth did not compare the experience of the self-selected group of plaintiffs with the entire group of African American owned bus companies serving this same market to determine whether Plaintiffs' treatment was representative of other African American companies.  Despite these limitations, such evidence, while not sufficient to demonstrate differential treatment because of the study's shortcomings, as explained in Major Tours, Inc., 2011 WL 2221176, is probative circumstantial evidence because it is accompanied by evidence of racial animus directed against Plaintiffs, as well as evidence of racial targeting by these Defendants.

strongest such piece of that evidence is the testimony of Wilfred Grotz, who averred that Schulze and Calorel "would go out and get the buses they thought were junk because of the minorities on the bus." (Grotz Dep. 47:24-48:20.)  Schulze goes on to explain how Schulze liked going to Atlantic City because he knew he could find a violation on black-owned buses, and that he especially liked the black-owned buses because they did not have the ability to fix problems on the spot.  (Grotz Dep. 49:6-17.)  Schulze reportedly said impounds were "a feather in his cap."  (Grotz Dep. 49:8-17.)  He said they would talk about this "[j]ust about every time" Grotz was in the office, and that it was "the highlight of the days."  (Grotz Dep. 50:6-15.)  Grotz reported that the inspectors mostly pulled over church buses or minority owned buses.  (Grotz Dep. 50:20-51:3.)  Schulze would tell the inspectors to be on the lookout for church buses especially, since there were a lot of "minority church buses."  (Grotz Dep. 51:10-17.)  Grotz also testified that Calorel constantly liked to brag about how he got "black buses."  (Grotz Dep. 53:5-14.)

From the context, it is not certain that Grotz is using the word "target" in the way Plaintiffs are, to mean that the inspectors departed from the normal selection measures to focus on what they perceived to be black-owned buses.  But a reasonable jury could certainly interpret the testimony this way, especially

31

in light of the other evidence, which is enough for Plaintiffs to proceed past the summary judgment stage.

Plaintiffs also point to the affidavit of a Mr. Elvert Elliot, a tour bus driver operating in Atlantic City who drove for two black-owned companies and one white-owned company from 2000-2007. (Pls.' Docket Item 389 Ex. K ("Elliot Aff.").)[12]  He states that buses belonging to black-owned companies seemed to get stopped more, adding that the buses for all three companies he drove for "were kept in about the same condition" as detected by his own inspections according to a common checklist before each trip, but differentially treated according to race. (Id. ¶

---

[12]   Defendants maintain that the Elliot affidavit should not be considered as admissible evidence on summary judgment because Elliot was not identified as a fact witness, because he has no personal knowledge of Plaintiffs' experiences, and because the affidavit is hearsay.  The last two objections are without merit.  Rule 56 expressly permits affidavits to be considered on summary judgment.  Rule 56(c)(1)(A), Fed. R. Civ. P.  And the testimony is relevant because the declarant has personal knowledge that the CBIU discriminated against some buses on the basis of race, which is relevant to a jury's determination of whether these Plaintiffs received the same treatment.  As to the issue of Rule 26 disclosure, Defendants have not filed a motion to exclude this testimony, and so Plaintiffs have not yet had the opportunity to explain whether the failure to disclose Elliot was "substantially justified or is harmless," as Rule 26, Fed. R. Civ. P., would require for the testimony's admissibility.  If Defendants wish to file a formal motion to exclude the testimony, as they have done with the other witnesses they sought to exclude, they are free to do so. The Court will also ensure that the State has the opportunity to depose Mr. Elliot before trial, if desired.

9.)[13]  In fact, he did not recall a single instance in which the white-owned bus he drove was selected for inspection.  Such evidence would appear to be admissible under Rule 404(b), Fed. R. Evid., and Defendants have not yet argued for its exclusion under Rule 403, Fed. R. Evid., which Defendants may seek to do after having an opportunity to depose Elliot.  This further bolsters Plaintiffs' claim that race, and not the condition of the buses, explains why their buses were stopped so much more often.

In sum, Plaintiffs adduce evidence that Schulze and Calorel held negative views about the condition of Plaintiffs' buses based on Plaintiffs' race, operated an inspection system with ample room for manipulation and discretion, inspected Plaintiffs' buses at a much higher rate than the average for other companies, and bragged about how their efforts to target minority buses resulted in higher violation and impound rates for the CBIU.  A reasonable jury could draw inferences from these facts sufficient

---

[13]    Plaintiffs also cite the statement of a former CBIU inspector, Walter Ricks, who was reported as having "made observations [about] the disparate treatment offered to the majority vendors who passed DOT inspections more frequently versus the minority vendors who had not."  (Pls.' Docket Item 389 Ex. JJ ("Internal Report of Investigation") at 4.)  Unlike Elliot's affidavit, this statement is plainly inadmissible on summary judgment on its face.  Assuming the factual findings of the report are admissible as an official record under 803(8)(c), Fed. R. Evid., to admit Ricks's statement for the truth would still require a second hearsay exception that is not present.  The Court therefore has not considered this statement for the purpose of assessing summary judgment.

to find by a preponderance of the evidence that Schulze and Calorel departed from the standard selection procedures and selectively targeted Plaintiffs' buses because of Plaintiffs' race.

### C.  False violations and forced impound

The Court does find, however, that Defendants are entitled to partial summary judgment on the claim of fabricated violations.[14]  While Grotz's crucial testimony can be read to support Plaintiffs' claim of selective targeting, nothing Grotz said supports the proposition that inspectors fabricated violations.  The same is true for Elliot's affidavit; indeed, Elliot acknowledges that each of his buses was permitted to be towed from the inspection site for the necessary repairs by a repair company of his choosing and he never suggests that such repairs were not in fact necessary.  (Elliot Aff. ¶ 11.)  Thus, unlike the supporting evidence about selective targeting for inspections, there is little other than the bare disparity between Plaintiffs' inspection outcomes and those of all other

---

[14]    As a practical matter, it may not make a difference to the relief Plaintiffs are ultimately entitled to if they show that they were illegitimately stopped and then given illegitimate violations, as opposed to having been illegitimately stopped and given legitimate violations. The Court previously held that Plaintiffs cannot recover damages for the fines paid to the municipal court.  Major Tours, Inc. v. Colorel, 720 F. Supp. 2d 587, 597 (D.N.J. 2010).

bus companies (including black-owned companies) to support the
differential treatment prong of the claims of fabricated
violations. Since the condition of the two compared groups'
buses is unknown, a disparity alone, without some other proof of
race-based treatment (like that provided by the Grotz and Elliot
testimony for selective inspections) does not demonstrate
differential treatment because it does not speak to whether
Plaintiffs were treated differently from similarly-situated
buses.

Plaintiffs do offer some anecdotes related to the legitimacy
of violations, but they rest on speculation rather than evidence
or known facts. Plaintiffs state that a violation was found on
one bus that had not been found two days earlier, or found by one
state inspection entity and not another. (Pls.' Supp. Statement
of Material Facts ¶ 63.) And they cite a handful of specific
citations for violations that Plaintiffs allege without proof
were improper, like a citation for self-adjusting brakes not
being adjusted (it is not clear to the Court that self-adjusting
brakes cannot function improperly such that they are improperly
adjusted).[15] Importantly, Plaintiffs have presented no evidence

---

[15]    It does not escape the Court's notice that these violations
may have led to a higher rate of subsequent inspections if
inspectors used the buses prior history to determine
inspections. One of the means of selecting a bus for
inspection, aside from random assignment and visible
violations, was to examine the safety score for that vehicle
from a federal database containing prior violations, so that

of any pattern of acquittals in municipal court for baseless violations, and the Court finds none in the record.  That Plaintiffs admitted or were found guilty and paid essentially all violations would foreclose their claims that the violations are unfounded.

The claim that Schulze and Calorel caused Plaintiffs' buses to be towed instead of fixed on-site is also unsupported by evidence.  There was never any statistical analysis of impound (as distinct from out-of-service violations repaired on site).  It is undisputed that Plaintiffs Wright, Ragin, and Revels were towed only a handful of times collectively, and all disavow ever having been towed to Jimmy's.  (Garage Defendants' Docket Item 404 Ex. C (Wright Dep.) at 142:12-145:6; Ex. D (Ragin Dep.) at 224:3-9; Ex. E (Revels Dep. 117:7-22).)  Although Major Tours, M

---

a bus with a worse score could be targeted for inspection, as explained above.  This raises a complex factual and legal question regarding whether any given subsequent inspection resulted from the recording of a legitimate violation on a company's record as the result of a racially discriminatory inspection, and if so whether that makes the subsequent inspection unlawful.  Like many critical questions in this case, the parties do not address this matter on this motion, so the Court leaves its resolution for another time.  Any such concern would apply only to an inspection of a plaintiff's bus that was based on a negative safety score, where the score itself was caused by racially-profiled prior inspections.  Without knowing what component of a bus's safety score was based upon which particular prior violations, it is probably impossible to make this showing that the safety scores were tainted by racial discrimination, and were a substantial factor in the later selection of that bus for inspection.

& M Tours, and CMT Express continue to allege that drivers were
"often not told they could get their own tow company, not given
an opportunity to repair their vehicles before they were towed,
or not given adequate time for the tow company of their choice to
respond," (Pls.' Supp. Statement of Material Facts ¶ 65), the
only evidence they attach supporting this proposition is
testimony about an example in which this did not happen, (Pls.'
Docket Item 389 Ex. J ("Ragin January 9, 2008 Dep.") 75-76)), and
testimony relaying something some other non-party told the
deponent, which is inadmissible hearsay.  (Pls.' Docket Item 389
Ex. B ("Allen January 9, 2008 Dep.") 61-62).  Plaintiffs have not
offered any admissible evidence showing a single instance of a
bus being denied the opportunity to repair on site,[16] much less

_____

[16]   The incident for which the record is best developed is the
inspection and impoundment of M & M Tours's Bus 203 on
December 10, 2003.  There is no evidence that Bus 203's
driver sought to make repairs at the inspection site or that
he sought to tow Bus 203 with a towing company of his own
choosing.  (State Defs.' Docket Item 369 Ex. 25 (Alfonzo
Colter Dec. 22, 2009 Dep.) at 360:25-361:2.)  In the section
of Colter's deposition submitted to the Court, he does make
apparent reference to some earlier testimony in the
deposition involving inspectors having "knocked the
adjustment off the S-Kam brakes," but not only has no party
referred to this statement in their argument or Statements
of Material Facts, no party has included the section of
deposition in which this earlier testimony occurred.  The
Court can only presume that the fuller context explains why
Plaintiffs have not submitted this statement as evidence of
fabrication.  Moreover, improperly adjusted brakes was not
one of the citations issued to Bus 203 on December 10, 2003.
(Garage Defs.' Docket Item 362 Ex. Q at MC-1 p.6.)  M & M
Tours did not attempt to repair the violations or have the
bus towed to a repair facility of its choosing, according to

that black-owned bus companies were generally forced to go to
Jimmy's unlike white-owned companies who got to select a garage
of their choosing.

Although Plaintiffs' pleadings and arguments have proclaimed
that false violations were imposed and that they were treated in
a disparate manner regarding opportunities to make repairs at the
inspection site and to make their own towing and repairing
arrangements, they have not satisfied their burden of producing
admissible evidence of these claims in opposition to the summary
judgment motion, which was their burden.  Partial summary
judgment will be entered in favor of the State Defendants upon
Plaintiffs' claims that their violations lacked probable cause
and that they were treated in a disparate manner with regard to
repair at the inspection site and opportunities to tow their bus
to a repair shop from the inspection site.


### D.  Scope of potential liability

The State Defendants contend that since Schulze and Calorel
did not personally perform most of the inspections at issue in
this case, Plaintiffs are improperly relying on respondeat
superior liability.  See Ashcroft v. Iqbal, 129 S.Ct. 1937, 1951

---

its driver, which is uncontradicted.  Further, if the
violations on Bus 203 were not genuine, that could have
easily been detected and shown by testimony of a mechanic
who inspected the bus and attempted an unnecessary repair,
but no such evidence exists.

38

(2009) ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").  As this Court explained in Liberty and Prosperity 1776, Inc. v. Corzine, 720 F. Supp. 2d 622, 628-29 (D.N.J. 2010), claims based on a showing that a supervisor knew of and acquiesced to the discriminatory conduct of a subordinate are not foreclosed by Iqbal.  Iqbal rejected supervisory liability in that case because the Supreme Court found that a nondiscriminatory intention, and not discriminatory animus, was the more likely inference to be drawn from the allegations made in that case regarding the supervisor's conduct.  Iqbal at 1951-52.  Consequently, merely permitting the operation of the discriminatory policy did not state a claim against the policymaker because there was no factual allegation or reasonable inference regarding discriminatory purpose behind that decision. Id.

Conversely, if a plaintiff shows that the supervisory decisions that resulted in the discriminatory effects were taken for a discriminatory reason, then the plaintiff need not show that the supervisor himself directly executed the harmful action. As the head of the CBIU, Schulze would oversee and participate in inspections of buses on site at casinos in Atlantic City.  (Grotz Dep. 48:21-49:25.)  Schulze reportedly told the inspectors to be on the lookout minority buses.  (Grotz Dep. 51:10-17.)  Calorel,

as a Primary Investigator, would also oversee and participate in inspections of buses on site at casinos in Atlantic City.  There is evidence that Schulze was present at the inspection sites on days when Plaintiffs' buses were inspected at least twenty-one times and Calorel was present at the inspection sites on days when Plaintiffs' buses were being inspected at least fifty-two times.  (Pls.' Docket Item 389 Ex. AA ("Churchill Aff.").) Schulze is personally the complaining witness on six summons. (Pls.' Docket Item 389 Ex. PP.)  This evidence must be evaluated against the other background evidence of racial animus.

While Plaintiffs have yet to articulate the precise scope of the liability they seek to impose on Schulze and Calorel (and Defendants have failed to use the tools of the Federal Rules of Civil Procedure to force them to do so), the Court is satisfied that Plaintiffs have adduced evidence from which a jury could find liability for at least some injuries based either on Schulze and Calorel's actual decision to inspect a bus, or the directions given to subordinates by Schulze and Calorel for a discriminatory purpose, or both.  Therefore, a reasonable jury could find that Schulze and Calorel's own actions caused Plaintiffs' buses to be stopped on the basis of the race of the owners.  Precisely how many of these stops are legally and factually attributable to Schulze and Calorel is a matter that is not ripe for summary judgment.

## VI.  DETENTION OF BUS 203

On December 10, 2003, the CBIU requested that Jimmy's impound a bus owned by Major Tours, Bus 203, that had been taken out of service by the CBIU because of safety violations.  The bus was not released until after the filing of this action in 2005.  The parties dispute whether the bus was unlawfully detained, and if so, whether this was because of racial animus.

As discussed previously, three months prior the December 10, 2003 impound, Charles Major and some other unidentified individuals hired an attorney named Robert Sugarman to pursue an action based on racial profiling.  (Pls.' Docket Item 389 Ex. U ("Letter from Robert Sugarman dated 9/11/03"); Ex. DD ("Major May 29, 2008 Dep.") at 64:12-23 (explaining that he hired Sugarman).)  Sugarman wrote to the New Jersey Attorney General and the Commissioner of the New Jersey Motor Vehicle Commission about allegations of racial profiling in the bus inspection system.  (Id.)  The letter mentions the allegation that buses are improperly forced to go to "Lakeview in Hammonton," which perhaps refers to Jimmy's Lakeside Garage, as well as one other garage, and complains about their high fees.  (Id.)

When Major went to the garage to retrieve Bus 203 in December 2003, Restuccio was openly belligerent toward him.  (Pls.' Docket Item 393 Ex. F ("Transcript of December 30, 2003

41

recording").)  When asked for a copy of his rates, Restuccio
responded, "It's none of your business what I charge.  I charge
what I want.  You want to hire a lawyer on me too?"  (Id. at 1.)
Restuccio asks, "What law is there that says what I can charge?"
to which Major responded, "You the law sir.  I'm in your place,
you are the law," causing Restuccio to declare, "You get too
fucking smart and I will call the cops and they will pick up your
fucking warrant to put you in jail." (Id.)  Restuccio tells
Major "Don't get fucking smart with me," and "Don't get too
fucking cocky." (Id.)  Restuccio ultimately orders Major to
stand outside until the bill is ready, saying "Get outside until
we give it to you.  Go get your goddamn lawyer.  [G]o get your
mother, your grandmother and your father too."  (Id.)

    According to Major's testimony, after making him stand
outside, Restuccio "came to the door, threw the paperwork out
like I was a dog . . . Called me an asshole.  Told me if the tow
truck that I hired wasn't there by quarter to five that I
couldn't get my bus." (Garage Defs.' Docket Item 359 Ex. G
("Major May 29, 2008 Dep.") 48:13-20.)  There is a genuine
dispute over whether Major offered to pay the entire towing and
storage bill at that time.  (Id. at 54:10-18; Garage Defs.'
Docket Item 360 Ex. J ("Restuccio March 4, 2008 Dep.") 114:15-

115:1.)[17]  It is undisputed that Major had Restuccio call an
unidentified state official who told him that the bus could be
released, as far as the CBIU was concerned.  (Restuccio Dep.
55:23-25.)

Major had arrived at the garage in the late afternoon.  He
avers that "at 4:45 when I returned with the funds and had
already called Joe's Towing[,] Defendant then stated that if the
tow truck I ordered was not there by 5:00 p.m. he would not allow
the truck on the premises."  (Pls.' Docket Item 393 Ex. I ("Major
June 8, 2005 Aff.") ¶ 44.)  The bus did not get towed that day.

A representative of Major Tours did not return to the garage
until January 8, 2004.  Major, through his attorney, offered $500
for the release of the bus in a letter sent before the January 8
visit.  It is unclear whether that offer was rejected, but in any
case the representative was told that the bus would not be
released until some outstanding warrants were satisfied.  (Pls.'
Docket Item 393 Ex. G ("Motor Carrier Inspector's Report of
January 8, 2004").)  Defendant Calorel apparently told Restuccio
that he could continue to impound the bus regardless because

_____

[17]  According to the bookkeeper for Jimmy's, the garage charges
      $375 for towing and $75 per day storage for buses.  (Garage
      Defs.' Docket Item 361 Ex. K ("Deininger June 12, 2008
      Dep.") 45:16-46:21.)  As of December 30, 2003, the bill for
      towing and storage was $1,965.  Plaintiffs attempt to
      dispute that this is Jimmy's ordinary rate, but are unable
      to point to any evidence other than the lower rate charged
      by one other garage and by the South Jersey Transit
      Authority.

there were outstanding warrants on it; the outstanding warrants were not satisfied until 2005.  (Id.; Garage Defs.' Docket Item 361 Ex. N-2 ("Requests for Admission) #19, #21, #34.)

Following commencement of this action, it was agreed that the Garage Defendants' bill would be kept at $51,414.00 as of September 12, 2005 and that the vehicle could be removed from the premises by Major Tours upon execution of security agreement in the amount of $55,000.00.  [Docket Item 22.]

### A.  Conversion

Conversion is a tort based on a defendant's exercise of dominion or control over property which is inconsistent with the plaintiff's rights.  LaPlace v. Briere, 962 A.2d 1139 (N.J. Super. Ct. App. Div. 2009).  The tort does not require that the defendant knowingly or intentionally acted wrongfully.  Id.  The question in this case is whether the Garage Defendants' refusal to release Bus 203 to a towing company of Major's choosing was inconsistent with his rights.  The Garage Defendants assert that they had lawful authority to withhold custody of the bus from Major until the full amount of the towing and storage fees had been paid.  And they contend that they were also entitled, indeed required, to detain the bus pursuant to the orders of Defendant Calorel.  Neither proposition is supported by the law.

The common law of possessory liens is inapplicable.  A person who merely tows and stores a vehicle without repairing or otherwise enhancing the value of vehicle had no right to a lien under the common law.  Bruce G. M. Diesel, Inc. v. Associates Financial Services Co., 288 A.2d 875 (N.J. Super. Ct. L. Div. 1972), rev'd on other grounds by 308 A.2d 373 (N.J. Super. Ct. App. Div. 1973).  And, in any case, the common law regarding such liens did not survive New Jersey's enactment of the Garage Keepers Lien Act.  Bruce G.M. Diesel, Inc., 308 A.2d at 374; Onondaga Truck Lease Inc. v. Hovell, 259 A.2d 6 (N.J. Co. Ct. L. Div 1969).

The Garage Defendants expressly abandon any reliance upon the Garage Keepers Lien Act.  (Garage Defs.' Reply Br. 11.)  But even if they had not, the Act would still be inapplicable because it does not apply to vehicles stored without the owner's consent. The Act applies to garage keepers who store a vehicle "at the request or with the consent of the owner or his representative." N.J. Stat. Ann. § 2A:44-21.  See also Rutgers Cas. Ins. Co. v. Simmermon, 2006 WL 1699442, at *4 (N.J. Super. Ct. App. Div. 2006) (holding that the Act did not apply to car towed at request of non-owner).  Both "consent" and "representative" are given their ordinary meanings under the Act, such that "consent" means to express a willingness or give assent or approval, and a "representative" is one that represents another or others in a

45

special capacity: as agent, deputy, substitute, or delegate
usually being invested with the authority of the principal.
General Elec. Capital Auto Lease v. Violante, 848 A.2d 732, 738
(N.J. 2004).  The Act has been read to cover somewhat attenuated
"representatives" of the owner, like a lessee obligated by the
lessor to repair the vehicle, see Violante, 848 A.2d at 739-40,
but has never been applied to the unwilling impound of a vehicle
by the State.

Because the Garage Defendants had no legal right to hold the
bus arising from their demand for payment, whether and in what
amount Major was obligated to pay the Garage Defendants for
towing and storage is irrelevant to this conversion claim.[18]

The other putative basis for the Garage Defendants lawfully
detaining the bus is also unfounded.  The Garage Defendants have
failed to identify any legal authority for the proposition that

---

[18]   The Court does not and need not decide the matter, but it is
    not clear what law authorizes the garage to charge the owner
    for impounding a vehicle.  Impound is not a service provided
    to the owner or to the vehicle; it is a preventative measure
    taken by the State for public safety pursuant to statute.
    The familiar procedure by which an owner is charged for
    unrequested towing is a creature of legislation.  See,
    e.g., N.J. Admin. Code 19:9-1.6(h).  But that legislation
    does not apply to these facts, and the Bus Safety Compliance
    Act contains no such provision for the shifting of impound
    costs to bus owners.  It simply provides, "The vehicle may
    be held or impounded . . . until towed by the owner or
    operator to an appropriate repair facility."  N.J. Stat.
    Ann. § 48:4-2.1h; N.J. Admin. Code § 16:53A-5.2.  Indeed,
    the Act explicitly reserves any penalties imposed pursuant
    to the act for adjudication in municipal court.  See N.J.
    Admin. Code § 16:53A-8.1.

the CBIU may order that an owner or operator not be permitted to

tow an out-of-service bus to an appropriate repair facility if

there are outstanding warrants against the bus company.  Such a

proposition runs contrary to the language of the Bus Safety

Compliance Act, which explicitly defines the permissible duration

of impound as "until towed by the owner or operator to an

appropriate repair facility."  N.J. Stat. Ann. § 48:4-2.1h.  The

applicable regulations regarding towing and impoundment echo

these contours, stating:  "The vehicle may be held or impounded:

1. Until appropriate repairs are made on site; or 2. Until towed

by the owner or operator to an appropriate repair facility or

maintenance garage so that repairs of all bus safety

out-of-service violations can be made."  N.J. Admin. Code §

16:53A-5.2.  Under Defendants' reading of the statute, impound is

permissible even if the owner is actively being denied the

ability to tow the vehicle to a repair facility.  This is not a

reasonable interpretation of the statute and regulation.  The

manifest purpose of empowering the CBIU to impound the bus is to

take it out-of-service until its defects are repaired.  If the

state lacked the authority to order the Garage Defendants to

continue to impound the bus after Major sought to have it towed

to a repair facility of his choosing, then following that

unlawful order does not transform the Garage Defendants' exercise

of dominion over the bus into a lawful act.  It is axiomatic that

47

one is not legally empowered to take some action merely by the unlawful order of a state employee.

It is conceivable that there is some as-yet unidentified source of legal authority for the CBIU to order a private company to withhold custody of a bus from its lawful owner who seeks to have it towed to a repair facility.  But since the Court has not been alerted to this authority, and has not found such authority it is own review, Defendants have not shown that they are entitled to summary judgment on the conversion claim.[19]

### B.   § 1981

42 U.S.C. § 1981 prohibits racial discrimination in the making and enforcement of contracts and property transactions, providing:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses and exactions of every kind, and to no other.

---

[19]   Notwithstanding the lease agreement between Major Tours and M & M Tours, the conversion claim is brought only on behalf of Charles Major and Major Tours. (Fourth Am. Compl. ¶ 79 ("Defendant Jimmy's did unlawfully deprive Plaintiffs Major and Major Tours of their property . . .  thus permanently depriving Plaintiff of the use and control of his vehicle until released by court order.")

42 U.S.C. § 1981.  In order to prove a claim under § 1981, a
plaintiff must show (1) that plaintiff is a member of a racial
minority; (2) intent to discriminate on the basis of race by the
defendant; and (3) discrimination concerning one or more of the
activities enumerated in the statute, which includes the right to
make and enforce contracts.  <u>Brown v. Phillip Morris Inc.</u>, 250
F.3d 789, 797 (3d Cir. 2001).  The statute defines the term "make
and enforce contracts" to include "the making, performance,
modification, and termination of contracts, and the enjoyment of
all benefits, privileges, terms, and conditions of the
contractual relationship."  42 U.S.C. § 1981(b).

        The Fourth Amended Complaint states:

>           Defendants have prevented Plaintiffs from
>           making and performing contracts with their
>           customers by illegally impounding their bus
>           for almost two years.  Defendants have also
>           prevented Plaintiffs from contracting with
>           repair, tow, or impound companies of
>           Plaintiffs' choice . . . thus denying
>           Plaintiffs enjoyment and the use of Bus 203
>           and the income that would have been derived
>           therefrom for more than two years.

(Fourth Am. Compl. ¶ 55.)  Since there is no evidence that any
Defendants forced Major and Daniels to use Restuccio's garage,
much less that Restuccio forced this, that basis for the claim
does not sustain it.  The question is therefore whether there is
evidence that Restuccio "prevented Plaintiffs from making and
performing contracts with their customers by illegally impounding

their bus for almost two years," and whether he did so out of racial animus.

As explained above, there is evidence that Restuccio illegally impounded the bus, at least after January 8, 2004.[20] The question is therefore whether Plaintiffs have adduced evidence that Restuccio acted out of racial animus.  It is a reasonable inference from the existence and content of Restuccio's extraordinarily hostile conduct towards Major on December 30, 2003 that Restuccio bore racial animosity toward Major.

Restuccio contends, essentially, that since he did not use any racial slurs, no reasonable jury could find that his hostility was based on Major's race.  (Garage Defs.' Br. 7.)  An open admission of racism is not the only basis upon which a reasonable jury can identify it.  Restuccio told his customer, "It's none of your business what I charge," admonished him not to "get too fucking smart and I will call the cops and they will pick up your fucking warrant to put you in jail," again

---

[20]   As to the impound for the period until January 8, 2010, the undisputed testimony is that, although they operate 24-hours in emergencies, Restuccio does not permit the removal of vehicles from his lot after 5:00 p.m.  (Restuccio Dep. 111:3-6.)  In other words, there is no evidence Restuccio permitted white-owned bus companies to tow their buses from his property after 5:00 p.m. while denying that permission to these Plaintiffs on account of their race.  But it is unclear whether this deadline could have been met absent Restuccio's hostile conduct.

admonished him to not "get too fucking cocky," and then made him
stand outside.  Restuccio offers no explanation whatsoever for
this exceptionally confrontational conduct.  He appears to be
very angry that Major would retain a lawyer to try to prevent
racial discrimination.  Among other possible inferences, a
reasonable fact-finder could read from the tenor of Restuccio's
abuse that he viewed Major as an inferior (e.g., "don't get too
fucking cocky."), and that his hostility was racial.  Under the
totality of the circumstances as a factfinder could reasonably
find them from Plaintiffs' evidence, this is a sufficient basis
from which a jury could find racial animus.


        C.  Conspiracy

        The elements of a § 1985(3) claim are "(1) a conspiracy; (2)
for the purpose of depriving, either directly or indirectly, any
person or class of persons of the equal protection of the laws,
or of equal privileges and immunities under the laws; and (3) an
act in furtherance of the conspiracy; (4) whereby a person is
injured in his person or property or deprived of any right or
privilege of a citizen of the United States." Farber v. City of
Paterson, 440 F.3d 131, 134 (3d Cir. 2006) (internal quotations
and citations omitted).  State law civil conspiracy has similar
requirements. LoBiondo v. Schwartz, 970 A.2d 1007, 1029-30 (N.J.
2009) (noting that the elements include an agreement between the

parties to inflict a wrong against or an injury upon another, and an overt act that results in damage).

Plaintiffs claim to have adduced evidence of what might be usefully thought of as three conspiracies that may or may not overlap: (1) conspiracy to force Bus 203, and perhaps buses generally, to be towed to Jimmy's; (2) a conspiracy to refuse to permit Charles Major to tow Bus 203 elsewhere; and (3) a conspiracy between Schulze and Calorel to target African American owned buses.[21]  The State and Garage Defendants argue with respect to both the § 1985 and civil conspiracy claims that there is no evidence of collusion or agreement between any of the parties to commit these acts.

As to the conspiracy to force Bus 203, or buses generally, to use Jimmy's Garage instead of towing elsewhere or repairing on-site, Defendants are correct that Plaintiffs have adduced insufficient evidence to support this claim, a matter already addressed above in Part V.C.

As to the conspiracy to refuse to permit Charles Major to tow Bus 203 elsewhere, there is evidence of agreement between Calorel and Restuccio.  On January 8, 2004, Calorel wrote to Schulze, stating that he contacted Restuccio to see if they still

---

[21]   If Plaintiffs intended their claim to raise other conspiracies, the Court sees no evidence for them, and therefore would grant summary judgment as to any other conspiracy claims.

had Bus 203, and Restuccio stated that he did and was having
trouble getting Major to pay.  (Pls.' Docket Item 389 Ex. Z
("Calorel Jan. 8, 2004 Letter".))  They evidently agreed that
Calorel would come to the garage to confront the representative
of the company who was coming on January 8 to retrieve the bus.
According to the letter, Calorel then helped Restuccio convince a
Hammonton police officer that the bus was lawfully seized.  (Id.)
If Schulze was not aware of the unlawful detention of Bus 203
before January 8, 2004, he was aware of it after that date based
on Calorel's letter to him.  (Pls.' Docket Item 389 Ex. Z
("Calorel Jan. 8, 2004 Letter".))  A reasonable fact-finder could
conclude that Schulze signaled his agreement to the ongoing
conspiracy to detain the bus and also directly participated by,
as Calorel's supervisor and Chief of the CBIU, taking no action
with respect to Bus 203.[22]  In light of the other evidence
related to the § 1983 and § 1981 claims, a reasonable jury could
find that Defendants agreed to unlawfully deprive Major of Bus
203 because of their racial animus toward Major.

It is true that there is evidence that these individuals
might have thought their conduct was lawful.  But even if that
question were not in dispute, unless the underlying wrongful act
requires knowledge of its illegality as an element, conspiracy

---

[22]   It is also possible for a fact-finder to conclude that the
       detention was part of Schulze and Calorel's wider conspiracy
       to harass black-owned buses.

does not require proof that the conspirators knew their conduct was unlawful, as distinct from intending to commit an act that is in fact unlawful.  <u>See, e.g.</u>, <u>United States v. Khalife</u>, 106 F.3d 1300, 1303 (6th Cir. 1997); <u>United States v. Adames</u>, 878 F.2d 1374, 1377 (11th Cir. 1989).  So the question is whether Defendants reached an agreement to unlawfully detain the bus, regardless of whether they knew that conduct to be unlawful. There is evidence in the record from which a jury could conclude that this happened.  Summary judgment is therefore denied as to Plaintiffs' claim that Defendants conspired to convert Bus 203.[23]

Finally, there is the conspiracy as between Schulze and Calorel based on the conduct discussed with respect to the § 1983 and NJCRA claims.  Grotz's testimony is sufficient to create a genuine dispute of material fact regarding whether Schulze and Calorel colluded to carry out a scheme to target minority buses. As related above, Grotz testified that the inspectors, including Schulze and Calorel, would talk about the discriminatory targeting "[j]ust about every time" Grotz was in the office, and that it was "the highlight of the days."  (Grotz Dep. 50:6-15.) Additionally, Schulze would tell the inspectors to be on the

---

[23]   As explained at greater length below with respect to indemnity, it is not clear whether the relationship between Restuccio and Calorel is properly described as principal-agent, as one between co-conspirators, or both.  But since the evidence at present does not resolve which legal characterization is appropriate (and since the parties have not yet argued the issue), the claim proceeds.

lookout for church buses especially, since there were a lot of "minority church buses." (Grotz Dep. 51:10-17.)  If this testimony is both believed and interpreted the way Plaintiffs interpret it, it is precisely the kind of agreement or collusion sufficient to prove a conspiracy claim.

In sum, Plaintiffs adduce evidence that Defendants conspired to impound Bus 203 because of racial animosity toward Charles Major, and that Schulze and Calorel conspired to selectively target Plaintiffs' buses on the basis of race.  Thus, Defendants are not entitled to summary judgment on these § 1985(3) and civil conspiracy claims.  Defendants are entitled to partial summary judgment as to claims of a conspiracy to force Bus 203, or buses generally, to use Jimmy's Garage, which fails for lack of admissible evidence.

## VII.  NJCRA CLAIMS

### A.  Due process

The Court previously dismissed Plaintiffs' federal procedural and substantive due process claims for lack of specificity and failure to state a claim under the relevant law, respectively.  Major Tours, Inc. v. Colorel, 720 F. Supp. 2d 587, 607-08 (D.N.J. 2010).  But an NJCRA due process claim remains.[24]

---

[24]   Although the parties and the Court had treated the NJCRA procedural due process claim as identical to the federal

The Fourth Amended Complaint brings the claim pursuant to N.J. Stat. Ann. § 10:6-2(c) and (e) stating that "By the foregoing acts, Defendants have deprived Plaintiffs of their property without due process of law, without just cause, and without providing any right to a hearing."

As with their federal procedural due process claims, it is impossible to identify whether Plaintiffs are talking about the ticketing of their buses, the impound, the charges for towing, all of these things, or none of these things.  In any case, N.J. Stat. Ann. § 10:6-2 protects invasions of substantive due process, not procedural due process.  The NJCRA was specifically amended to limit the legislation's scope to substantive due process.  New Jersey Assembly Floor Statement, A.B. 2073, 6/24/2004.  So regardless of what the claim refers to, it is meritless on its face since a procedural due process claim cannot be brought under the NJCRA.

Plaintiffs attempt to resolve the contradiction between the Complaint's statement of a procedural due process claim and the scope of the NJCRA in inconsistent ways.  In Plaintiffs' opposition to the Garage Defendants' motion, they characterize it consistently with the pleadings but inconsistently with the NJCRA as a claim involving procedural due process.  In their opposition

_____

    claim, the Court did not specifically dismiss the NJCRA
    procedural due process claim.

to the State Defendants' motion, they characterize the claim inconsistently with the pleadings as a claim for substantive due process but consistently with the scope of the NJCRA.  However it is characterized, the claim is meritless.  Either it is a procedural due process claim, and therefore cannot be brought under the NJCRA.  Or, alternatively, it is a substantive due process claim, and therefore in direct contradiction with the Fourth Amended Complaint.[25]  Defendants are therefore entitled to summary judgment on this claim.

### B.  Criminal prohibitions

Plaintiffs contend that the State Defendants targeting of their buses violated various criminal statutes related to police racial profiling and official misconduct, giving rise to a claim under the NJCRA independent from the equal protection claims. The State Defendants move for summary judgment as to this claim, arguing that a civil plaintiff cannot bring a criminal prosecution.  That argument is irrelevant to the legal theory underlying this claim, which is that the NJCRA's language "any substantive rights, privileges or immunities secured by the  . . . laws of this State" includes criminal statutes designed to

---

[25]   Additionally, even in this newly asserted version of the claim, Plaintiffs never identify a substantive due process right that was interfered with; instead, they appear to regard the claim as being duplicative of their equal protection claim.

protect the individual bringing suit under the NJCRA.  Since the only argument made as to this claim is irrelevant, the State Defendants have not shown themselves to be entitled to summary judgment as a matter of law.


### C.  Equal Protection

As previously explained, Plaintiffs' NJCRA equal protection claim against the State Defendants will proceed.  However, Plaintiffs also appear to bring the claim against the Garage Defendants.[26]  The Garage Defendants contend that, in addition to their arguments discussed above with respect to § 1981 liability, they are also not state actors and therefore cannot be held liable under the NJCRA.

Assuming for the sake of argument that the NJCRA's private right of action is limited to claims against state actors, see Cottrell v. Zagami, LLC Civil Action No. 08-3340, 2010 WL 2652229, at *4 (D.N.J. June 23, 2010), the Garage Defendants would still not be entitled to summary judgment because there are disputed facts with respect to whether they were state actors to the extent they were "willful participant[s] in joint activity

---

[26]   The Fourth Amended Complaint generally states "By the foregoing acts, Defendants have denied plaintiffs the enjoyment of their rights and discriminated against them on account of their race, treating them more harshly than similarly-situated white bus operators."  (Fourth Am. Compl. ¶ 69.)

with the State or its agents." Harvey v. Plains Tp. Police
Dept., 421 F.3d 185, 195 (3d Cir. 2005) (citing United States v.
Price, 383 U.S. 787, 794 (1966)).

Since the same evidence that Plaintiffs adduced to support
the § 1981 claim would also support an Equal Protection claim
against the Garage Defendants, the Garage Defendants have not
shown themselves to be entitled to summary judgment.

## VIII.   CROSS-CLAIMS OF GARAGE DEFENDANTS

### A.  Cross-claim I

The Garage Defendants contend that they are entitled to
common law indemnification from the State Defendants for
withholding Bus 203 from Charles Major because they acted in good
faith pursuant to the direction of Defendant Calorel.  The cross-
claim does not specify in what capacity Calorel is being sued.
The State Defendants move for summary judgment as to this claim,
maintaining that it is barred by the Contractual Liability Act
and by a failure to provide notice under the Tort Claims Act.[27]
The Garage Defendants cross-move for summary judgment.  As
explained below, neither party is entitled to summary judgment.

Indemnification is a claim brought by a party who is
secondarily liable for the wrong committed by another because of

---

[27]   They also raise new arguments in their reply which the Court
       will not consider because they are procedurally improper.

the operation of some contract, or by operation of the law because of the relationship between the parties.  Dickinson v. Magargal, Civ. A. No. 91-CV-4533, 1993 WL 391328, at *3-4 (D.N.J. Sept. 28, 1993) (citing Ruvolo v. United States Steel Corp., 336 A.2d 508, 510 (N.J. Super. Ct. L. Div. 1975)).[28]  Because the Garage Defendants assert indemnity arising solely from the relationship between the parties instead of on the basis of contract, the Contractual Liability Act, N.J. Stat. Ann. § 59:13-3, does not apply.

Typically, indemnity by reason of a special relationship requires an agent to reimburse his principal who has paid damages to a third person injured by the unauthorized tort of the agent.  See Ramos v. Browning Ferris Industries, 103 N.J. 177, 189 (1986) (holding that indemnification applies to principal and agent but not vendor and vendee).  However, this type of indemnity can also apply in reverse, as it were, such that a principal must indemnify the tort-committing agent, when the agent acts in accordance with the principal's directions, so long as the agent

---

[28]   Contribution, by contrast, "is the right of one tortfeasor to recover from another tortfeasor when both are liable to a victim and one has paid more than his or her equitable share of the common liability."  In re Cendant Corp. Sec. Litig., 139 F. Supp. 2d 585, 594 (D.N.J. 2001) (citing Restatement (Second) Torts § 886A (1979)).  While both the cross-claim and the briefs use the word "contribution," both sides actually only address indemnity, saying nothing about how damages should be distributed in the scenario in which both parties are found to be joint tortfeasors.

acted in good faith relying upon the lawfulness of the direction. Id. ("[O]ne who in good faith and at the direction of another commits a tort is allowed indemnity against the person who caused him to act."); In re Sunrise Securities Litigation, 793 F. Supp. 1306, 1317 (E.D. Pa. 1992) ("Indemnity also may be allowed . . . where he acted pursuant to directions of the indemnitor which the indemnitee reasonably believed to be lawful."); see also Restatement (First) of Restitution § 90 (1937).  The paradigm case of such reverse indemnity is when an agent is ordered to seize some chattel by a principal who falsely represents that the seizure is lawful.  Restatement (First) of Restitution § 90 (1937).

The Tort Claims Act prohibits a suit against a public entity unless the entity is given notice of the claim "not later than the ninetieth day after accrual of the cause of action." N.J. Stat. Ann. § 59:8-8.  However, the Tort Claims Act notice requirements do not bar claims for indemnity, because they are not said to have accrued until the plaintiff recovers a judgment. See S.P. v. Collier High School, 725 A.2d 1142, 1154 (N.J. Super. Ct. App. Div. 1999).  Thus, the State Defendants' arguments for summary judgment on these claims are meritless.

But the Garage Defendants have also not demonstrated that they are entitled to judgment as a matter of law.  Whether they will be indemnified by Calorel depends on two issues:  the nature

61

of Restuccio and Calorel's relationship and whether the impound order was the cause of the detention (as distinct from Restuccio's mistaken belief that he had a lien).  On the factual record as presented for this motion, a reasonable jury could find that Restuccio was an agent of Calorel, a co-conspirator of Calorel, or merely a vendor whom Calorel employed.  The record evidence also admits of the reasonable interpretation in either direction with respect to whether Calorel's direction caused Bus 203 to be detained beyond January 8, 2004, since there are few facts about what precisely happened on that day with respect to Major's offer of reasonable payment.

Finally, no judgment has been awarded on any of Plaintiffs' claims, so while this claim for indemnity may be appropriately commenced even though it is not yet technically ripe, final judgment cannot be awarded until the underlying liability has been established.  See Hatco Corp. v. W.R. Grace & Co. Conn., 59 F.3d 400, 406 n.3 (3d Cir. 1995) ("Although a claim for indemnity does not arise until the prime obligation to pay has been established, some third-party actions may be commenced in the interest of judicial economy before they are technically ripe.").

**B.  Cross-claim II**

This cross-claim asserts no legal basis for the State to be obligated to pay the towing and storage fees, nor does the brief supporting it.  The Garage Defendants' opposition brief discusses

only indemnification, which applies only to the shifting of liability imposed by Plaintiffs' legal action, and does not provide a basis for an independent action against the State Defendants to recover for the cost of towing and storing Bus 203. The State Defendants are entitled to summary judgment on this basis alone, since the Garage Defendants fail to assert any relevant legal theory to support this cross-claim.

The State Defendants, perhaps out of an abundance of caution, address the claim as one for implied contract. The Court agrees that even if the cross-claim adequately pleads a claim for implied contract, the State Defendants would be entitled to summary judgment on that claim because "where a public official requests services but lacks substantive or procedural authority to contract expressly for them, the provider of those services cannot reasonably infer an intent to pay for them." Saint Barnabas Medical Center v. Essex County, 543 A.2d 34, 40 (N.J. 1988). The Court is not aware of any authority empowering Calorel to enter a contract on behalf of the state, and therefore there can be no contract implied-in-fact. While Saint Barnabas goes on to note that "recovery may be had based on quasi-contract, or a contract implied-in-law," the Contractual Liability Act, N.J. Stat. Ann. § 59:13-3, forecloses liability from being imposed upon the State for contracts implied-in-law.

Consequently, the Garage Defendants cannot recover from the State on this cross-claim.[29]


## IX.  EXPERTS

### A.  McCombs

Dr. Guy McCombs, Ed.D., is the President of a marketing and communications firm, who previously served as an adjunct professor of Graduate Statistics.  He is an expert on survey design, and was asked by the State Defendants to examine the Motor Vehicle Commission data on inspections.  To aid him in this endeavor, he conducted a survey to determine information about the race of bus owners to supplement the database information, since data on the race of bus owners is not in the inspection database.

Dr. McCombs described various statistical calculations based on a data set he constructed as a sub-set of the Motor Vehicle Commission data on inspections.  Specifically, he identified nine

---

[29]    The second cross-claim also does not state whether it is brought against Calorel in his individual capacity in addition to being brought against Calorel and Schulze in their official capacities.  But even if the Court assumes the claim to also be brought against Calorel in his individual capacity, Calorel may not be held liable since there is no allegation that he engaged the services of Restuccio for his personal benefit.  Especially in light of the fact that the Garage Defendants make no effort to identify legal authority for holding Calorel (or the State) liable independent of derivative liability from Plaintiffs' claims, the Court is satisfied that the State Defendants are entitled to summary judgment on this cross-claim.

companies that he considered to be similarly-situated to
Plaintiffs:  five minority-owned and four white-owned companies.
From this constructed sample, he calculated the means and
standard deviations for various inspection-related variables, and
determined how far from the mean Plaintiffs were.  One measure of
this is called a z-score, which is the sole basis for the
statistical conclusions of his initial report.[30]  A z-score is a
measure of how likely it is to achieve a given data point by
random chance assuming a normal distribution, which looks at how
far the data point is from the mean of a sample.  McCombs found
that the z-scores for Plaintiffs' relevant data points were all
within the area around the mean generally considered to be
attributable to random chance.

     Dr. McCombs's report makes two mutually compounding errors
that fundamentally undermine the reliability of his method, and
these errors were not addressed in his subsequent attempt to
supplement and correct the report.  These errors make his
conclusions unreliable, and so his report and testimony will be
excluded.

     First, Dr. McCombs's definition of similarly-situated
companies is incorrect as a matter of law.  He compared
Plaintiffs to other companies that had widely differing numbers

---

[30]     In his supplemental report, he also included a so-called
         ANOVA (a measure comparing the means of different groups).

of trips to Atlantic City than Plaintiffs (he included companies making hundreds of trips per year as well as companies making tens of trips per year).  (Pls.' Docket Item 354 Ex. B ("McCombs Report") ¶ 66.)  For the purposes of determining whether there is a racial disparity in rates of inspection, it is necessary to compare buses based on how often they could have been selected for inspection, which is based on how many trips they took.  The sample was also flawed in that it only included bus companies that had been through the inspection process in Atlantic City, omitting buses that traveled to Atlantic City but were not selected for inspection, and thereby artificially inflating the mean number of inspections.

Without knowing how the studied companies' number of trips compared, and without knowing how many companies with zero inspections should have been included in the comparison, McCombs's data on number of inspections is both misleading and useless to a trier of fact seeking to determine whether Plaintiffs were subject to disparate treatment as that term is used in the law.  McCombs initially failed to recognize why this might be a problem, testifying that it "is not necessary to know the number of trips to make the decision based upon one group having a disproportionate number of inspections compared to another."  (Pls.' Docket Item 354 Ex. E ("McCombs July 21, 2010 Dep.") at 65:7-16.)  The State Defendants, apparently realizing

that this logic is flawed, now reply that the error is limited to McCombs's analysis of rates of inspection, since the other variables are independent of number of trips.  That the error is confined to McCombs's analysis of the disparity in inspections is quite possibly true (though taking a large number of trips may contribute to the condition of buses), but since differential treatment in selection is the primary matter in dispute, it is hardly a saving argument.

Second, Dr. McCombs calculated the mean and standard deviation of his selected group of purportedly similarly-situated buses using the data from all the studied companies.  This included Plaintiffs (who were six of the fifteen studied) and other minority-owned companies, in addition to the aforementioned companies that had many more trips to Atlantic City than Plaintiffs.[31]  The mean number of inspections being used for the z-score and ANOVA analysis was 15.67, and the standard deviation was 13.18.  Consequently, for example, RAC Tours's 20 total inspections was within one standard deviation from the mean, well within the margin that random chance can explain — even though it

---

[31]   McCombs's initial report miscalculated these scores by inadvertantly inputting Major Tours's number of inspections instead of the standard deviation of the sample standard deviation in the denominator.  Although the supplemental report correct this error, it does not change the method McCombs used to calculate the z-scores.

is double the number of inspections of three white-owned companies.

The mean of the sample was so high and the standard deviation so large only because the sample included Plaintiffs and two bus companies with many more trips to Atlantic City, one of which was minority-owned. These z-scores and ANOVA analysis based on a similar method simply do not tell the fact-finder anything useful about how Plaintiffs' experience compared to the experience of similarly-situated white-owned bus companies. Unlike the first error being limited to the analysis of inspection rates, this error clouds all of McCombs's conclusions.

Finally, McCombs's opinion that the age of Plaintiffs' buses might explain any disparity is not an expert opinion. He admits he has no specialized knowledge from which to make that assertion, and that he did not even test to see if age of the buses was correlated with any of the other inspection variables. (Pls.' Docket Item 354 Ex. F ("McCombs July 22, 2010 Dep.") at 33:12-20.) Fedorczyk v. Caribbean Cruise Lines, Ltd., 82 F.3d 69, 75 (3d Cir. 1996) ("[I]f an expert opinion is based upon speculation or conjecture, it may be stricken.").

**B. Levinson**

The Tinari Economics Group was hired by Plaintiffs to make an expert estimate of their damages from the Friday inspections.

Dr. Stephen Levinson, in cooperation with Dr. Tinari, authored reports for each Plaintiff making such estimates. (State Defs.' Docket Item 356 Exs. 2-8.) Determination of the admissibility of Dr. Levinson's testimony and report is premature, for several reasons.

Levinson's report does not distinguish between damages resulting from those inspections inside and outside the statute of limitations (and, indeed, focuses solely on Friday night inspections, the majority of which are outside the statute of limitations);[32] he combines damages for claims that have been herein rejected with those claims that survive (i.e., damages from forced towing); and he assumes that Schulze and Calorel will be held responsible for every inspection, even though the scope of their liability is yet to be resolved.

Levinson stated it would be improper to apply his analysis to any other day or night of the week because Friday nights were more lucrative. (State Defs.' Docket Item 356 Ex. 9 ("Levinson June 9, 2010 Dep.") at 58:17-20.) Consequently, it is not clear at this time precisely how or whether this report will be introduced into evidence, and what opinions Levinson might offer

---

[32]  Major had no Friday inspections inside the statutory period; CMT had one out of seven within the statutory period; JAMM had five out of ten within the statutory period; RAC had eleven out of sixteen in the statutory period; JW Auto had fourteen out of seventeen; and M & M Tours had only two overall, both within the statutory period.

at trial.  Certainly, if Plaintiffs intend to use Levinson's report, it will have to be substantially amended to account for the changes in Plaintiffs' legal position.  At the moment, no party has sought to introduce Levinson's report or refer to it in support of or in opposition to summary judgment.  Therefore, the Court finds that it is premature to assess which of Levinson's conclusions are reliable and admissible.

This motion will therefore be dismissed without prejudice to the filing of a motion in limine if and when Plaintiffs seek to introduce part of Levinson's report or testimony.


**C.  Tinari**

Dr. Tinari was asked to opine about the economic losses suffered by Major Tours, Inc. as a consequence of the impounding of Bus 203.  Tinari's short report of October 7, 2008 consists of an examination of "trip sheets" for the period from December 1, 2002 through November 30, 2003.  (Garage Defs.' Docket Item 355 Ex. 1 ("Tinari Report") 5.)  No party has attached these sheets, which appear to contain information about individual charter trips, but Tinari describes them as containing information about "the scheduled trips, number of buses, trip charge, and payment dates for bus 203."  (Tinari Report 5.)  Tinari calculated that Major Tours received $105,531 in revenue from the operation of Bus 203.  (Tinari Report 6.)  Tinari then

70

estimated that the money saved by not operating the bus was 57.4% of revenues, based on Major Tours financial documents. (Tinari Report 8.) Then Tinari projected this annual revenue through the period of the impoundment, resulting in projected lost profits of $113,340.[33]

Unfortunately, Dr. Tinari was not presented with an accurate statement of Major Tours, Inc.'s business structure in 2003. According to Charles Major, "Beginning in January 2003 and continuing to December 6, 2003, the date that Bus 203 was impounded, it was being operated by M & M Tours . . . pursuant to a lease agreement of $1,545 per month." (Garage Defs.' Docket Item 355 Ex. 2 ("Major Oct. 6 2008 Aff.".)  When asked why he attributed income from the bus to Major Tours instead of the income from the lease, he replied that he mistakenly assumed the revenue went to them. (Garage Defs.' Docket Item 355 Ex. 5 ("Tinari June 29, 2010 Dep.") 10:2-7.)

Tinari admitted in his deposition that, based on what he now knows, much of his report was erroneous. When asked "How do you square your report of $103,000.00 in income from bus 203 alone if the total income for -- gross income for Major Tours in 2003 was $86,OOO.OO?" to which he responded, "Well, you have 2002 showing

---

[33]    Tinari also observed, without offering any expert opinion, that based on Mr. Major's estimate of the worth of the bus if it had been properly maintained, it was sold at a reduced price because it had not been properly maintained while stored for two years. (Tinari Report 9.)

Major Tours operated all its busses and had revenues and expenses.  And in 2003 when -- which I did not have -- there was apparently a substantial shift of the way they operated the business." (Tinari Dep. 21:4-12.)  He admitted that he would write a different report given the new information.  (Tinari Dep. 28:2-6.)

Plaintiffs now argue that Dr. Tinari relied on the proper facts because he was assessing a hypothetical based on there having been no change in Major's business model, since they reason that leasing the bus to M & M Tours was a consequence of the State Defendants' racial profiling.  They submit a supplemental affidavit of Tinari stating that his entire analysis of damages assumes that it was Defendants' conduct that forced Major Tours to alter its business structure, and explains that he was therefore analyzing a hypothetical set of facts in which Major Tours continued to operate exactly as it had in 2003. (Pls.' Docket Item 390 Ex. D-2 ("Tinari Sept. 28, 2010 Aff.") ¶¶ 10-13.)[34]

---

[34]   Plaintiffs also state in passing that the report could still be used as a baseline to construct the profit lost by M & M Tours.  But M & M Tours did not bring this conversion claim. (Fourth Am. Compl. ¶ 79 ("Defendant Jimmy's did unlawfully deprive Plaintiffs Major and Major Tours of their property . . . thus permanently depriving Plaintiff of the use and control of his vehicle until released by court order."). And, in any case, there is no information in the record about how M & M Tours business compared to Major Tours.

Rule 702 of the Federal Rules of Evidence "demands that the expert testimony assist the trier of fact," and so the Court must ensure that "the research is sufficiently connected to the facts and issues presented in a given case." Suter v. General Acc. Ins. Co. of America, 424 F. Supp. 2d 781, 787 (D.N.J. 2006) (citing In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 743 (3d Cir. 1994)).

The problem here is not that Tinari relied on a partial picture of the data — that kind of problem goes to weight more than admissibility. The problem is that the facts Tinari did rely on are wholly inapplicable to the actual undisputed facts of this case. Even if his opinion as to the hypothetical facts could potentially be appropriate, Plaintiffs have adduced no evidence that Major leased the bus to M & M Tours as a consequence of any particular conduct, much less conduct for which Restuccio is potentially responsible. Indeed, Plaintiffs' counsel contradict even their own argument, elsewhere in the briefing on this motion having argued that the act of leasing the bus to M & M Tours was evidence that Major did not know about the discriminatory conduct of Defendants. (Pls.' Br. Opp. State Defs.' Mot. for Summ. J. 7 n.2.) Therefore, a hypothetical projection from 2002 to ascertain Major's "but-for" losses without considering the changes to his business model after January 2003 is of no use to a fact-finder now in determining the

73

potential damages.  The report and testimony will therefore be stricken.[35]


## X.   MOTION TO SEAL

Plaintiffs move to seal certain documents relating to the Taylor investigation, asserting that no brief or certification is necessary because the documents were stamped confidential by someone.  [Docket Item 394.]  When a party does not identify a statute requiring that documents be kept confidential, L. Civ. R. 5.3 requires that a motion to seal describe (a) the nature of the materials or proceedings at issue; (b) the legitimate private or public interest which warrant the relief sought; (c) the clearly defined and serious injury that would result if the relief sought is not granted; and (d) why a less restrictive alternative to the relief sought is not available.  Thus, under the Local Civil Rules of this Court, observing without a brief or certification that a document has been stamped confidential is insufficient to warrant a sealing order.  See L. Civ. R. 5.3(c).  The documents will remain sealed until a renewed motion in compliance with L.

---

[35]   It is questionable whether this report would even be admissible if it had not been revealed that it relied on incorrect assumptions.  The expert performed nothing more than a clerical function, adding up expenses and subtracting costs based on financial documents.  Dr. Tinari does not appear to have used his expertise to add anything to the analysis.  The jury could do this equally as well, so his testimony would not be helpful to them, as required by Rule 702.

Civ. R. 5.3(c) is decided or, if no renewed motion is filed, for 30 days.

**XI.   CONCLUSION**

A small number of the many unresolved issues in this case are appropriately resolved on these summary judgment motions. The State Defendants correctly argue that New Jersey's statute of limitations will constrain the period of actionable conduct to the two years preceding the filing of the initial complaint for Major and Daniels, and for the two years preceding the amended complaint for the remaining Plaintiffs.  The State Defendants also correctly argue that Plaintiffs have not adduced sufficient evidence of racially discriminatory fabrication of violations or refusal to permit buses to be repaired on site or towed to a facility of the owner's choosing.  The State Defendants are also entitled to partial summary judgment as to the claims of conspiracy regarding the forced towing.  The State Defendants are also entitled to partial summary judgment on the NJCRA due process claim.  Finally, the Court has also found that the State Defendants are entitled to summary judgment as to the Garage Defendants' second cross-claim.

The Court can also appropriately resolve some of the claims against the Garage Defendants' on their motion.  To the extent Plaintiffs' § 1981 claim rests on the theory that Bus 203 was

discriminatorily towed to Jimmy's Lakeside Garage, the Garage
Defendants are entitled to judgment on that claim.  They are also
entitled to summary judgment on some aspects of the conspiracy
claims, including the claim that they entered a conspiracy to
force Bus 203, or buses generally, to use Jimmy's Garage (and to
discriminate against black-owned buses in the inspection process,
to the extent Plaintiffs ever intended to bring such a claim
against the Garage Defendants).  Finally, the Garage Defendants
are entitled to partial summary judgment as to Plaintiffs' NJCRA
due process claim.

        The Court has also ruled on the admissibility of the expert
testimony produced by the parties.  The testimony of Dr. Guy
McCombs is entirely based on an incorrect legal analysis of who
constituted a similarly-situated party in this case, among other
errors.  It will be excluded.  Dr. Tinari's report regarding the
economic cost of impounding Bus 203 will also be excluded because
there is no basis for his admittedly essential assumption that
the lease agreement between Major Tours, Inc. and M & M Tours was
a result of Defendants' conduct.  Finally, the Court will
withhold judgment on the admissibility of Dr. Levinson's report
and testimony, as it will have to be substantially altered if it
is to be used in this case, and no part of it has been
introduced.

76

Unfortunately, after six years of litigation and 2,000-plus pages of evidence and argument for this set of motions alone, and as occasionally noted within this Opinion, the parties have whistled past numerous complex issues in this case.  The Court can only address the arguments it is given for the positions taken by each party, and it has done so in today's Opinion to the maximum extent possible given the record in this case. Ultimately, an orderly and fair trial will require the parties to stake out clear positions, and clear, concise presentations of evidence on the remaining claims, on each of the critical issues in this case.

It is incumbent on the parties to now apply the requisite diligence to identifying the remaining essential issues in this case and to lay them out as discrete triable questions of fact informed by clear theories of law with respect to the well-defined liability Plaintiffs seek to establish as to each Defendant.  Plaintiffs have received the benefit of burdens having been placed on Defendants for the purposes of most of the motions addressed in today's Opinion, but that is not a benefit they will enjoy at trial.  Although there are a number of issues the parties need to bring into clearer focus, the following two are of the utmost importance:  Plaintiffs must expound upon (or craft) a clear legal theory for the precise scope of the State Defendants' liability, and for the scope of the damages that can

be legally attributed to that liability.[36]  Defendants must make

clear statements on their respective positions as to how to

characterize their legal relationships to each other.[37]

    The accompanying Order will be entered.


  **June 29, 2011**                   **s/ Jerome B. Simandle**
Date                                JEROME B. SIMANDLE
                                United States District Judge

---

[36]    Are repairs of actual violations compensable?  Are damages from subsequent stops based on poor safety scores, if any, compensable?  How will a jury determine which stops were caused by the conduct of Schulze or Calorel?  How can the damages from conduct outside the statute of limitations be disentangled from damages flowing from actionable conduct?  These and many more questions must be resolved before trial.

[37]    Was Restuccio acting as an agent of Calorel, or merely a vendor, according to each side?  Was he a willful participant, or was he acting under the official orders of Calorel?